UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  21-CR-20123-BLOOM

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

EMRAAN ALI,

   Defendant.

_____/

## MOTION TO SUPPRESS STATEMENTS MADE ON AUGUST 7th AND 8th, 2019

## FACTS:

Emraan Ali is a dual citizen of Trinidad and Tobago and the United States who is charged by Superseding Indictment with Conspiring to Provide Material Support to ISIS and Providing Material Support to ISIS from March 2015 through March 2019, in violation of 18 U.S.C. § 2339B(a)(1); and Receipt of Military-Type Training from ISIS in violation of 18 U.S.C. § 2339D. Mr. Ali made his first appearance in the District on September 30, 2020, after being transported from Syria to Miami on a US transport flight accompanied by two FBI Agents.

## BACKGROUND OF THE SYRIAN WAR

I.   Conflict and Civil War

Syria has predominantly been an Islamic country, with a majority of the population identifying as Sunni Muslims.[1] Sunni Muslims is a branch of Islam and is practiced by 85-90%

---

[1] *See Syrian Culture*, Cultural Atlas, https://culturalatlas.sbs.com.au/syrian-culture/syrian-culture-religion (last visited July 29, 2022).

1

of the worlds Muslims. However, for almost fifty years, the minority Alawite community has held political dominance in the country.[2] Alawite political dominance began in November 1970, when Hafez al-Assad seized control of Syria, leading to his presidency in 1971 that lasted until he died in 2000.[3]  Hafez al-Assad's successor and son, Bashar al-Assad, was ushered into power hours after his father's death after the legislature approved a constitutional amendment lowering the minimum age of the president from forty to thirty-four, Bashar's age at the time.[4] Assad largely continued and followed his father's authoritarian regime, using threats of violence and arrests to extinguish pro-reform activism.[5]

In response to a decade's worth of broken political promises by Bashar Al-Assad's administration[6] and inspired by protests erupting throughout the Middle East and North Africa, Syrian citizens led peaceful demonstrations, covering public walls with anti-regime graffiti.[7] Fourteen year-old Naief Abazid and twenty-two other teenagers were arrested and tortured for their acts of protest, provoking non-violent protests led by pro-democracy groups to occur across

---

[2] *See id.*

[3]  *See* The Editors of Encyclopedia Britannica, *Hafez al-Asad*, Encyclopedia Britannica, https://www.britannica.com/biography/Hafiz-al-Assad (last visited August 1st, 2022).

[4] *Id.*

[5] *Id.*

[6] Zachary Laub, *Syria's Civil War: The Descent into Horror*, Council on Foreign Rels. (Mar. 17, 2021), https://www.cfr.org/article/syrias-civil-war (last visited August 1, 2022).

[7] Kali Robinson & Will Merrow, *The Arab Spring at Ten Years: What's the Legacy of the Uprisings?*, Council on Foreign Rels. (Dec. 3, 2020 9:00 AM), https://www.cfr.org/article/arab-spring-ten-years-whats-legacy-uprisings (last visited August 1, 2022) ("In 2010 and 2011 protests in the Middle east and Northern Africa began, also referred to as the Arab Spring. The protesting began in December of 2010, where a Tunisian street vendor Mohamed Bouazizi set himself on fire in protest outside a government office. This set off a chain reaction of protests and destabilized most of the region, more specifically set off post-uprising civil wars in Libya, Syria, and Yemen").

2

Syria.[8] In a disproportionate response on April 2011, President Assad unleashed full military firepower on protestors in Daraa for two weeks, resulting in the murder of dozens.[9]

In July 2011, defectors from Assad's military and security forces announced the formation of the Free Syrian Army (FSA), a coalition formed to defend against the brutal conduct of the Syrian government.[10] Foreign countries, including strong US allies, funded and armed opposition groups.[11] FSA militias sometimes had competing interests, and at times preyed on the very populations they were charged with protecting.[12] As a result, rival coalitions began proliferating and FSA fighters drifted to Islamist brigades that faired greater successes against the Assad regime due to their funding and arms from Gulf donors.[13]

By June 2012, the conflict in Syria had escalated to a full-scale civil war.[14] In November 2012, rebel forces announced the formation of the National Coalition for Syrian Revolutionary and Opposition Forces, which received recognition from dozens of countries, including the United States, as the representatives of the Syrian people.[15] Despite divisions and rivalries within

---

[8] Kareem Fahim & Hwaida Saad, *A Faceless Teenage Refugee Who Helped Ignite Syria's War*, N.Y. Times, Feb. 8, 2013, https://www.nytimes.com/2013/02/09/world/middleeast/a-faceless-teenage-refugee-who-helped-ignite-syrias-war.html.  ("The government, nervous as leaders were being toppled around the Arab world, reacted furiously to the slight, arresting the teenager and more than a dozen other boys and then torturing them for weeks"); Dave Burke, *The boy whose graffiti changed the world*, Daily Mail (Mar. 14, 2017), https://www.dailymail.co.uk/news/article-4312502/The-boy-anti-Assad-graffiti-changed-world.html (last visited Aug. 10, 2022).

[9] Burke, *supra* note 8.

[10] Laub, *supra* note 6.

[11] Louise Arimatsu & Mohbuba Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and Libya*, Chatham House, 1, 7–9 (2014) https://www.chathamhouse.org/sites/default/files/home/chatham/public_html/sites/default/files/20140300ClassificationConflictsArimatsuChoudhury1.pdf.

[12] Laub, *supra* note 6.

[13] *Id.*

[14] *Syria in state of war, says Bashar al-Assad*, BBC News (June 27, 2012), https://www.bbc.com/news/world-middle-east-18598533 (last visited Aug. 10, 2022).

