UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  21-CR-20123-BLOOM

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

EMRAAN ALI,

     Defendant.

_____/

## MOTION TO SUPPRESS STATEMENTS MADE ON SEPTEMBER 28, 2020

## FACTS:

Emraan Ali is a dual citizen of Trinidad and Tobago and the United States who is charged by Superseding Indictment with Conspiring to Provide Material Support to ISIS and Providing Material Support to ISIS from March 2015 through March 2019, in violation of 18 U.S.C. § 2339B(a)(1); and Receipt of Military-Type Training from ISIS in violation of 18 U.S.C. § 2339D. Mr. Ali made his first appearance in the District on September 30, 2020, after being transported from Syria to Miami on a US transport flight accompanied by two FBI Agents.

## BACKGROUND OF THE SYRIAN WAR

### I.    Conflict and Civil War

Syria has predominantly been an Islamic country, with a majority of the population identifying as Sunni Muslims.[1] Sunni Muslims is a branch of Islam and is practiced by 85-90%

---

[1] *See Syrian Culture*, Cultural Atlas, https://culturalatlas.sbs.com.au/syrian-culture/syrian-culture-religion (last visited July 29, 2022).

1

of the worlds Muslims. However, for almost fifty years, the minority Alawite community has held political dominance in the country.[2] Alawite political dominance began in November 1970, when Hafez al-Assad seized control of Syria, leading to his presidency in 1971 that lasted until he died in 2000.[3]  Hafez al-Assad's successor and son, Bashar al-Assad, was ushered into power hours after his father's death after the legislature approved a constitutional amendment lowering the minimum age of the president from forty to thirty-four, Bashar's age at the time.[4] Assad largely continued and followed his father's authoritarian regime, using threats of violence and arrests to extinguish pro-reform activism.[5]

In response to a decade's worth of broken political promises by Bashar Al-Assad's administration[6] and inspired by protests erupting throughout the Middle East and North Africa, Syrian citizens led peaceful demonstrations, covering public walls with anti-regime graffiti.[7] Fourteen year-old Naief Abazid and twenty-two other teenagers were arrested and tortured for their acts of protest, provoking non-violent protests led by pro-democracy groups to occur across

---

[2] *See id.*

[3]  *See* The Editors of Encyclopedia Britannica, *Hafez al-Asad*, Encyclopedia Britannica, https://www.britannica.com/biography/Hafiz-al-Assad (last visited August 1st, 2022).

[4] *Id.*

[5] *Id.*

[6] Zachary Laub, *Syria's Civil War: The Descent into Horror*, Council on Foreign Rels. (Mar. 17, 2021), https://www.cfr.org/article/syrias-civil-war (last visited August 1, 2022).

[7] Kali Robinson & Will Merrow, *The Arab Spring at Ten Years: What's the Legacy of the Uprisings?*, Council on Foreign Rels. (Dec. 3, 2020 9:00 AM), https://www.cfr.org/article/arab-spring-ten-years-whats-legacy-uprisings (last visited August 1, 2022) ("In 2010 and 2011 protests in the Middle east and Northern Africa began, also referred to as the Arab Spring. The protesting began in December of 2010, where a Tunisian street vendor Mohamed Bouazizi set himself on fire in protest outside a government office. This set off a chain reaction of protests and destabilized most of the region, more specifically set off post-uprising civil wars in Libya, Syria, and Yemen").

Syria.[8] In a disproportionate response on April 2011, President Assad unleashed full military firepower on protestors in Daraa for two weeks, resulting in the murder of dozens.[9]

In July 2011, defectors from Assad's military and security forces announced the formation of the Free Syrian Army (FSA), a coalition formed to defend against the brutal conduct of the Syrian government.[10] Foreign countries, including strong US allies, funded and armed opposition groups.[11] FSA militias sometimes had competing interests, and at times preyed on the very populations they were charged with protecting.[12] As a result, rival coalitions began proliferating and FSA fighters drifted to Islamist brigades that faired greater successes against the Assad regime due to their funding and arms from Gulf donors.[13]

By June 2012, the conflict in Syria had escalated to a full-scale civil war.[14] In November 2012, rebel forces announced the formation of the National Coalition for Syrian Revolutionary and Opposition Forces, which received recognition from dozens of countries, including the United States, as the representatives of the Syrian people.[15] Despite divisions and rivalries within

---

[8] Kareem Fahim & Hwaida Saad, *A Faceless Teenage Refugee Who Helped Ignite Syria's War*, N.Y. Times, Feb. 8, 2013, https://www.nytimes.com/2013/02/09/world/middleeast/a-faceless-teenage-refugee-who-helped-ignite-syrias-war.html.  ("The government, nervous as leaders were being toppled around the Arab world, reacted furiously to the slight, arresting the teenager and more than a dozen other boys and then torturing them for weeks"); Dave Burke, *The boy whose graffiti changed the world*, Daily Mail (Mar. 14, 2017), https://www.dailymail.co.uk/news/article-4312502/The-boy-anti-Assad-graffiti-changed-world.html (last visited Aug. 10, 2022).

[9] Burke, *supra* note 8.

[10] Laub, *supra* note 6.

[11] Louise Arimatsu & Mohbuba Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and Libya*, Chatham House, 1, 7–9 (2014) https://www.chathamhouse.org/sites/default/files/home/chatham/public_html/sites/default/files/20140300ClassificationConflictsArimatsuChoudhury1.pdf.

[12] Laub, *supra* note 6.

[13] *Id.*

[14] *Syria in state of war, says Bashar al-Assad*, BBC News (June 27, 2012), https://www.bbc.com/news/world-middle-east-18598533 (last visited Aug. 10, 2022).

