**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO:  21-CR-20123-BLOOM**

**UNITED STATES OF AMERICA,**

 **Plaintiff,**

vs.

**EMRAAN ALI,**

 **Defendant.**

_____/

**MOTION TO SUPPRESS STATEMENTS MADE IN VIOLATION OF THE**
**PRESENTMENT CLAUSE**

**Facts**

Emraan Ali was taken into custody by SDF in March of 2019 and was not transported to the United States until September 28th, 2020.  Within that year and six months of confinement, Mr. Ali was held in five different detention centers located around Syria. Initially Mr. Ali was held for twelve days near the U.S. base located at the Tanak Oil Fields. After being interviewed by members of the U.S. Department of Defense, Mr. Ali was returned to the custody of SDF, and taken to Omar Prison for three days. After three days, he was transported to Shaddadhi prison. Mr. Ali was placed in isolation in a 5-foot by 5-foot cell with no toilet and was allowed outside once a day.  Mr. Ali was eventually released from isolation but remained in Shaddadhi for three months.

Mr. Ali was then transported to Ya'arubiya and remained there for approximately twenty days. While in Ya'arubiya Mr. Ali's son was beaten by SDF guards for being an American who traveled to Syria to join ISIS.  Soon after, Mr. Ali was moved to Derik prison for two weeks.

1

This was one of the most secure detention centers for ISIL members is the located in al-Malikiyah, a town near the Iraq-Syria border, where about 400 ISIL fighters were held. Mr. Ali fell sick from an unknown virus he contracted from the Prison, and he had a difficult time hearing and was suffering from low blood pressure. The conditions of each prison were very poor as they were converted from old schools, hospitals, or warehouses with minimal medical care.

In late July 2019 Mr. Ali and his two sons were sent to Ayn Issa Prison. When they arrived, they were placed in in the "black hole". It had no lights and was a room approximately 20x15 with concrete black small rooms approximately 6x5 on both sides with a steel door. Once a day they would give prisoners food and let them use the toilet. All 3 of them were put in one 6x5 room. Emraan Ali got sick from the lack of air so they took him out of the small room and into the hall to get some air.

On August 7th and 8th, 2019, Mr. Ali was blindfolded and handcuffed to be taken into a room to be interviewed by the FBI. The U.S. agents interviewed Mr. Ali's sons first and then separated the three after the interviews. They interviewed Emraan Ali for approximately 8 days. He asked for a lawyer but was told they cannot provide one but if he cooperated, they would be able to help him. Around March 2020, he was moved to Hasakah Prison until he was flown to Miami in September of 2020. Durring this flight, Mr. Ali was again interviewed for a number of hours by the FBI.

The majority of the ISIS captured fighters and prisoners (85%) were held at the two SDF prisons run in Hasakah and Shaddadi, where each housed 3,000 to 5,0000 prisoners.[1] Similar to the detention center Mr. Ali was held at in Shaddadi, conditions here were very poor. The

---

[1] Andrew Hanna, *Islamists Imprisoned Across the Middle East*, Wilson Ctr. (June 24, 2021), https://www.wilsoncenter.org/article/islamists-imprisoned-across-middle-east (last visited July 29th, 2022).

detention center was converted from old schools and warehouses where dozens of people shared a single cell. Boys as young as fourteen shared a prison cell with older men.

Tensions in these prisons were high, as there was a riot in March of 2020. The Hasakah facility holds low-level ISIS members, but this did not stop an uprising. As several ISIS members escaped the prison in March of 2020, by ripping off doors and using them to break down a wall during the uprising. The prisoners ended up taking over the first floor of the prison and some managed to escape before the prison was stabilized. [2] While at the Hasakah prison, Mr. Ali's sons were beaten for exercising.

While in custody in Syria, Mr. Ali had no ability to communicate with a lawyer, his other family members or friends.

At no time while he was in custody in Syria was Mr. Ali ever charged with any violation of law by Syria, SDF or any other country. Mr. Ali was never brought to court or participated in any legal proceeding while in custody in Syria.

However, a criminal complaint was filed and pending against Mr. Ali by the United States in this case on December 5, 2019.