[15] Mark Lander, Michael R. Gordon, Anne Barnard, *U.S. Will Grant Recognition to Syrian Rebels, Obama Says*, N.Y. Times (Dec. 11, 2012), http://nyti.ms/2mOHJYL; The Editors of Encyclopedia Britannica, *Syrian Civil War*, Encyclopedia Britannica https://www.britannica.com/event/Syrian-Civil-War/Civil-war (last visited Aug. 10, 2022).

the Coalition, rebels saw a string of successes, seizing key cities in the north and east, including eastern Aleppo, Syria's largest city.[16] By 2013, both rebel and government forces came to a military stalemate, depleting in resources and traction as the civilian death toll continued to rise.[17] Seeing the state of Syria at the time, international allies of both parties(?) became involved.[18]

### A.  War as a Breeding Ground for Islamist Factions

The Assad regime's violence was exploited by al-Qaeda militants eager to capitalize on Syria's chaos.[19] Under the guise of leading a jihad, or spiritual fight, against the regime, the Syrian franchise of al-Qaeda, Jabhat al-Nusra, called Sunnis from around the region to Syria. Jabhat al-Nusra was one of the more successful opposition groups, thus gaining a large amount of Syrian and foreign recruits. In Iraq, the Islamic State emerged from the remnants of al -Qaeda in Iraq. The organization faded into obscurity in 2007 until it re-emerged in 2011 under the leadership of Abu-Bakr al-Baghdadi.[20] Al-Baghdadi declared he would combine the forces in Iraq and Syria to create the Islamic State of Iraq and the Levante. Evidently, al-Baghdadi intended for Jabhat al-Nusra to join the new group under his command, however al-Nusra

---

[16] *See* Lander, *supra* note 15.

[17] *Id.*

[18] *Id.* (Efforts by Turkey, Saudi Arabia, and Qatar to fund and arm rebels became increasingly public in late 2012 and 2013. The United States, which had been reluctant to send weapons for fear of inadvertently arming radical jihadists who would someday turn against the West, eventually started a modest program to train and equip a few vetted rebel groups. The Syrian government continued to receive weapons from Iran and the Lebanese militant group Hezbollah. By late 2012 Hezbollah had also begun sending its own fighters into Syria to battle the rebels.)

[19] Laub, *supra* note 6.

[20] Cameron Glenn, Mattisan Rowan, John Caves, & Garrett Nada, *Timeline: the Rise, Spread, and Fall of the Islamic State*, Wilson Ctr. (Oct. 28, 2019) https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state (last visited July 29, 2022).

rejected the merger.[21] The rejection led to fighting between the two Islamist factions, where ISIL came out on top, seizing the city of al-Raqqa by January 2014.[22]

ISIL (a.k.a. ISIS) continued to expand throughout Syria, fighting the government, rebel forces, and the Kurdish peshmerga (military)[23] in the process. In June 2014, the group, now renamed the Islamic State (IS) declared a caliphate (religious state), with their capital in the city of Raqqa.[24] The Islamic State peaked in size in late 2014, controlling 100,000 square kilometers or 38,610 square miles of territory in northern Syria and Iraq, which was home to over eleven million people.[25] The organization benefited from the Assad regime's use of IS to create a two-front war and willingness to purchase oil from the Islamic State's territories.[26] Turkey and the Free Syrian Army also acquired oil from IS, implicitly funding the organization.[27]

In 2014, the Islamic State also developed its media center, which regularly published the organization's widely read publication called *Dabiq* in Arabic, English, French and German.[28] The publication focused on sophisticated and visually pleasing materials of cities under IS control.[29] *Dabiq* portrayed romanticized images of the caliphate and the idea of an Islamic

---

[21] Basma Atassi, *Qaeda chief annuls Syrian-Iraqi jihad merger*, Al Jazeera America (June 9, 2013), https://www.aljazeera.com/news/2013/6/9/qaeda-chief-annuls-syrian-iraqi-jihad-merger.

[22] *Syria, Anti-Assad Rebel Infighting Leaves 700 Dead, Including Civilians*, Asia News (Jan. 13, 2014) https://www.asianews.it/news-en/Syria,-anti-Assad-rebel-infighting-leaves-700-dead,-including-civilians-30013.html.

[23] *Kurdish Peshmerga*, The Kurdish Project, https://thekurdishproject.org/history-and-culture/kurdish-nationalism/kurdish-peshmerga/ (last visited Aug. 10, 2022).

[24] Michael Pizzi, *In declaring a caliphate, Islamic State draws a line in the sand*, Al Jazeera, (June 30, 2014) http://america.aljazeera.com/articles/2014/6/30/islamic-state-caliphate.html.

[25] Seth G. Jones, *Rolling Back the Islamic State*, RAND Corp., (2017) https://www.rand.org/pubs/research_reports/RR1912.html. xi.

[26] Chapter Seven: Middle East and North Africa, 115:1 The Military Balance 303, 303–62 (Feb. 10, 2015).

[27] Helbast Shekani, *Islamic State sold oil to Syrian regime and Turkey, commander says*, Kurdistan24 (July, 2, 2018) https://www.kurdistan24.net/en/story/16444-EXCLUSIVE:-Islamic-State-sold-oil-to-Syrian-regime-and-Turkey,-commander-says.

[28] Harleen K. Gambhir, *DABIQ: The Strategic Messaging of the Islamic State*, Inst. for the Study of War (Aug. 15, 2014), https://www.understandingwar.org/sites/default/files/Dabiq%20Backgrounder_Harleen%20Final.pdf (last visited August 4th, 2022).