[15] Mark Lander, Michael R. Gordon, Anne Barnard, *U.S. Will Grant Recognition to Syrian Rebels, Obama Says*, N.Y. Times (Dec. 11, 2012), http://nyti.ms/2mOHJYL; The Editors of Encyclopedia Britannica, *Syrian Civil War*, Encyclopedia Britannica https://www.britannica.com/event/Syrian-Civil-War/Civil-war (last visited Aug. 10, 2022).

the Coalition, rebels saw a string of successes, seizing key cities in the north and east, including eastern Aleppo, Syria's largest city.[16] By 2013, both rebel and government forces came to a military stalemate, depleting in resources and traction as the civilian death toll continued to rise.[17] Seeing the state of Syria at the time, international allies of both parties(?) became involved.[18]

### A.  War as a Breeding Ground for Islamist Factions

The Assad regime's violence was exploited by al-Qaeda militants eager to capitalize on Syria's chaos.[19] Under the guise of leading a jihad, or spiritual fight, against the regime, the Syrian franchise of al-Qaeda, Jabhat al-Nusra, called Sunnis from around the region to Syria. Jabhat al-Nusra was one of the more successful opposition groups, thus gaining a large amount of Syrian and foreign recruits. In Iraq, the Islamic State emerged from the remnants of al -Qaeda in Iraq. The organization faded into obscurity in 2007 until it re-emerged in 2011 under the leadership of Abu-Bakr al-Baghdadi.[20] Al-Baghdadi declared he would combine the forces in Iraq and Syria to create the Islamic State of Iraq and the Levante. Evidently, al-Baghdadi intended for Jabhat al-Nusra to join the new group under his command, however al-Nusra

---

[16] *See* Lander, *supra* note 15.

[17] *Id.*

[18] *Id.* (Efforts by Turkey, Saudi Arabia, and Qatar to fund and arm rebels became increasingly public in late 2012 and 2013. The United States, which had been reluctant to send weapons for fear of inadvertently arming radical jihadists who would someday turn against the West, eventually started a modest program to train and equip a few vetted rebel groups. The Syrian government continued to receive weapons from Iran and the Lebanese militant group Hezbollah. By late 2012 Hezbollah had also begun sending its own fighters into Syria to battle the rebels.)

[19] Laub, *supra* note 6.

[20] Cameron Glenn, Mattisan Rowan, John Caves, & Garrett Nada, *Timeline: the Rise, Spread, and Fall of the Islamic State*, Wilson Ctr. (Oct. 28, 2019) https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state (last visited July 29, 2022).

rejected the merger.[21] The rejection led to fighting between the two Islamist factions, where ISIL came out on top, seizing the city of al-Raqqa by January 2014.[22]

ISIL (a.k.a. ISIS) continued to expand throughout Syria, fighting the government, rebel forces, and the Kurdish peshmerga (military)[23] in the process. In June 2014, the group, now renamed the Islamic State (IS) declared a caliphate (religious state), with their capital in the city of Raqqa.[24] The Islamic State peaked in size in late 2014, controlling 100,000 square kilometers or 38,610 square miles of territory in northern Syria and Iraq, which was home to over eleven million people.[25] The organization benefited from the Assad regime's use of IS to create a two-front war and willingness to purchase oil from the Islamic State's territories.[26] Turkey and the Free Syrian Army also acquired oil from IS, implicitly funding the organization.[27]

In 2014, the Islamic State also developed its media center, which regularly published the organization's widely read publication called *Dabiq* in Arabic, English, French and German.[28] The publication focused on sophisticated and visually pleasing materials of cities under IS control.[29] *Dabiq* portrayed romanticized images of the caliphate and the idea of an Islamic

---

[21] Basma Atassi, *Qaeda chief annuls Syrian-Iraqi jihad merger*, Al Jazeera America (June 9, 2013), https://www.aljazeera.com/news/2013/6/9/qaeda-chief-annuls-syrian-iraqi-jihad-merger.

[22] *Syria, Anti-Assad Rebel Infighting Leaves 700 Dead, Including Civilians*, Asia News (Jan. 13, 2014) https://www.asianews.it/news-en/Syria,-anti-Assad-rebel-infighting-leaves-700-dead,-including-civilians-30013.html.

[23] *Kurdish Peshmerga*, The Kurdish Project, https://thekurdishproject.org/history-and-culture/kurdish-nationalism/kurdish-peshmerga/ (last visited Aug. 10, 2022).

[24] Michael Pizzi, *In declaring a caliphate, Islamic State draws a line in the sand*, Al Jazeera, (June 30, 2014) http://america.aljazeera.com/articles/2014/6/30/islamic-state-caliphate.html.

[25] Seth G. Jones, *Rolling Back the Islamic State*, RAND Corp., (2017) https://www.rand.org/pubs/research_reports/RR1912.html. xi.

[26] Chapter Seven: Middle East and North Africa, 115:1 The Military Balance 303, 303–62 (Feb. 10, 2015).

[27] Helbast Shekani, *Islamic State sold oil to Syrian regime and Turkey, commander says*, Kurdistan24 (July, 2, 2018) https://www.kurdistan24.net/en/story/16444-EXCLUSIVE:-Islamic-State-sold-oil-to-Syrian-regime-and-Turkey,-commander-says.

[28] Harleen K. Gambhir, *DABIQ: The Strategic Messaging of the Islamic State*, Inst. for the Study of War (Aug. 15, 2014), https://www.understandingwar.org/sites/default/files/Dabiq%20Backgrounder_Harleen%20Final.pdf (last visited August 4th, 2022).

[29] *Id.*

golden age under IS held territories.[30] These curated media tactics depicted Raqqa as a calm

place suitable for raising a family oriented around the Islamic faith.[31] Al-Baghdadi called on

Muslims to perform hijrah, or emigration, to the Islamic State, a call that was republished in

*Dabiq*.[32] Significantly, al-Baghdadi called for non-militant individuals to emigrate to the Islamic

State in an effort to repopulate its territory and establish sustainable control.[33]

The second installment of *Dabiq* called for hijrah, telling readers it was not so much a

request as it was a requirement for all Muslims.[34] ISIS publicized the benefits of the Islamic

State, which included enforcement of property rights, security, aid distribution, and food and

goods provided for civilians, particularly in Raqqa and Aleppo.[35] Since the uprisings in Syria in

2011, tens of thousands of individuals have traveled to Syria to join rebel groups.[36] Of those tens

of thousands, an estimated 36,500 joined the Islamic State, particularly after 2013.[37] Most of the

foreign fighters came from the Arab region, but around 6,600 of the fighters arrived from

Western countries. [38]

Trinidad and Tobago had its own ISIS phenomenon with 240 of their citizens moving to

ISIS ruled territory. The population of Trinidad and Tobago is 1.3 million with approximately

eight percent being Muslim. Trinidad and Tobago had the highest number of immigrants to the

---

[30] Alex P. Schmid, *Challenging the Narrative of the Islamic State,* Int'l Ctr. for Counter-Terrorism-The Hague, June 2015 https://icct.nl/app/uploads/2015/06/ICCT-Schmid-Challenging-the-Narrative-of-the-Islamic-State-June2015.pdf.