Declassified communications between the U.S. and SDF show that the United States government, via the FBI agents, were aware of Mr. Emraan Ali's capture as early as March 20, 2019.  On or about June 22, 2019 the FBI sent a "tearline", via the FBI's Legal Attache in Baghdad, Iraq, to the SDF. This was a U.S. request to the SDF to confirm the location of Emraan Ali within SDF facilities. On or about July 9, 2019, the FBI received word back that Mr. Ali was in Shaddadi prison. A request by the U.S was made to SDF to transfer him to Ayn Issa prison for

---

[2] Jessie Yeung, Ryan Browne, & Ghazi Balkiz, I*SIS Memebers riot and break out of Syrian prison*, <u>CNN</u>  (Mar. 30, 2020), https://www.cnn.com/2020/03/30/middleeast/isis-prison-escape-syria-intl-hnk/index.html (last visited July 29th, 2022).

questioning by U.S. Agents. Pursuant to this U.S. request, Mr. Ali was transferred and interviewed by U.S. Agents at this prison of the FBI Agents' choosing. In December of 2019, the FBI again asked the SDF for the location of Mr. Ali. On January 24, 2020, the SDF provided the location of Mr. Ali to the FBI and the FBI received a response from the SDF informing that he was at Hasakah Prison. The FBI, in March of 2020, again requested the SDF transfer Mr. Ali and the SDF complied, bringing him to the Northern Landing Zone in Syria. The U.S. informed the SDF, that that US would be taking Mr. Ali into US custody at that location. The SDF transferred the custody of Mr. Ali to the United States here pursuant to U.S. instructions and Mr. Ali was flown on a U.S. military flight directly to Miami, Florida to face the charges in this case.

<b>Legal Argument</b>

Mr. Ali's statements are fatally tainted by a violation of the McNabb-Mallory rule and 18 U.S.C. **§**3501(c) through the use of a secret detention and must be suppressed.

**I. EMRAAN ALI'S STATEMENTS AND THEIR FRUITS ARE INADMISSIBLE AS THEY WERE OBTAINED IN VIOLATION OF THE MCNABB-MALLORY RULE AND 18 U.S.C. §3501 THROUGH THE USE OF A SECRET DETENTION IN SYRIA**

**A. Federal Presentment Requirement**

Mr. Ali moves to exclude his statements as they were the result of an unlawful presentment delay and in violation of this Due Process Rights, Statutory Rights and Criminal Rules which all mandate that an arrestee be brought before a judicial official without necessary delay. Fed. R. Crim. P. 5(a)(1)(B) states, "a person making an arrest outside of the United States must take the defendant without necessary delay before a magistrate judge, unless a statue provides otherwise." 18 U.S.C. § 3501(c) states,

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law

4

enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

Under 18 U.S.C. § 3501(c), any admissions made within six hours of arrest are deemed admissible as long as they were made voluntarily and are otherwise admissible under the Federal Rules of Evidence. Corley v. United States, 129 S. Ct. 1558 at 1571 (2009)[discussing the presentment exclusionary rule established in McNabb v. United States, 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957)]. However, a confession that is obtained outside of the six hour window can still be admissible if the "longer delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate][.]'" Id. (quoting 18 U.S.C. § 3501(c) (alterations in original)]. "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed." Id. "Therefore, a confession obtained more than six hours after detainment, even when such confession may be otherwise voluntary pursuant to section 3501(b), is by negative implication of section 3501(c) presumptively invalid unless the government can show that such delay was

reasonable given the means of transportation and the distance to be traveled." United States v. Evans, CR-95-H-67-E, 1995 U.S. Dist. LEXIS 5805 (N.D. Ala. Apr. 17, 1995).

When determining whether a violation of Rule 5 has occurred, courts consider the reasons for the delay, United States v. Purvis, 768 F.2d 1237, 1239 (11th Cir. 1985), including factors such as "the availability of a committing magistrate, the length of the delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay." United States v. Mendoza, 473 F.2d 697, 702 (5th Cir. 1973) (citation and internal marks omitted). A "delay for the purpose of interrogation is the epitome of 'unnecessary delay.'" Corley, 129 S. Ct. at 1563 (citations omitted).

In U.S. v. Perez, 733 F.2d 1026 (2d Cir. 1984), the court stated that "statutory language, legislative history and case law bears out, a delay of greater than six hours may by itself be grounds for suppression unless the delay is found to be reasonable." Id. at 1029. The court found that his pre-arraignment statements made after his arrest were properly excluded for violating 18 U.S.C. Section 3501 and Fed. R. Crim. P. 5(a). In Perez, the defendant had been arrested at 3:25 pm, and although a magistrate was available after his processing at 5 pm, he was not arraigned until the next afternoon. See also U.S. v. Riviera, 750 F. Supp. 614 (S.D.N.Y. 1990)(The defendant was picked up from the M.C.C. at approximately 10:00 a.m. and was taken to 26 Federal Plaza for "routine processing" which generally takes one hour and in this case took 65 minutes. At this point, approximately 11:15 a.m., the defendant could have been taken to the United States Courthouse for arraignment before a magistrate. Given the local geography, Rivera was transported right past the courthouse door on his way from the M.C.C. to 26 Federal Plaza. Instead, the defendant was read his Miranda rights and questioned by Agent Galligan and Detective Bostic. This interview resembles the troublesome Southern District United States