[29] *Id.*

golden age under IS held territories.[30] These curated media tactics depicted Raqqa as a calm place suitable for raising a family oriented around the Islamic faith.[31] Al-Baghdadi called on Muslims to perform hijrah, or emigration, to the Islamic State, a call that was republished in *Dabiq*.[32] Significantly, al-Baghdadi called for non-militant individuals to emigrate to the Islamic State in an effort to repopulate its territory and establish sustainable control.[33]

The second installment of *Dabiq* called for hijrah, telling readers it was not so much a request as it was a requirement for all Muslims.[34] ISIS publicized the benefits of the Islamic State, which included enforcement of property rights, security, aid distribution, and food and goods provided for civilians, particularly in Raqqa and Aleppo.[35] Since the uprisings in Syria in 2011, tens of thousands of individuals have traveled to Syria to join rebel groups.[36] Of those tens of thousands, an estimated 36,500 joined the Islamic State, particularly after 2013.[37] Most of the foreign fighters came from the Arab region, but around 6,600 of the fighters arrived from Western countries. [38]

Trinidad and Tobago had its own ISIS phenomenon with 240 of their citizens moving to ISIS ruled territory. The population of Trinidad and Tobago is 1.3 million with approximately eight percent being Muslim. Trinidad and Tobago had the highest number of immigrants to the

---

[30] Alex P. Schmid, *Challenging the Narrative of the Islamic State,* Int'l Ctr. for Counter-Terrorism-The Hague, June 2015 https://icct.nl/app/uploads/2015/06/ICCT-Schmid-Challenging-the-Narrative-of-the-Islamic-State-June2015.pdf.

[31] *See generally* Gambhir, *supra* note 28.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *How the Islamic State Rose, Fell and Could Rise Again in the Maghreb*, Int'l Crisis Gr. (July 17, 2014), https://www.crisisgroup.org/middle-east-north-africa/north-africa/178-how-islamic-state-rose-fell-and-could-rise-again-maghreb (last visited Aug. 4, 2022.)

[37] *Id.*

[38] *Id.*

Islamic State per capita in the Western world.[39] To further break it down the immigrants were 34% male, 23% female, and 43% minors. Additionally, Trinidad and Tobago topped the list in the Western world for the number of female ISIS migrants and the number of migrant families. [40] Before leaving, many of the Trinidadian migrants expressed their sentiments of moving to ISIS as wanting to live in an Islamic state where God truly rules. They expressed disillusionment with Trinidad, as they saw the culture of the country as sexually permissive, corrupt, and lacking any real value. Within the Trinidad community members who had moved to ISIS posted on Facebook that they had nice cars, jobs, and homes.[41] The Muslim community within Trinidad and Tobago saw ISIS as a safe haven for Muslims where they could follow their religion.

### B.  United States Involvement in Syria

Prior to 2014, the United States had minimal involvement with the conflict in Syria. At the beginning of the Syrian destabilization the United States provided more than $1.3 billion in assistance to counterweight to the influence of the Iranian, Russian, and the Syrian government and imposed sanctions against the Syrian government in 2011. In 2013, the United States increased its involvement by making a deal with Moscow to dismantle Syria's chemical weapons arsenal. Still, the United States was reluctant to send weapons for fear of inadvertently arming radical jihadists who would someday turn against the West.[42]

By 2014, the U.S. began training, advising, and enabling rebel forces in Syria as part of the Syria Train and Equip program authorized by Congress. President Barack Obama assembled an international coalition with sixty-seven partners to fight the Islamic State, deploying 2,000

---

[39] CIJN Staff Writers, *The ISIS Phenomenon in Trinidad and Tobago*, Caribbean Investigative Journalism Network (Dec. 5, 2019) https://www.cijn.org/the-isis-phenomenon-in-trinidad-and-tobago/ (Last visited August 1st, 2022).

[40] *Id.*

[41] *Id.*

[42] The Editors of Encyclopedia Britannica, *supra* note 15.

American special forces soldiers to Syria and ordering and launching a large portion of 17,000 airstrikes. The focus was to counter the Islamic State as part of Operation Inherent Resolve and there were roughly 900 U.S. trips based in Syria. The United States has remained involved in Syria, and since 2015 the U.S. military has conducted several airstrikes.[43]

## II.    Syria's Geopolitical Landscape from 2015-2019

The Islamic State had weakened due to the continuous airstrikes by 2015, however it continued to have a stronghold in key cities including Raqqa and Palmyra[44], exercising control over five million people by the end of 2015. That same year, the United States turned to the Kurdish and Arab militias already fighting the jihadists in Syria, forming a partnership that grew into the Syrian Democratic Forces (SDF).[45] With American troops recruiting, organizing and advising thousands of Syrian Kurdish and Arab militia fighters, along with American aid in the form of arms, air support and intelligence, the SDF became America's main fighting force against ISIS.[46]   Throughout 2015, ISIS expanded the caliphate beyond Iraq and Syria, taking control of cities in Libya, Egypt, and Yemen. By June 2015, the SDF had expelled ISIS from the

---

[43] Carla E. Humud, *Syria and U.S. Policy*, Cong. Rsch. Serv. (updated April 19, 2022) https://crsreports.congress.gov/product/pdf/IF/IF11930 (last visited July 29th, 2022).

[44] Anne Barnard & Hwaida Saad, *ISIS Fighters Seize Control of Syrian City of Palmyra, and Ancient Ruins*, N.Y. Times (May 20, 2015) https://www.nytimes.com/2015/05/21/world/middleeast/syria-isis-fighters-enter-ancient-city-of-palmyra.html; Catherine E Shoichet, *ISIS Takes Control of Ramadi, a Key Iraqi City*, CNN (May 18, 2015) https://www.cnn.com/2015/05/17/asia/isis-ramadi.

[45] Cora Engelbrecht, *The U.S.-Kurd alliance in Syria has tangled history*, N.Y. Times, (Jan. 26, 2022) https://www.nytimes.com/2022/01/26/world/middleeast/us-kurds-syria.html (last visited August 1st, 2022) ("As of 2022, the U.S. kept about 700 troops in northeastern Syria to help the SDF battle the remnants of ISIS"); Humud, *supra* note 37 (describing SDF as "U.S.-backed"); Cameron Glenn, *Timeline: US Policy on ISIS*, Wilson Ctr. (April 27, 2016), https://www.wilsoncenter.org/article/timeline-us-policy-isis (SDF among vetted opposition groups that received US support).

[46] *Timeline: US intervention in Syria's war since 2011*, Al Jazeera, (Oct. 7, 2019) https://www.aljazeera.com/news/2019/10/7/timeline-us-intervention-in-syrias-war-since-2011; Luis Martinez & Elizabeth McLaughlin, *What you need to know about US military involvement in Syria as Trump orders withdrawal*, ABC News (Dec. 20, 2018) https://abcnews.go.com/Politics/us-military-involvement-syria-trump-orders-withdrawal/story?id=59930250 (last visited July 27th, 2022).