[31] *See generally* Gambhir, *supra* note 28.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *How the Islamic State Rose, Fell and Could Rise Again in the Maghreb*, Int'l Crisis Gr. (July 17, 2014), https://www.crisisgroup.org/middle-east-north-africa/north-africa/178-how-islamic-state-rose-fell-and-could-rise-again-maghreb (last visited Aug. 4, 2022.)

[37] *Id.*

[38] *Id.*

Islamic State per capita in the Western world.[39] To further break it down the immigrants were 34% male, 23% female, and 43% minors. Additionally, Trinidad and Tobago topped the list in the Western world for the number of female ISIS migrants and the number of migrant families. [40] Before leaving, many of the Trinidadian migrants expressed their sentiments of moving to ISIS as wanting to live in an Islamic state where God truly rules. They expressed disillusionment with Trinidad, as they saw the culture of the country as sexually permissive, corrupt, and lacking any real value. Within the Trinidad community members who had moved to ISIS posted on Facebook that they had nice cars, jobs, and homes.[41] The Muslim community within Trinidad and Tobago saw ISIS as a safe haven for Muslims where they could follow their religion.

### B. United States Involvement in Syria

Prior to 2014, the United States had minimal involvement with the conflict in Syria. At the beginning of the Syrian destabilization the United States provided more than $1.3 billion in assistance to counterweight to the influence of the Iranian, Russian, and the Syrian government and imposed sanctions against the Syrian government in 2011. In 2013, the United States increased its involvement by making a deal with Moscow to dismantle Syria's chemical weapons arsenal. Still, the United States was reluctant to send weapons for fear of inadvertently arming radical jihadists who would someday turn against the West.[42]

By 2014, the U.S. began training, advising, and enabling rebel forces in Syria as part of the Syria Train and Equip program authorized by Congress. President Barack Obama assembled an international coalition with sixty-seven partners to fight the Islamic State, deploying 2,000

---

[39] CIJN Staff Writers, *The ISIS Phenomenon in Trinidad and Tobago*, Caribbean Investigative Journalism Network (Dec. 5, 2019) https://www.cijn.org/the-isis-phenomenon-in-trinidad-and-tobago/ (Last visited August 1st, 2022).
[40] *Id.*
[41] *Id.*
[42] The Editors of Encyclopedia Britannica, *supra* note 15.

American special forces soldiers to Syria and ordering and launching a large portion of 17,000 airstrikes. The focus was to counter the Islamic State as part of Operation Inherent Resolve and there were roughly 900 U.S. trips based in Syria. The United States has remained involved in Syria, and since 2015 the U.S. military has conducted several airstrikes.[43]

## II.     Syria's Geopolitical Landscape from 2015-2019

The Islamic State had weakened due to the continuous airstrikes by 2015, however it continued to have a stronghold in key cities including Raqqa and Palmyra[44], exercising control over five million people by the end of 2015. That same year, the United States turned to the Kurdish and Arab militias already fighting the jihadists in Syria, forming a partnership that grew into the Syrian Democratic Forces (SDF).[45] With American troops recruiting, organizing and advising thousands of Syrian Kurdish and Arab militia fighters, along with American aid in the form of arms, air support and intelligence, the SDF became America's main fighting force against ISIS.[46]  Throughout 2015, ISIS expanded the caliphate beyond Iraq and Syria, taking control of cities in Libya, Egypt, and Yemen. By June 2015, the SDF had expelled ISIS from the

---

[43] Carla E. Humud, *Syria and U.S. Policy*, Cong. Rsch. Serv. (updated April 19, 2022) https://crsreports.congress.gov/product/pdf/IF/IF11930 (last visited July 29th, 2022).

[44] Anne Barnard & Hwaida Saad, *ISIS Fighters Seize Control of Syrian City of Palmyra, and Ancient Ruins*, N.Y. Times (May 20, 2015) https://www.nytimes.com/2015/05/21/world/middleeast/syria-isis-fighters-enter-ancient-city-of-palmyra.html; Catherine E Shoichet, *ISIS Takes Control of Ramadi, a Key Iraqi City*, CNN (May 18, 2015) https://www.cnn.com/2015/05/17/asia/isis-ramadi.

[45] Cora Engelbrecht, *The U.S.-Kurd alliance in Syria has tangled history*, N.Y. Times, (Jan. 26, 2022) https://www.nytimes.com/2022/01/26/world/middleeast/us-kurds-syria.html (last visited August 1st, 2022) ("As of 2022, the U.S. kept about 700 troops in northeastern Syria to help the SDF battle the remnants of ISIS"); Humud, *supra* note 37 (describing SDF as "U.S.-backed"); Cameron Glenn, *Timeline: US Policy on ISIS*, Wilson Ctr. (April 27, 2016), https://www.wilsoncenter.org/article/timeline-us-policy-isis (SDF among vetted opposition groups that received US support).

[46] *Timeline: US intervention in Syria's war since 2011*, Al Jazeera, (Oct. 7, 2019) https://www.aljazeera.com/news/2019/10/7/timeline-us-intervention-in-syrias-war-since-2011; Luis Martinez & Elizabeth McLaughlin, *What you need to know about US military involvement in Syria as Trump orders withdrawal*, ABC News (Dec. 20, 2018) https://abcnews.go.com/Politics/us-military-involvement-syria-trump-orders-withdrawal/story?id=59930250 (last visited July 27th, 2022).

strategic Syrian town of Tal Abyad on the Turkish border. The SDF took full control of the military base, Ain Issa, from ISIS militias that same month. By 2015, SDF installed the "Dêrik prison" for captured Islamic State members in al-Malikiyah.

In November 2015, France increased airstrikes on Raqqa as a response to the November 13 Paris attacks, weakening the Islamic State's hold on the area. While ISIS continued to focus its energies on attacks in different regions, the SDF, backed by U.S. airstrikes, launched a mission to recapture the city of Raqqa in 2016.[47] In the preliminary phases of the battle for Raqqa, SDF cut off Islamic State supply routes to isolate Raqqa. Around the same time, the Assad regime captured the last rebel-held enclave of eastern Aleppo and much of southeastern Syria.[48]

Throughout June 2017, the second phase of the battle for Raqqa commenced, leading to a bloody siege on the city. After four months of bloodshed, the remaining IS militants surrendered in Raqqa, leaving the Islamic State with only a small piece of territory in Syria along the Euphrates River.[49] Still, throughout 2018, the Islamic State remained in Syria, engaging in guerilla warfare throughout the country and harassing local populations with small-scale terrorist attacks.[50] The organization carried out an average of 127.1 attacks per month in 2018.[51] The Islamic State lost its last remaining territory, in Baghuz, Syria, on March 23, 2019.[52] On October 13, 2019, President Donald Trump ordered the withdrawal of U.S. troops from northern Syria,

---

[47] Glenn, *supra* note 20.