6

Attorney's policy of prearraignment interviews, discussed in <u>Perez</u>, <u>United States v. Foley</u>, 735 F.2d 45 (2nd Cir. 1984), cert. den., 469 U.S. 1161, 83 L. Ed. 2d 928, 105 S. Ct. 915 (1985) and <u>United States v. Rondon</u>, 614 F. Supp. 667 (S.D.N.Y. 1985); <u>United States v. Rivera</u>, 750 F. Supp. 614, 620 (S.D.N.Y. 1990). Individuals must not be detained without charges, and must also promptly be advised of the charges on which they are being held.

The purpose of Rule 5, McNabb-Mallory, and 18 U.S.C. § 3501(c) is to prevent "secret detentions." See <u>United States v. Corley</u>, 556 U.S. 303 (2009).  In <u>United States v. Corley</u>, the defendant was initially arrested for assaulting a federal officer at about 8 a.m. and then brought to a hospital to treat a minor injury; at 3:30 pm he was taken from the hospital to the local FBI office (which is in the same building as the nearest magistrate judges) for questioning about bank robbery. About 9.5 hours after his arrest, the defendant began an oral confession that he robbed the bank. He asked for a break, was held overnight and when the he interrogation resumed the next morning he signed a written confession. He was not finally presented to a Magistrate Judge at 1:30 pm., 29.5 hours after his initial arrest. The Supreme Court stated, "[w]ithout McNabb-Mallory, federal agents would be free to question suspects for extended periods before bringing them out in the open, even though 'custodial police interrogation, by its very nature, isolates and pressures the individual,' inducing people to confess to crimes they never committed. <u>Id</u>. (citing <u>Dickerson v. United States</u>, 530 U.S. 428, 435 (2000). As a policy matter, the Court advised, "[W]e have always known what custodial secrecy leads to. No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far." <u>Corley</u> at 320. The Court reiterated that "delay for the purpose of interrogation is the epitome of unnecessary delay." <u>Id</u>. at 309 (internal quotations omitted)(emphasis added).

Further, this right does not disappear overseas. The Constitution restrains the federal government "whenever and wherever the sovereign power of that government is exerted." Balzac v. Porto Rico, 258 U.S. 298, 312 (1922); see also United States v. Yunis, 859 F.2d 953 (D.C. Cir. 1988) (deciding whether a defendant's Fifth Amendment right was violated overseas, and specifically noting that "…in Bram v. United States, 168 U.S. 532 (1897), the Court excluded a confession from an American trial, notwithstanding that the coercive interrogation was conducted by a foreign police officer in a foreign country."). Furthermore, in United States v. Bin Laden, the Southern District of New York undertook the §3501(c) and McNabb-Mallory analysis for defendants held overseas. See 132 F. Supp. 2d 198, 208-09 (S.D.N.Y. 2001) ("…the purpose of the rule (to ensure that the federal government does not improperly conspire with other agencies to evade the requirements of Rule 5(a)) seems equally applicable in the international context.")

**B. The "Working Arrangement" Rule**

In this case, the Government will likely argue that Rule 5, § 3501(c), and McNabb-Mallory's Constitutional protections require that the defendant either be in federal custody or held on federal charges, and that Mr. Ali was in neither position while he was in Syria. See United States v. Bin Laden, 132 F. Supp. 2d at 208-09. While true in part, it is also well-established that, "[F]ederal officials may not collude with [foreign] officers to circumvent federal presentment requirements." Id. at 208 (emphasis added). This is known as the "working arrangement" rule. Id. The "working arrangement" rule was designed to ensure that the federal government does not improperly conspire with local law enforcement to evade the requirements of Rule (5)(a)) Id. When raising a working arrangement issue, "defendants bear the burden of establishing that [the foreign] custody was improperly used to circumvent the rigors of Rule 5(a).

Mere suspicion of a collusive arrangement is insufficient. To satisfy their burden, the Defendants must show that the Government made deliberate use of [the foreign] custody to postpone their presentment requirements." Id. (emphasis added)(internal citations omitted). If, from an objective appraisal of the surrounding circumstances, it appears that a person is detained in local custody for the purpose of allowing federal officers to obtain a confession before he is taken to a commissioner for arraignment in accordance with Rule 5, the confession is ipso facto inadmissible. See United States v. Chadwick, 415 F.2d 167, 170 (10th Cir. N.M. 1969); see also United States v. Alvarez-Sanchez, 511 U.S. 350, 359-69 (U.S. 1994).