8

strategic Syrian town of Tal Abyad on the Turkish border. The SDF took full control of the military base, Ain Issa, from ISIS militias that same month. By 2015, SDF installed the "Dêrik prison" for captured Islamic State members in al-Malikiyah.

In November 2015, France increased airstrikes on Raqqa as a response to the November 13 Paris attacks, weakening the Islamic State's hold on the area. While ISIS continued to focus its energies on attacks in different regions, the SDF, backed by U.S. airstrikes, launched a mission to recapture the city of Raqqa in 2016.[47] In the preliminary phases of the battle for Raqqa, SDF cut off Islamic State supply routes to isolate Raqqa. Around the same time, the Assad regime captured the last rebel-held enclave of eastern Aleppo and much of southeastern Syria.[48]

Throughout June 2017, the second phase of the battle for Raqqa commenced, leading to a bloody siege on the city. After four months of bloodshed, the remaining IS militants surrendered in Raqqa, leaving the Islamic State with only a small piece of territory in Syria along the Euphrates River.[49] Still, throughout 2018, the Islamic State remained in Syria, engaging in guerilla warfare throughout the country and harassing local populations with small-scale terrorist attacks.[50] The organization carried out an average of 127.1 attacks per month in 2018.[51] The Islamic State lost its last remaining territory, in Baghuz, Syria, on March 23, 2019.[52] On October 13, 2019, President Donald Trump ordered the withdrawal of U.S. troops from northern Syria,

---

[47] Glenn, *supra* note 20.

[48] Laub, *supra* note 6.

[49] Mapping Militant Orgs., *The Islamic State*, Stanford Univ. (last modified April 2022) https://cisac.fsi.stanford.edu/mappingmilitants/profiles/islamic-state#_ftnref85; Glenn, *supra* note 20.

[50] Mapping Militant Orgs., *supra* note 43.

[51] Michael Knights, *The Islamic State Inside Iraq: Losing Power or Preserving Strength?*, Combatting Terrorism Ctr. at West Point: CTC Sentinel 11, no. 11 (December 2018), 2.

[52] Rukmini Callimachi, *ISIS Caliphate Crumbles as Last Village in Syria Falls* N.Y. Times (March 23, 2019) https://www.nytimes.com/2019/03/23/world/middleeast/isis-syria-caliphate.html.

which provided foreign forces and SDF prisoners with the opportunity to make advancements in the region.

## BACKGROUND OF EMRANN ALI

### I.      Life before moving to Syria

Emraan Ali is 54-year-old, naturalized United States Citizen who was born on July 4th, 1967 in Trinidad & Tobago. He resided in Trinidad & Tobago until 1991. From 1991 until 2008 he lived in New York, before he relocated to Syria in 2015.Mr. Ali is fluent in English, as he lived in New York for seventeen years and is from the English-speaking country of Trinidad & Tobago. Mr. Ali is married to Sulaimah Mohammad and together they had 5 children, and he is the stepfather to his wife's daughter. He also has three sons from a prior marriage and two daughters from a prior relationship.

In Trinidad and New York, Mr. Ali was employed in construction and real estate. After hearing and seeing posts of other Muslims from Trinidad and Tobago move to ISIS, in March of 2015, Mr. Ali and his family moved to Syria to join some of his wife's family who were residing there. Mr. Ali and his family settled into the town of Raqqa by late 2015, where Mr. Ali expected to work in construction or run a business. As detailed above, in 2017 the area where Mr. Ali and his family were residing came under bombing attacks by Syrian Democratic Forces (SDF). During these bombing attacks, two of Mr. Ali's children were killed.

### II.      Custody of Emraan Ali

In March 2019, Mr. Ali and his two eldest sons surrender to SDF near Baghuz, Syria, and were interviewed on video by members of the U.S. Department of Defense near Tanak Oil Field, Syria. Initially, Mr. Ali and his sons were held in custody for about twelve days at or near the US base in Tanak. Mr. Ali and his sons were taken to a room approximately 12x12 feet that was

used for storage at the checkpoint. There was no toilet, sink, or light, and they stayed there for twelve days. Thereafter, they were taken by SDF to a camp and then to the Omar prison for three days.

The drive to Omar prison was approximately five minutes away, and once he arrived, he was met with a scene of horror. Mr. Ali met people with wounds that were rotting with worms. Mr. Ali also witnessed a noise of constant screaming all day and night at the prison, from people who were wounded and received no help. After Omar Prison they were moved to Shaddadi Prison where they stayed three months.

U.S. and SDF officials have described the prisons as "makeshift" facilities from schools, hospitals and other abandoned buildings that were quickly converted to contain over 10,000 IS captured fighters. Additionally, officials had warned that the facilities were "good enough for the moment, but it would be dangerous to consider these facilities a permanent solution."[53] SDF at the time, stated they were holding 12,000 prisoners, including 4,000 foreigners, in seven detention camps around northeast Syria (the region where Shaddadi is located).[54]

A journalist from *The Times of London* visited one of the detention facilities and filmed what he saw. The footage shows cells with dozens of men in orange jumpsuits packed together like sardines and an equally crowded medical block holding boys. The journalist stated that among the detainees were British, French, Belgian, and US citizens held in "terrible, terrible conditions."[55] Another journalist who visited a detention center in the northeastern region of

---

[53]Jeff Seldin, *US Moves to Bolster Prisons Holding Captured Islamic State Fighters*, VOA News (April 4, 2020), https://www.voanews.com/a/middle-east_us-moves-bolster-prisons-holding-captured-islamic-state-fighters/6186950.html (last visited July 29th, 2022).

[54] *Id.*

[55] *Northeast Syria: Boys, Men Held in Inhumane Conditions*, Hum. Rts. Watch (Oct. 8, 2019), https://www.hrw.org/news/2019/10/08/northeast-syria-boys-men-held-inhumane-conditions (last visited July 29th, 2022).