[48] Laub, *supra* note 6.

[49] Mapping Militant Orgs., *The Islamic State*, Stanford Univ. (last modified April 2022) https://cisac.fsi.stanford.edu/mappingmilitants/profiles/islamic-state#_ftnref85; Glenn, *supra* note 20.

[50] Mapping Militant Orgs., *supra* note 43.

[51] Michael Knights, *The Islamic State Inside Iraq: Losing Power or Preserving Strength?*, Combatting Terrorism Ctr. at West Point: CTC Sentinel 11, no. 11 (December 2018), 2.

[52] Rukmini Callimachi, *ISIS Caliphate Crumbles as Last Village in Syria Falls* N.Y. Times (March 23, 2019) https://www.nytimes.com/2019/03/23/world/middleeast/isis-syria-caliphate.html.

which provided foreign forces and SDF prisoners with the opportunity to make advancements in the region.

## BACKGROUND OF EMRANN ALI

### I. Life before moving to Syria

Emraan Ali is 54-year-old, naturalized United States Citizen who was born on July 4th, 1967 in Trinidad & Tobago. He resided in Trinidad & Tobago until 1991. From 1991 until 2008 he lived in New York, before he relocated to Syria in 2015.Mr. Ali is fluent in English, as he lived in New York for seventeen years and is from the English-speaking country of Trinidad & Tobago. Mr. Ali is married to Sulaimah Mohammad and together they have 5 children, and he is the stepfather to his wife's daughter. He also has three sons from a prior marriage and two daughters from a prior relationship.

In Trinidad and New York, Mr. Ali was employed in construction and real estate. After hearing and seeing posts of other Muslims from Trinidad and Tobago move to ISIS, in March of 2015, Mr. Ali and his family moved to Syria to join some of his wife's family who were residing there. Mr. Ali and his family settled into the town of Raqqa by late 2015, where Mr. Ali expected to work in construction or run a business. As detailed above, in 2017 the area where Mr. Ali and his family were residing came under bombing attacks by Syrian Democratic Forces (SDF). During these bombing attacks, two of Mr. Ali's children were killed.

### II. Custody of Emraan Ali

In March 2019, Mr. Ali and his two eldest sons surrender to SDF near Baghuz, Syria, and were interviewed on video by members of the U.S. Department of Defense near Tanak Oil Field, Syria. Initially, Mr. Ali and his sons were held in custody for about twelve days at or near the US base in Tanak. Mr. Ali and his sons were taken to a room approximately 12x12 feet that was

used for storage at the checkpoint. There was no toilet, sink, or light, and they stayed there for twelve days. Thereafter, they were taken by SDF to a camp and then to the Omar prison for three days.

The drive to Omar prison was approximately five minutes away, and once he arrived, he was met with a scene of horror. Mr. Ali met people with wounds that were rotting with worms. Mr. Ali also witnessed a noise of constant screaming all day and night at the prison, from people who were wounded and received no help. After Omar Prison they were moved to Shaddadi Prison where they stayed three months.

U.S. and SDF officials have described the prisons as "makeshift" facilities from schools, hospitals and other abandoned buildings that were quickly converted to contain over 10,000 IS captured fighters. Additionally, officials had warned that the facilities were "good enough for the moment, but it would be dangerous to consider these facilities a permanent solution."[53] SDF at the time, stated they were holding 12,000 prisoners, including 4,000 foreigners, in seven detention camps around northeast Syria (the region where Shaddadi is located).[54]

A journalist from *The Times of London* visited one of the detention facilities and filmed what he saw. The footage shows cells with dozens of men in orange jumpsuits packed together like sardines and an equally crowded medical block holding boys. The journalist stated that among the detainees were British, French, Belgian, and US citizens held in "terrible, terrible conditions."[55] Another journalist who visited a detention center in the northeastern region of

---

[53]Jeff Seldin, *US Moves to Bolster Prisons Holding Captured Islamic State Fighters*, VOA News (April 4, 2020), https://www.voanews.com/a/middle-east_us-moves-bolster-prisons-holding-captured-islamic-state-fighters/6186950.html (last visited July 29th, 2022).

[54] *Id.*

[55] *Northeast Syria: Boys, Men Held in Inhumane Conditions*, Hum. Rts. Watch (Oct. 8, 2019), https://www.hrw.org/news/2019/10/08/northeast-syria-boys-men-held-inhumane-conditions (last visited July 29th, 2022).

Syria said he saw "several prisoners had multiple amputations" and he had seen a prisoner with "intestines hanging out beneath bloody dressing.[56]

While in Shaddadi Prison, Mr. Ali was placed in an isolation cell for 40 days with no lights or windows, for no reason. When Mr. Ali was being loaded on the truck to be transported to Shaddadi, a guard grabbed him by the beard and began to beat him. He was placed in a room approximately 25x12 feet with approximately sixty other people with one sink, no windows, an exhaust wall fan, and some power that was supplied by a generator. The generator was cut off sometimes and people would faint around him from not being able to breathe. Mr. Ali witnessed people being taken to get fresh air but some would return and others would disappear. During this time Mr. Ali was separated from his son, once he was interviewed he asked for his son back. He was put together with his son in a room infested with lice and bugs, which resulted in both of them getting scabies and boils. Mr. Ali recounts that at times there was no water for days, and when water did come it was gone after twenty minutes.

After Shaddadi, they were moved to Ya'arubiya [al-Hasakah]. To be transported, Mr. Ali and his son were blindfolded and handcuffed. When he arrived, still blindfolded and handcuffed, he was hit with a pipe about five times until he fell down pretending, he was dying. In Ya'arubiya they stayed for 20 days. While at Ya'arubiya, he was placed in a room approximately 25x20 feet with no ventilation except for two 6x6 holes at the top of the wall. Mr. Ali recounts not being able to breath and the floor being wet from moisture dripping from the ceiling and pipes. Mr. Ali pleaded for help, even though he feared retaliation from the guards. The guards did begin moving those who were in worst conditions first, and at this time Mr. Ali was separated from his sons. Mr. Ali later found out his son was beaten severely for being from the United States.