Courts have examined many factors to determine whether a "working arrangement" was present. In Bin Laden, the court examined which authorities brought the charges and which authorities dominated the questioning, (citing United States v. Coppola, 281 F.2d 340, 341 (2d Cir. 1960); United States v. Frank, 8 F. Supp. 2d 284, 298 (S.D.N.Y. 1998) (discussing who "conducted and controlled" the investigation)). In fact, the court stated in Bin Laden, "the early and significant involvement of the Americans in the investigation of these Defendants makes this case a closer 'working arrangement' call than many others." United States v. Bin Laden, 132 F. Supp. 2d at 209-210. In addition to examining who conducted the questioning, courts discussed who retrieved and returned the prisoner to and from his cell, whether there were any unconventional actions by the foreign government at the exclusive direction of the foreign government, whether there were foreign charges, and whether there was only nominal local involvement. See United States v. Broadhead, 413 F.2d 1351, 1359 (7th Cir. Ind. 1969); United States v. Bin Laden, 132 F. Supp. 2d at 208-09; United States v. Chadwick, 415 F.2d at 170. For example, in Bin Laden, the court found that the Kenyans controlled the investigation, and because the defendants were being held on Kenyan charges then "the Americans could not

9

reasonably be expected to arrange presentment before a United States magistrate. United States v. Bin Laden, 132 F. Supp. 2d at 208.

In United States v. Abu Ali, 528 F.3d 210 (4th Cir. 2008), the Fourth Circuit touched on this issue in the context of Miranda and assessed whether the Saudi and U.S. Governments were engaged in a "joint venture." In finding that the two Governments were not engaged in a "joint venture," the court emphasized several factors. One, the court noted that the defendant was held pursuant to a Saudi government order, two, "the Saudi government refused to accommodate a request by the United States to directly question [the defendant]," and three, the Saudi interrogators also refused to ask seven of the thirteen questions (a majority) submitted by the United States." Id. at 229 n. 5. Overall, as the court in Bin Laden found, the context makes it clear whether it was the foreign or the U.S. federal government that drove the investigation. See United States v. Bin Laden, 132 F. Supp. 2d at 208-09.

The communication between the United States Government Agents demonstrate the "working arrangement" or "joint venture" between the U.S. Government and the SDF with reference to this U.S. Citizen, Emraan Ali. Mr. Ali was being held by the SDF for no other purpose but for the United States as he was not charged, interviewed, or investigated, etc. by the SDF or any other foreign nation (but the United States) during this time period. Further, it is clear that with reference to Mr. Ali's detention, the SDF was working at the direction of the United States when the United States was able to immediately and automatically locate and direct the movement of Mr. Ali and communicate and interview him at their pleasure at any time during his SDF detention. The U.S.'s control of Mr. Ali is further seen when the U.S. directed the time and place of Mr. Ali's ultimate transfer to U.S. custody for return to the U.S. Each time the FBI made a request of the SDF with reference to Mr. Ali, the SDF complied.

10

Mr. Ali was *defacto* in U.S. custody since at least March of 2019, by virtue of the U.S.'s working relationship and joint venture with the SDF. Therefore, Mr. Ali was subject to Fed. R. Crim. P. 5(a)(1)(B), 18 U.S.C. § 3501(c) and the McNabb-Mallory rule protections which were evaded by the U.S. Government and violated for many, many months until he was finally brought to the United States and stood before a Judge.

WHEREFORE for the foregoing reasons, Mr. Emraan Ali moves this Court to suppress all his statements made to United States law enforcement during this presentment delay.

Respectfully submitted,

_____/S/_____

Khurrum B. Wahid
Counsel for Emraan Ali
Wahid Vizcaino Geller LLP
2103 Coral Way, Suite 401
Miami, FL 33145
(305)444-4303
(305)444-4302 Fax

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of September, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either by electronic transmission generated by CM/ECF, or in some other manner for those counsel or parties who are not able to receive electronic filings.

Respectfully submitted,

Wahid Vizcaino Geller, LLP
2103 Coral Way, Suite 401
** PLEASE NOTE NEW FIRM NAME AND ADDRESS
Miami FL 33145
Phone: (305) 444-4303
Fax: (305) 444-4302
khurrum@wvglegal.com

_____/s/_____
Khurrum B. Wahid
FL Bar No. 178764