Syria said he saw "several prisoners had multiple amputations" and he had seen a prisoner with "intestines hanging out beneath bloody dressing.[56]

While in Shaddadi Prison, Mr. Ali was placed in an isolation cell for 40 days with no lights or windows, for no reason. When Mr. Ali was being loaded on the truck to be transported to Shaddadi, a guard grabbed him by the beard and began to beat him. He was placed in a room approximately 25x12 feet with approximately sixty other people with one sink, no windows, an exhaust wall fan, and some power that was supplied by a generator. The generator was cut off sometimes and people would faint around him from not being able to breathe. Mr. Ali witnessed people being taken to get fresh air but some would return and others would disappear. During this time Mr. Ali was separated from his son, once he was interviewed he asked for his son back. He was put together with his son in a room infested with lice and bugs, which resulted in both of them getting scabies and boils. Mr. Ali recounts that at times there was no water for days, and when water did come it was gone after twenty minutes.

After Shaddadi, they were moved to Ya'arubiya [al-Hasakah]. To be transported, Mr. Ali and his son were blindfolded and handcuffed. When he arrived, still blindfolded and handcuffed, he was hit with a pipe about five times until he fell down pretending, he was dying. In Ya'arubiya they stayed for 20 days. While at Ya'arubiya, he was placed in a room approximately 25x20 feet with no ventilation except for two 6x6 holes at the top of the wall. Mr. Ali recounts not being able to breath and the floor being wet from moisture dripping from the ceiling and pipes. Mr. Ali pleaded for help, even though he feared retaliation from the guards. The guards did begin moving those who were in worst conditions first, and at this time Mr. Ali was separated from his sons. Mr. Ali later found out his son was beaten severely for being from the United States.

---

[56] *Id.*

Then SDF transferred Mr. Ali and his sons to Ayn Issa Prison, so Mr. Ali could be interviewed by the FBI. He was in this prison for eight days prior to this interview. The conditions at Ayn Issa consisted of a prison room that was about 20 by 15 feet with concrete black small rooms approximately 6x5 on both sides with a steel door. Prior to his FBI interviews, he had witnessed many other prisoners who were taken out of the cell for questioning. Many were returned and told him that they were of tortured by the SDF because they were not cooperative in their willingness to speak to the Americans. This fear of being electrocuted and otherwise abused was at the forefront of his agreement to speak to the FBI without a lawyer on August 7th and 8th of 2019. He had already been in the prison for several months at that point and believed he could be "disappeared" at any time without anyone knowing or inquiring about him.

### III.    August 7th and 8th, 2019, Interview of Emraan Ali

On March 7th and 8th, 2019, Mr. Ali was interviewed by two FBI Agents at Ayn Issa prison. He was brought by SDF guards to the interview room blindfolded and handcuffed, which were removed during the interview. He was offered a bottle of water, a banana, and a package of crackers. The interview was conducted in English by two FBI Agents and an FBI Language Specialist was also present, one SDF guard remained present during the entirety of the interview. Although, the FBI did generate a 302 report regarding the details of the interview, the interview was not video and or audio recorded..

The Agents presented Mr. Ali with the attached Advice of Rights form. Mr. Ali asked for an attorney but was told there was none present in Syria. Thereafter, he signed the form. The Agents questioned Mr. Ali about his biographical information, his family, his trip to Syria, his activity in Syria, his surrender and his imprisonment, among other topics. It is unknown when

13

the interviews began or how long they lasted, but the Advice of Rights form was signed at 11:25PM local time on August 7, 2019 and at 10:53PM on August 8, 2019.

## IV.     Joint Control of Mr. Ali by SDF and FBI

Mr. Ali was never charged with a crime in Syria and never went before Judge or any court in Syria. He was however detained from March of 2019 through his removal to the United States in late September 2020.

Declassified communications between the U.S. and SDF show that the United States government, via the FBI agents, were aware of Mr. Emraan Ali's capture as early as March 20, 2019.  On or about June 22, 2019 the FBI sent a "tearline", via the FBI's Legal Attache in Baghdad, Iraq, to the SDF. This was a U.S. request to the SDF to confirm the location of Emraan Ali within SDF facilities. On or about July 9, 2019, the FBI received word back that Mr. Ali was in Shaddadi prison. A request by the U.S was made to SDF to transfer him to Ayn Issa prison for questioning by U.S. Agents. Pursuant to this U.S. request, Mr. Ali was transferred and interviewed by U.S. Agents at this prison of the FBI Agents' choosing. In December of 2019, the FBI again asked the SDF for the location of Mr. Ali. On January 24, 2020, the SDF provided the location of Mr. Ali to the FBI and the FBI received a response from the SDF informing that he was at Hasakah Prison. The FBI, in March of 2020, again requested the SDF transfer Mr. Ali and the SDF complied, bringing him to the Northern Landing Zone in Syria. The U.S. informed the SDF, that that US would be taking Mr. Ali into US custody at that location. The SDF transferred the custody of Mr. Ali to the United States here pursuant to U.S. instructions and Mr. Ali was flown on a U.S. military flight directly to Miami, Florida to face the charges in this case.

## LEGAL ARGUMENTS

14

**I.**     **US Government Agents Took a Coerced, Involuntary Statement from Emraan Ali After He Had Already Been Threatened and Observed His Son Beaten by the SDF And Was Still Under Threat of Torture**

The Due Process Clause to the U.S. Constitution guarantees the right to silence unless a criminal suspect "chooses to speak in the unfettered exercise of his own will." Malloy v. Hogan, 378 U.S. 1, 8 (1964). This bar on coerced confessions is a hallmark of the U.S. criminal justice system. The Supreme Court has repeatedly held that due process prohibits the government's use of involuntary statements obtained through psychological pressure, physical intimidation, torture or other mistreatment.  Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973); Lego v. Twomey, 404 U.S. 477, 489 (1972).