---

[56] *Id.*

12

Then SDF transferred Mr. Ali and his sons to Ayn Issa Prison, so Mr. Ali could be interviewed by the FBI. He was in this prison for eight days prior to this interview. The conditions at Ayn Issa consisted of a prison room that was about 20 by 15 feet with concrete black small rooms approximately 6x5 on both sides with a steel door. Prior to his FBI interviews, he had witnessed many other prisoners who were taken out of the cell for questioning. Many were returned and told him that they were of tortured by the SDF because they were not cooperative in their willingness to speak to the Americans. This fear of being electrocuted and otherwise abused was at the forefront of his agreement to speak to the FBI without a lawyer on August 7th and 8th of 2019. He had already been in the prison for several months at that point and believed he could be "disappeared" at any time without anyone knowing or inquiring about him.

### III.    Prison Prior to September 2020 Interview

After the interview Mr. Ali was returned to SDF custody by the SDF guards. At the time of the interview Mr. Ali advised the officials that he believed he was sick from contracting a virus in prison and he was having difficulty eating; he was also suffering from low blood pressure and a pinched nerve in his neck. In addition, he had difficulty breathing in his cell and would have to sit in the hallway to be able to breathe. Mr. Ali was put back into the dark room, where he stayed for forty-two days. One of the bosses asked a guard why he was still in the dark room, and he said they were instructions from the United States. The prison had separated the sick people who had hepatitis or tuberculosis from the bigger population and would place them in the small black rooms.

Turkey began bombing the area where the prison was, and after two days of no food they were loaded into a dump truck and taken to Tabha. Mr. Ali remained in Tabha for approximately

13

one week with one hundred and twenty people. The room had no toilet, sink, or windows. Mr. Ali and his sons were then transported to their final destination before being transported to the United States.

Around March 2020, he was moved to Hasakah Prison until he was flown to Miami in September of 2020. The majority of the ISIS captured fighters and prisoners (85%) were held at the two SDF prisons run in Hasakah and Shaddadi, where each housed 3,000 to 5,0000 prisoners.[57] Similar to the detention center Mr. Ali was held at in Shaddadi, conditions here were very poor. The detention center was converted from old schools and warehouses where dozens of people shared a single cell. Boys as young as fourteen shared a prison cell with older men.

Tensions in these prisons were high, as there was a riot in March of 2020. The Hasakah facility holds low-level ISIS members, but this did not stop an uprising. As several ISIS members escaped the prison in March of 2020, by ripping off doors and using them to break down a wall during the uprising. The prisoners ended up taking over the first floor of the prison and some managed to escape before the prison was stabilized. [58] Mr. Ali's sons while at the Hasakah prison were beaten for exercising.

### IV.      September 28, 2020, Interview of Emraan Ali

On December 3, 2019, a Criminal Complaint was presented in the Southern District of Florida against Emraan Ali and thereafter an arrest warrant was issued. Between this time and September of 2020, Mr. Ali was in Syria under SDF custody and was not aware of any criminal charges against him. On September 28, 2020, the arrest warrant was executed on Mr. Ali by two

---

[57] Andrew Hanna, *Islamists Imprisoned Across the Middle East*, <u>Wilson Ctr.</u> (June 24, 2021), https://www.wilsoncenter.org/article/islamists-imprisoned-across-middle-east (last visited July 29th, 2022).

[58] Jessie Yeung, Ryan Browne, & Ghazi Balkiz, I*SIS Memebers riot and break out of Syrian prison*, <u>CNN</u>  (Mar. 30, 2020), https://www.cnn.com/2020/03/30/middleeast/isis-prison-escape-syria-intl-hnk/index.html (last visited July 29th, 2022).

FBI agents when he was taken from the Syrian prison to a US transport airplane. While on the airplane Mr. Ali was handcuffed, blindfolded, masked, and had noise cancelling headphones on. Sometime after the US flight was boarded, Mr. Ali was questioned by two FBI Agents.

During the interview his blindfold and headphones were removed. The first thing he was told by the Agents was about COVID, how the world was shut down and millions have died. Mr. Ali had been unaware of the COVID pandemic. Next, the Agents read the attached Advice of Rights Form to Mr. Ali and asked him whether he agreed to talk to them without a lawyer present. Mr. Ali asked for a lawyer and understood from the Agents that there was none available during the entirety of the flight. The Agents ignored Mr. Ali's request for a lawyer, presented him a pen to sign the Advice of Rights form, which he signed. Thereafter, Mr. Ali proceeded to answer questions for approximately one hour and forty-seven minutes. During this interview, Mr. Ali was offered water and a banana. Mr. Ali asked for a break and used the restroom, and the interview was stopped for an unknown amount of time.

During this break, the flight took off destined for Miami, Florida. Sometime thereafter when the plane was in midflight, the Agents returned to Mr. Ali who was sleeping to continue the interview. The blindfold and earphones were removed, and he was offered some water. The interview continued for approximately another hour and ten minutes.

## Legal Arguments

I.   **US Government Agents Took a Coerced, Involuntary Statement on September 28, 2020, from Emraan Ali After He Was Held Confined for One and a Half Years in Syria**

   A.   **The September 28th Statement was Fruits of the Poisonous Tree and Must be Suppressed**

   In conjunction with this instant motion Emraan Ali has filed another Motion to Suppress

Statements he made to U.S. Agents on August 7 and 8, 2019, based upon coercion and threat of torture. He specifically incorporates by reference all facts and arguments cited in that motion herein. The September 28, 2020 statement at issue in this motion occurred approximately a year after that statement. This statement flowed from that first detention and similarly is fruit of the poisonous tree which calls for the September 28th statement to also be suppressed.

The "fruit of the poisonous tree" doctrine may require exclusion of a subsequent confession only if the prior confession was obtained in violation of the Fifth Amendment. United States v. Mendoza-Cecelia, 963 F.2d 1467 (11th Cir. 1992), citing Oregon v. Elstad, 470 U.S. at 306 and Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985).

In Mr. Ali's case the first statements from August 2019 are challenged as involuntary, coerced and taken in violation of the 5th Amendment, not only Miranda. Therefore, the fruit of the poisonous tree doctrine should apply to similarly exclude this September 2020 statement as well.