**A.  Voluntariness Must Be Evaluated Under the Totality of the Circumstances**

In evaluating whether or not a confession was made voluntarily, federal courts consider the "totality of the circumstances" surrounding the interrogation, including the age, intelligence and education level of the accused; the length of the detention and interrogation; and the use of physical punishments such as the deprivation of food or sleep. Schneckloth, 412 U.S. at 226 (assessment includes evaluation of the characteristics of the accused and the details of the interrogation).

**1.  Conditions of Confinement**

Federal courts have already determined that conditions of confinement such as solitary or isolation and restriction on communication and lack of substantial food, etc.  result in involuntary confessions and require the resultant statements be excluded.

In Brooks v. Florida, 389 U.S. 413, 414-15 (1967), defendant's confession held to be involuntary where defendant was held in solitary confinement for 14 days, fed minimal food rations, forced to be naked, and saw no one from outside prison. Specifically, "the cell was 7 feet

long and 6 1/2 feet wide; a witness for the State testified it was 6 feet longer. This minor difference aside, the parties agree that the punishment cell had no external window, that it contained no bed or other furnishings or facilities except a hole flush with the floor which served as a commode, and that during the first 14 days he lived in this cell Brooks' only contact with the outside was an unspecified number of interviews with the prison's investigating officer. It is also agreed that while so confined Brooks was fed a "restricted diet" consisting, according to the testimony of the investigating officer, of "peas and carrots in a soup form" three times daily. Brooks' more detailed description of this concoction -- "they fed us four ounces of soup three times a day and eight ounces of water" -- was not controverted, nor was his testimony that he was stripped naked before being thrown into the cell. On the 15th day of confinement under these conditions, Brooks was taken from the punishment cell and again brought directly to the investigating officer. This time, shortly after questioning began, Brooks confessed and dictated his statement into a tape recorder." at 413-414.

In Haynes v Washington, 373 U.S. 503, 514-15 (1963), the confession was found to be involuntary and excluded after the defendant was held incommunicado from his family for 5 to 7 days after his arrest until he agreed to cooperate with police. This police behavior was found to be a threat and the Court stated, "the secret and incommunicado detention and interrogation -- are devices adapted and used to extort confessions from suspects."

In United States v. Koch, 552 F.2d 1216, 1219-20 (7th Cir. 1977), the defendant's statements were deemed involuntary as, "it was extracted through confining him to a "boxcar" cell for six hours. The evidence showed that a boxcar cell is a 6 feet x 8 feet room with an interior barred door and an exterior solid door that is kept shut. The solitary occupant is deprived of all personal property and is without visibility outside of the cell, "necessary hygiene" or ability

16

to speak to others." The court found that this was a form a punishment and also an implied threat of further punishment if he didn't provide a statement.

In Townsend v. Henderson, 405 F.2d 324, 327-29 (6th Cir. 1968), the defendant was placed, "in solitary confinement and was suffering from a head wound received the preceding day which had rendered him unconscious and for which he had received medical treatment during the interim…when a prisoner was subjected to solitary confinement, he was stripped of his clothes and placed in a dark cell on a diet of bread and water. The cell contained only the most primitive sanitary facilities and a board for a bed." The Court recognized, "Coercion that vitiates a confession can be mental as well as physical." The conviction was revered because the confession was obtained in a manner clearly prohibited by constitution. See further Stidham v. Swenson, 506 F.2d 478 (8th Cir. 1974) (suspect's statement was involuntary, in part because suspect's imprisonment in solitary confinement for eighteen months in subhuman conditions, including a bug-infested cell, lack of sufficient food, and denial of visits with family and friends.

"[A] finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient" Ariz. v. Fulminante, 499 U.S. 279, 287 (U.S. 1991). Court have considered less traditional forms of coercion, including psychological torture, and conditions of confinement in assessing the voluntariness of the statements.

Mr. Ali was taken into custody by SDF in March of 2019 and was not moved to the United States until September 28th, 2020.  Within that year and six months of confinement Mr. Ali was held in five different detention centers located around Syria. Initially Mr. Ali was held for twelve days near the U.S. base located at the Tanak Oil Fields. After the interview, Mr. Ali was returned to the custody of SDF, and taken to Omar Prison for three days. After three days, he was transported to Shaddadhi prison. Mr. Ali was placed in isolation in a 5-foot by 5-foot cell

17

with no toilet and was allowed outside once a day.  Mr. Ali was eventually released from isolation but remained in Shaddadhi for three months.

Mr. Ali was then transported to Ya'arubiya and remained there for approximately twenty days. While in Ya'arubiya Mr. Ali's son was beaten by SDF guards for being an American who traveled to Syria to join ISIS.  Soon after, Mr. Ali was moved to Derik prison for two weeks. This was one of the most secure detention centers for ISIL members is the located in al-Malikiyah, a town near the Iraq-Syria border, where about 400 ISIL fighters were held. He remained there until September of 2020. Mr. Ali fell sick from an unknown virus he contracted from the Prison, and he had a difficult time earing and was suffering from low blood pressure. The conditions of each prison were very poor as they were converted from old schools, hospitals, or warehouses with minimal medical care.

In late July 2019 Mr. Ali and his two sons were sent to Ayn Issa Prison. When they arrived, they were placed in in the "black hole". It had no lights and was a room approximately 20x15 with concrete black small rooms approximately 6x5 on both sides with a steel door. Once a day they would give prisoners food and let them use the toilet. All 3 of them were put in one 6x5 room. Emraan Ali got sick from the lack of air so they took him out of the small room and into the hall to get some air.  On August 7th and 8th, 2019, Mr. Ali was blindfolded and handcuffed to be taken into a room to be interviewed by the FBI. The U.S. agents interviewed the boys first and then separated the three after the interviews. They interviewed Emraan Ali for approximately 8 days. He asked for a lawyer but was told they cannot provide one but if I cooperate, they would be able to help.