The Supreme Court has recognized that subsequent confessions could be similarly suppressed unless there was a break in the stream of events between the two statements.  See Clewis v. Texas, 386 U.S. 707 (1967); see also Wainwright v. La Salle, 414 F.2d 1235 (5th Cir. 1969)(holding that better warnings before a subsequent confession will not "break the stream of events" from a prior invalid confession). Similar to the facts in the Clewis case, there was a long period of custody where the Mr. Ali was not fully advised that he could consult with appointed counsel; he was also transported and held in various locations and in these custody locations he was held under poor conditions; and Mr. Ali similarly had no prior experience or been in trouble with the law before. All these facts support a finding that there was nothing to break the

continuous chain of events between the first coerced statements in August of 2019 and

September of 2020.

**B.      The September 28, 2020 Statement on its Own is also involuntary under that Totality of the Circumstances**

Even if this statement was not the excludable fruit of the prior coerced statement,

standing alone the September 28, 2020, statement was involuntary and must be suppressed. The

Due Process Clause to the U.S. Constitution guarantees the right to silence unless a criminal

suspect "chooses to speak in the unfettered exercise of his own will." Malloy v. Hogan, 378 U.S.

1, 8 (1964). This bar on coerced confessions is a hallmark of the U.S. criminal justice system.

The Supreme Court has repeatedly held that due process prohibits the government's use of

involuntary statements obtained through psychological pressure, physical intimidation, torture or

other mistreatment.  Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973); Lego v. Twomey,

404 U.S. 477, 489 (1972).

In evaluating whether or not a confession was made voluntarily, federal courts consider

the "totality of the circumstances" surrounding the interrogation, including the age, intelligence

and education level of the accused; the length of the detention and interrogation; and the use of

physical punishments such as the deprivation of food or sleep. Schneckloth, 412 U.S. at 226

(assessment includes evaluation of the characteristics of the accused and the details of the

interrogation).

**1. Conditions of Confinement**

Federal courts have already determined that conditions of confinement such as solitary or

isolation and restriction on communication and lack of substantial food, etc.  result in involuntary

confessions and require the resultant statements be excluded.

17

In Brooks v. Florida, 389 U.S. 413, 414-15 (1967), defendant's confession held to be involuntary where defendant was held in solitary confinement for 14 days, fed minimal food rations, forced to be naked, and saw no one from outside prison. Specifically, "the cell was 7 feet long and 6 1/2 feet wide; a witness for the State testified it was 6 feet longer. This minor difference aside, the parties agree that the punishment cell had no external window, that it contained no bed or other furnishings or facilities except a hole flush with the floor which served as a commode, and that during the first 14 days he lived in this cell Brooks' only contact with the outside was an unspecified number of interviews with the prison's investigating officer. It is also agreed that while so confined Brooks was fed a "restricted diet" consisting, according to the testimony of the investigating officer, of "peas and carrots in a soup form" three times daily. Brooks' more detailed description of this concoction -- "they fed us four ounces of soup three times a day and eight ounces of water" -- was not controverted, nor was his testimony that he was stripped naked before being thrown into the cell. On the 15th day of confinement under these conditions, Brooks was taken from the punishment cell and again brought directly to the investigating officer. This time, shortly after questioning began, Brooks confessed and dictated his statement into a tape recorder." at 413-414.

In Haynes v Washington, 373 U.S. 503, 514-15 (1963), the confession was found to be involuntary and excluded after the defendant was held incommunicado from his family for 5 to 7 days after his arrest until he agreed to cooperate with police. This police behavior was found to be a threat and the Court stated, "the secret and incommunicado detention and interrogation -- are devices adapted and used to extort confessions from suspects."

In United States v. Koch, 552 F.2d 1216, 1219-20 (7th Cir. 1977), the defendant's statements were deemed involuntary as, "it was extracted through confining him to a "boxcar"

18

cell for six hours. The evidence showed that a boxcar cell is a 6 feet x 8 feet room with an interior barred door and an exterior solid door that is kept shut. The solitary occupant is deprived of all personal property and is without visibility outside of the cell, "necessary hygiene" or ability to speak to others." The court found that this was a form a punishment and also an implied threat of further punishment if he didn't provide a statement.

In Townsend v. Henderson, 405 F.2d 324, 327-29 (6th Cir. 1968), the defendant was placed, "in solitary confinement and was suffering from a head wound received the preceding day which had rendered him unconscious and for which he had received medical treatment during the interim…. when a prisoner was subjected to solitary confinement, he was stripped of his clothes and placed in a dark cell on a diet of bread and water. The cell contained only the most primitive sanitary facilities and a board for a bed." The Court recognized, "Coercion that vitiates a confession can be mental as well as physical." The conviction was revered because the confession was obtained in a manner clearly prohibited by constitution. See further Stidham v. Swenson, 506 F.2d 478 (8th Cir. 1974) (suspect's statement was involuntary, in part because suspect's imprisonment in solitary confinement for eighteen months in subhuman conditions, including a bug-infested cell, lack of sufficient food, and denial of visits with family and friends.

"[A] finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient" Ariz. v. Fulminante, 499 U.S. 279, 287 (U.S. 1991). Court have considered less traditional forms of coercion, including psychological torture, and conditions of confinement in assessing the voluntariness of the statements.

Emraan Ali was in Shaddadi prison for several months in the spring and summer of 2019. He was moved to Hasakah Prison until he was flown to Miami in September of 2020. The majority of the ISIS captured fighters and prisoners (85%) were held at the two SDF prisons run

19

in Hasakah and Shaddadi, where each housed 3,000 to 5,0000. Prior to his boarding the plane Mr. Ali had observed over the course of 18 months how those who do not cooperate with their captures face physical punishment for non-compliance.

### 2. Length of Detention

Taken into custody in March of 2019 and held in 4 or 5 different prisons with no charges pending against him anywhere in the world, until September 28, 2020, when he was put on a US airplane. For over a year and six months, this United States citizen was held incommunicado from his family and friends with no contact from an attorney or a US Consulate.

Cases have discussed impermissible detention for much shorter periods of time. For example, 5 days in Chambers v. Florida, 309 U.S. 227(1940); 14 days in Brooks v. Florida, 389 U.S. 413, 414-15 (1967) (confession was involuntary where the defendant was held in solitary for 14 days, "saw not one friendly face from outside the prison" and was "completely under the control and domination of his jailers"; for 16 days in Davis v. North Carolina, 384 U.S. 737 (1966).