2. **Personal Characteristics of Client**

In analyzing the totality of the circumstances to determine voluntariness the Court also looks at the personal characteristics of the defendant.  See United States v. Abu Ali, 528 F.3d 210 (4th Cir. 2008), "In making this voluntariness determination, we also look to the district court's factual findings as to Abu Ali's personal characteristics, and the conditions of his confinement. The court noted that Abu Ali "is an intelligent, well-educated man with a rich and graphic vocabulary," and found him "intelligent, capable, and articulate," Id. at 378. It is undisputed that Abu Ali attended school in Saudi Arabia, and he does not allege any religious, cultural, or linguistic difficulties in dealing with his Saudi interrogators. Indeed, he responded to his interrogators' questions in Arabic, and the district court found that the Saudi officers provided him with a prayer rug and Koran among other accommodations. For these reasons, Abu Ali's personal characteristics did not render him particularly susceptible to coercion or pressure." Id.

Mr. Ali is 54 years old, and at the time of his capture by SDF forces he had been suffering from displacement of his home in Raqqa, walking through the Syrian dessert with a group of others from Raqqa, and suffered the loss of two children from bombing attacks. While in the detention centers in Syria, Mr. Ali was separated his wife and children, with one of his sons being detained with him as well. Mr. Ali had been disillusioned from the wonderful Muslim life he was promised when he decided to make the trip from Trinidad & Tobago. Mr. Ali had been imprisoned from March of 2019 until September of 2020 when he was released to the FBI. The prisons in Syria were so detached from the media and news that Mr. Ali had no idea about the Covid-19 pandemic that had killed millions of people worldwide. Mr. Ali's physical and mental health had definitely declined by the time of his interrogation due to all the trauma and suffering he had faced.

19

Emraan Ali did not complete high school. As a young man at approximately the age of 18 he left his native Rio Claro, Trinidad, a very small town in the south central forests of Trinidad, and moved to New York in search of a living wage. He went from day labor work to full time construction. His reading and writing ability to this day are limited.

### 3.  Conditions of Interrogation

Lastly, the specific conditions of the interrogation must be evaluated.  Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973), including such things as "breaks, access to food, water, a bathroom, and refreshments during breaks in questioning" and the defendant's ability to communicate in the language used by the interrogators. See Abu Ali at 234. During interrogation Mr. Ali was given brakes, but only upon his request. His access to food was restricted to the banana and water given to him by Federal Agents. Mr. Ali may speak English, but he is unfamiliar with the criminal proceedings and protections afforded to him by being a United States Citizen. The worst of the conditions of the interrogation were unspoken, Mr. Ali had witnessed several other imamates at the prison be interrogated, and upon their return they told him about being tortured for not being "cooperative". Mr. Ali feared for his life and his children never hearing from him again. An SDF officer from the prison had been present at all times during interrogation.  Emraan Ali was aware of the consequences if he were to complain to the FBI agents about the conditions he and his children had been through.

### 4.  Physical Violence or Threat of Physical Violence

A statement is coerced if the "will was overborne" at the time of confession. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Haynes v. Washington, 373 U.S. 503, 513 (1963). However, the Supreme Court has stated that confessions obtained using physical violence or the threat of physical violence are *per se* involuntary, and "there is no need to weigh

or measure [the] effects on the will of the individual victim" before excluding such confessions. See Stein v. New York, 346 U.S. 156, 182 (1953)(overruled on other grounds); see also Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985)(recognizing violence or threats of violence as described in Stein as *per se* coercive as to produce involuntariness). The Supreme Court in Stein explained:

> Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt. Id. at 180.

Again, in United States v. Brown, 557 F.2d 541 (6th Cir.1976), a confession given in the back seat of a patrol car was found involuntary as the defendant feared that he would suffer violence at the hands of the police after he received injuries during a violent arrest and a blow by officer prior to the confession.

The violence and fear of violence was always present in Mr. Ali's mind and around him. In Derik prison, Mr. Ali witnessed his son being beaten for being an American. In Shaddadi prison it was routine for Emraan Ali to see other detainees taken and tortured if they were uncooperative during interrogations. When Mr. Ali arrived at Ayn Issa Prison in 2020, he was in the prison eight days before being interviewed by the FBI. Within those eight days, Mr. Ali witnessed several other prisoners taken out of his cell for questioning. Upon returning, the prisoners said they had been tortured for not being cooperative with the Americans. Mr. Ali

21

reasonably had a fear of being electrocuted or facing other repercussions in his looming interview. Additionally, Mr. Ali feared and believed he could disappear at any moment.

### B.   An Involuntary Confession Must be Excluded

The Supreme Court has repeatedly recognized that it is inconsistent with the justice system of any civilized society to permit the introduction of involuntary confessions. In Rogers v. Richmond, the Court stated that "ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." Rogers v. Richmond, 365 U.S. 534, 540-41 (1961). See also Rochin v. California, 342 U.S. 165, 173 (1952) ("Coerced confessions offend the community's sense of fair play and decency"); Lyons v. Oklahoma, 322 U.S. 596, 605 (1944). ("A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt.") The Court stated this same view when it noted the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." Jackson v. Denno, 378 U.S. 368, 386 (1964) citing Blackburn v. Alabama, 361 U.S. 199, 206-07 (1960).

By excluding involuntary admissions, the Court explained, the law deters unlawful conduct, "The abhorrence of society to the use of involuntary confessions turns not only on their inherent untrustworthiness, but also on the feeling that the police must obey the law while enforcing it, and that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Spano v. New York, 360 U.S. 315, 320-21 (1959).

22

Therefore, when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, the government must prove by at least a preponderance of the evidence that the confession was voluntary before it can be admitted at trial. See Lego v. Twomey, 404 U.S. 477, 489 (1972); see also Colorado v. Connelly, 479 U.S. 157, 168 (1986).

### C.  Coerced Confessions After Violence and Threats of Torture by Foreign Government Agents Cannot Be Used in United States Courts

"Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government." Ashcraft v. Tennessee, 322 U.S. 143, 155.