### 3. Personal Characteristics of Client

In analyzing the totality of the circumstances to determine voluntariness the Court also looks at the personal characteristics of the defendant.  See United States v. Abu Ali, 528 F.3d 210 (4th Cir. 2008), "In making this voluntariness determination, we also look to the district court's factual findings as to Abu Ali's personal characteristics, and the conditions of his confinement. The court noted that Abu Ali "is an intelligent, well-educated man with a rich and graphic vocabulary," and found him "intelligent, capable, and articulate," Id. at 378. It is undisputed that Abu Ali attended school in Saudi Arabia, and he does not allege any religious, cultural, or linguistic difficulties in dealing with his Saudi interrogators. Indeed, he responded to

his interrogators' questions in Arabic, and the district court found that the Saudi officers provided him with a prayer rug and Koran among other accommodations. For these reasons, Abu Ali's personal characteristics did not render him particularly susceptible to coercion or pressure." Id.

Emraan Ali did not complete high school. As a young man at approximately the age of 18 he left his native Rio Claro, Trinidad, a very small town in the south central forests of Trinidad, and moved to New York in search of a living wage. He went from day labor work to full time construction. His reading and writing ability to this day are limited.

### 4. Conditions of Interrogation

Lastly, the specific conditions of the interrogation must be evaluated. Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973), including such things as "breaks, access to food, water, a bathroom, and refreshments during breaks in questioning" and the defendant's ability to communicate in the language used by the interrogators. See Abu Ali at 234. During interrogation Mr. Ali was given brakes. He was, however kept shackled at all times when not being interrogated. He was also kept with ear and eye covers while not being interrogated. In other words, his only respite from complete sensory deprivation and immobilization was during the time he was being questioned. He was allowed water and use of a restroom as needed.

### C. An Involuntary Confession Must be Excluded

The Supreme Court has repeatedly recognized that it is inconsistent with the justice system of any civilized society to permit the introduction of involuntary confessions. In Rogers v. Richmond, the Court stated that "ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." Rogers v. Richmond, 365 U.S. 534, 540-41 (1961). See also Rochin v. California, 342 U.S. 165, 173

21

(1952) ("Coerced confessions offend the community's sense of fair play and decency"); Lyons v. Oklahoma, 322 U.S. 596, 605 (1944)("A coerced confession is offensive to basic standards of justice, not because the victim has a legal grievance against the police, but because declarations procured by torture are not premises from which a civilized forum will infer guilt."). The Court stated this same view when it noted the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." Jackson v. Denno, 378 U.S. 368, 386 (1964), citing Blackburn v. Alabama, 361 U.S. 199, 206-07 (1960).

By excluding involuntary admissions, the Court explained, the law deters unlawful conduct, "The abhorrence of society to the use of involuntary confessions turns not only on their inherent untrustworthiness, but also on the feeling that the police must obey the law while enforcing it, and that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Spano v. New York, 360 U.S. 315, 320-21 (1959).

Therefore, when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, the government must prove by at least a preponderance of the evidence that the confession was voluntary before it can be admitted at trial. See Lego v. Twomey, 404 U.S. 477, 489 (1972); see also Colorado v. Connelly, 479 U.S. 157, 168 (1986).

**D. Jurisdiction of the United States While in Flight**

The United States Congress has specially recognized that a United States aircraft in flight is considered within the "special aircraft jurisdiction of the United States" for purposes of application of extraterritorial jurisdiction of federal criminal law. 49 U.S.C. § 46501.

22

In addition, Congress has recognized a US owned aircraft is within the "special maritime and territorial jurisdiction of the United States" "while such aircraft is in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State." 18 U.S.C. § 7.

Federal civil jurisdiction has also been inferred from 18 U.S.C. § 7, special maritime and territorial jurisdiction of the United States and special aircraft jurisdiction of the United States under the predecessor to 49 U.S.C. § 46501[59] for civil cases that arise on flights en route to the United States. See Chumney v. Nixon, 615 F.2d 389 (6th Cir. 1980).

Therefore, if Mr. Ali had committed a crime while on this flight in question or an act giving rise to civil liability, he would be considered completely within US jurisdiction for these purposes. It only stands to reason that this United States Citizen who was in sole custody of US federal agents on a US aircraft headed straight to the United States was also in US jurisdiction for purposes of Miranda and could no longer be considered on foreign soil allowing for any "modified" warnings.[60]  No circumstances are reasonably present that would require any modification of the traditional Miranda rights to counsel in this case as they were on a US plane.

**E. Advice of Rights was False, Misleading and Wholly Inadequate**

The Advice of Rights form provided to Mr. Ali by federal agents addressed only two things: the right to remain silent and the right to counsel. The statements on the form related to the right to counsel were not accurate. Each sentence will be analyzed:

---

[59] formerly 49 U.S.C. § 1301

[60] Other Circuits have approved of modified Miranda advisements when questioning is done in foreign countries.  See Cranford v. Rodriguez, 512 F.2d 860 (10th Cir. 1975); United States v. Dopf, 434 F.2d 205 (5th Cir. 1970); United State v. Odeh, 552 F 3d 180 (2d Cir. 2008).

1. "We are law enforcement agents from the Federal Bureau of Investigation. Even though *we are not in the United States*, United States laws provide you with certain rights in your dealings with us."

This statement is not accurate as discussed above, he was now in US jurisdiction. This statement is meant to mislead Mr. Ali into believing that he was in the same situation as when he was being interrogated on Syrian soil and therefore no able to have an attorney present during the questioning.

2.  "You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, you have the right to have one appointed for you before any questioning, if you wish."

As Mr. Ali is now in US jurisdiction he *should* have these rights, but they are immediately removed by the following sentence.

3. "However, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney."

This statement is patently false and again misleads Mr. Ali into believing that he is still in Syria under foreign control when he is in fact in US jurisdiction where the Agents have no limitations and could absolutely secure Mr. Ali an attorney. In addition, this sentence completely vitiates the prior rights regarding an attorney that were just explained.

First, because Mr. Ali was in US jurisdiction, he should have received full and complete Miranda warnings and most importantly been properly advised of his right to an attorney prior to questioning. However, even if this were a circumstance where Miranda warnings could be modified under certain circumstances, the modifications must be truthful. See Cranford v.