Even when a suspect is held in a foreign country by foreign jailers when he is interrogated, the Court will still analyze the confession for coercion under the same standards. See Abu Ali supra (analyzing statements made after the arrest, detention and interrogation of a US Citizen in Saudi Arabia); see also United States v. Odeh, 552 F 3d 180 (2d Cir. 2008)(Court analyzing statements made overseas in Kenya to US officials). Therefore, it does not matter if the violence of threat of violence originated with foreign agents. As mentioned previously, Mr. Ali saw and feared physical violence throughout his entire time under SDF control. His son was physically beat and other inmates told horror stories of being tortured for not being cooperative.

### II.    The 5th Amendment Applies and Miranda Warnings Should Have Been Provided to Emraan Ali Prior to Questioning

Emrann Ali, a United States citizen, was in custody in the country of Syria, interrogated by United States FBI agents and had a constitutional right to an attorney and was not properly advised of that right.  He was only provided modified and limited Miranda warnings that vitiated his right to counsel, advising him that he has the right in theory but in reality, the right did not exist in Syria. The Advice of Rights form provided to him addressed only two things: the right to remain silent and the right to counsel. The majority of the statements on the form related to the right to counsel were not accurate. Each sentence will be analyzed:

1. "You have the right to talk to a lawyer for advice before we ask you any questions." This statement is patently false. There was no lawyer, let alone an American lawyer available. So, although this statement is printed on the form, it is untrue in its entirety.

2. "You have the right to have a lawyer with you during questioning." Again, wholly untruthful. So, again, printed on a form, but misleading.

3.  If you cannot afford a lawyer, you have the right to have on appointed for you before any questioning, if you wish. Again, wholly untruthful. So, although it is printed on a form, its meaningless.

4. "However, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney."

This statement is true but it completely contradicts the above three statements and cannot be reconciled therefore could only lead to complete confusion making the admonishment completely misleading.

Case law is clear that U.S. citizens abroad are entitled to the Fifth Amendment when interrogated by U.S. agents. See United States v. Frank, 599 F.3d 1221, 1228-29 (11th Cir.

2010)[(following United States v. Heller, 625 F.2d 594, 596-98 (5th Cir. 1980)]; United States v. Abu Ali, 528 F.3d 210, 227-28 (4th Cir. 2008).

Mr. Emraan Ali recognizes other Circuits have approved of modified Miranda advisements when questioning is done in foreign countries.  For example, in Cranford v. Rodriguez, 512 F.2d 860 (10th Cir. 1975), the Tenth Circuit considered a challenge to a waiver form brought by a defendant detained in Mexico and subsequently questioned there by U.S. agents where no US attorney was available. The Tenth Circuit approved a modification of the standard waiver form that omitted "the line respecting appointment of a lawyer and inserting instead that if [the suspect] wished to consult the American Consulate the latter would be advised of his detention and [the suspect] will be given the opportunity to talk to a Consulate representative," Id. at 862.  Again, in United States v. Dopf, the 5th Circuit permitted the admissibility of statements obtained in a custodial interview held in Mexico by a U.S. agent in light of a warning that omitted reference to the appointment of counsel. 434 F.2d 205 (5th Cir. 1970). Specifically, the U.S. agent warned the suspects that "anything they said could be used against them when and if they were returned to the United States; that he could not furnish them with a lawyer in Mexico but offered to contact the American Consul on their behalf." Id. at 207. In both these cases however, the modified Miranda warnings given were completely accurate and provided for consultation with the American Consul, unlike the advisements in Mr. Ali's case.

In United State v. Odeh, the court concluded, "that the application of that framework to overseas interrogations may differ from its domestic application, depending on local circumstances, in keeping with the context-specific nature of the Miranda rule." The Advice of Rights form in Odeh was slightly different from the form used with Mr. Ali. The Odeh form stated, "*in the United States*, they would have had the right to consult with a lawyer and to have

25

a lawyer present during questioning … ***in the United States***, a lawyer would have been appointed for them if they could not afford one; and if they chose not to speak, that fact could not be used against them in a U.S. court". It further advised them that "[b]ecause we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning." (emphasis added). The Odeh court recognized that the form did provide factually accurate statements as modified. By simply adding the phrase, "in the United States" it was made clear that there was a difference because they were on foreign soil. Because this phrase is lacking in the Ali form, it makes the form read in its entirety completely contradictory and misleading to a detainee.

The US agents must provide accurate information. See Duckworth v. Eagan, 492 U.S. 195 (1989). The "crucial test" for determining whether a proper warning was given "is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights." Coyote v. United States, 380 F.2d 305, 308 (10th Cir. 1967). Further, a waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421, (1986) (quoting Miranda, 384 U.S. at 444).

The Defense submits that the Odeh case was wrongly decided and should not be followed because it essentially finds that now only the right to remain silent is required in the warnings, thereby fully gutting Miranda of the right to counsel component. It does not appear that the 11th Circuit has specifically addressed this issue. The Defense submits that despite these out of Circuit decisions, the Advice of Rights form presented to Mr. Ali was erroneous, misleading and unconstitutional.  Therefore, Mr. Ali's waiver of his rights prior to providing a statement to the

26

government agents on August 7th and 8th of 2019 was not knowing, intelligent and voluntary and these statements must be suppressed.

**Conclusion**

WHEREFORE for the foregoing reasons, Mr. Emraan Ali moves this Court to suppress his statements made to United States law enforcement in August of 2019.

Respectfully submitted,

_____/S/_____

Khurrum B. Wahid
Counsel for Emraan Ali
Wahid Vizcaino Geller LLP
2103 Coral Way, Suite 401
Miami, FL 33145
(305)444-4303
(305)444-4302 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of September, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either by electronic transmission generated by CM/ECF, or in some other manner for those counsel or parties who are not able to receive electronic filings.

Respectfully submitted,

Wahid Vizcaino Geller, LLP
2103 Coral Way, Suite 401
** PLEASE NOTE NEW FIRM NAME AND ADDRESS
Miami FL 33145
Phone: (305) 444-4303
Fax: (305) 444-4302
khurrum@wvglegal.com


_____/s/_____
Khurrum B. Wahid
FL Bar No. 178764

28