24

Rodriguez, 512 F.2d 860 (10th Cir. 1975); United States v. Dopf, 434 F.2d 205 (5th Cir. 1970); United State v. Odeh, 552 F 3d 180 (2d Cir. 2008).

Moreover, although the Miranda warnings do not have to be read verbatim in an exact form, they must reasonably convey a suspect his rights. See Duckworth v. Eagan, 492 U.S. 195 (1989). Specifically, the right to counsel cannot be mis-conveyed to be linked to some future point in time after interrogation. Id; see also California v. Prysock, 453 U.S. 355 (1981) (recognizing other cases where, "In both instances the reference to appointed counsel was linked to a future point in time after police interrogation, and therefore did not fully advise the suspect of his right to appointed counsel before such interrogation.").

The "crucial test" for determining whether a proper warning was given "is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights." Coyote v. United States, 380 F.2d 305, 308 (10th Cir. 1967). Further, a waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421, (1986).

In Mr. Ali's case, the Advice of Rights form not only was inaccurate but essentially advised him that he had a right to counsel at some future time after he got off the airplane when an American-trained attorney would be available, but he certainly was not advised that an attorney would be appointed or available before the interrogation as required by U.S. Supreme Court caselaw.  These warnings were inaccurate, misleading and altered the right to counsel in material way and therefore were not sufficient.  This was evidenced by the fact that Mr. Ali questioned requested an attorney and the Agents ignored this request and pushed forward with the signing of the waiver form.

**III.    Emraan Ali Invoked Right to Counsel and Any Questioning AFTER Invocation was Illegal and Must be Suppressed**

Emraan Ali's interrogation was audio recorded however due to the noise on the flight, many parts are difficult to hear. The Government has provided a transcript of the recording. On page 4-5 of the transcript the Agent reads the Advice of Rights form to Mr. Ali and afterward asks, "do you want to talk to us?"  Mr. Ali then asks an unintelligible question to which the Agent responds, "Well, it's your decision to make". Then there is a statement by Mr. Ali, "This is the way I see it. I see it as, uh, obviously I mean of course I would love to have an attorney, but there is none. And uh, I mean you guys uh [UI] the situation. And this, uh, and it is probably the best thing uh to have an attorney." Here is it clear that Mr. Ali invokes his right to counsel. However, the Agent ignores this invocation and says, "No, uh, I-I-I want you to make the decision, I mean, just yes or no if you want to talk to us." In this statement, the Agent first is acknowledging that Mr. Ali has asked for an attorney but there is no attorney when he says, "No" and then goes on to try to change his mind again by asking him to "make a decision" to speak to without an attorney.  Then Mr. Ali says something unintelligible and the Agent gives him a pen to sign the form prior to the questioning beginning.

Mr. Ali makes a clear and unambiguous request for counsel: "I would love to have an attorney but there is none" and "It is probably the best thing uh to have an attorney".  Whether a suspect has invoked the right to counsel is an objective inquiry that requires "at a minimum, some statement that can reasonably be construed to be an expression of desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, (1994)(quoting McNeil v. Wisconsin, 501 U.S. 171, 178, (1991)). "A statement either is such an assertion [of the right to counsel] or it is not . . . Although a suspect need not 'speak with the discrimination of an Oxford don, he must

26

articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis</u> at 459.

If a suspect indicates in any manner at any time during a police interview that he or she wants the help of a lawyer the interrogation must cease because they are not subject to further questioning until a lawyer has been made available. <u>Edwards v. Arizona</u>, 451 U.S. 483, 484-85 (1981). A suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. <u>Minnick v. Mississippi</u>, 498 U.S. 146 (1990). Further, a suspect's statements after a clear invocation of his rights may not be used to find that his invocation of rights was ambiguous. <u>Smith v. Illinois</u>, 469 U.S. 91 (1984)(holding that accused's post-request responses to further interrogation may not be used to cast retrospective doubt on clarity of initial request itself).

In similar factual situations it has been held that there was a valid invocation of the right to counsel. See <u>United States v. Lee</u>, 413 F.3d 622, 624 (7th Cir. 2005)(determining clear assertion of right to counsel where defendant asked "Can I have a lawyer?"); <u>United States v. Salazar-Orellana</u>, 2010 WL 3293343 (N.D. Ga. June 18, 2010)(Court rejected the Government's argument that statement "Can you get me an attorney" was more an inquiry about learning the process about how to obtain an attorney rather than a clear request for counsel, and ruled to suppress subsequent statement).  In contrast in <u>Davis</u>, the Supreme Court found a present desire for counsel lacking and thus suspect's statement was ambiguous (e.g., "maybe I should talk to a lawyer" but then he clarified that he was not asking for nor did he want a lawyer).

After the right to counsel or silence has been asserted by an accused, further interrogation of the accused should not take place unless the accused himself initiates further communication, exchanges, or conversations with the police. <u>Oregon v. Bradshaw</u>, 462 U.S. 1039 (1983). In

27

addition, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards at 484.

In Mr. Ali's case it is clear he expressed an unequivocal desire for an attorney which he had been repeatedly told was not available under the circumstances. At that point, the Agents must stop questioning him. Nothing Mr. Ali said after this invocation can be used to cast doubt on this invocation, even his acquiescence to the Agents when he signed the form and continued answering the questions they posed. Therefore, the totality of Mr. Ali's statement made to the Agents after this invocation must be suppressed.

## Conclusion

WHEREFORE for the foregoing reasons, Mr. Emraan Ali moves this Court to suppress his statements made to United States law enforcement in September of 2020.

Respectfully submitted,

_____/S/_____

Khurrum B. Wahid
Counsel for Emraan Ali
Wahid Vizcaino Geller LLP
2103 Coral Way, Suite 401
Miami, FL 33145
(305)444-4303
(305)444-4302 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of September, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either by electronic transmission generated by CM/ECF, or in some other manner for those counsel or parties who are not able to receive electronic filings.

Respectfully submitted,

Wahid Vizcaino Geller, LLP
2103 Coral Way, Suite 401
** PLEASE NOTE NEW FIRM NAME AND ADDRESS
Miami FL 33145
Phone: (305) 444-4303
Fax: (305) 444-4302
khurrum@wvglegal.com


_____/s/_____
Khurrum B. Wahid
FL Bar No. 178764