UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-20123-BLOOM/OTAZO-REYES

UNITED STATES OF AMERICA

vs.

EMRAAN ALI,
        a/k/a "Abu Jihad TNT,"

        Defendant.
                                                        /

GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS

The United States of America, by and through undersigned counsel, files this response to Defendant Emraan Ali's Motions to Suppress [ECF Nos. 54, 55, and 56] ("Motions to Suppress"). For the reasons below and based on the evidence to be adduced at a hearing, the United States requests that the Court deny the Motions to Suppress.

I.    FACTS

A.  Defendant's Syrian Arrest and Subsequent Detention

On March 17, 2019, Defendant surrendered to Syrian Democratic Forces ("SDF") in Baghuz, Syria near the Tanak Oil Field.  Upon his surrender, Defendant was biometrically enrolled (a process of taking fingerprints, DNA, and pictures) and video-interviewed by members of the United States Department of Defense ("DOD").  Following Defendant's interview and biometric enrollment, Defendant was detained by SDF forces, who thereafter had sole custody and authority over Defendant.

For about three months, Defendant had no interaction with the United States government. On June 27, 2019, however, two members of the FBI's "fly-team"[1] discovered that Defendant and his two sons were at Shaddadi Prison, where the FBI fly-team was looking for English speaking ISIS prisoners.[2]

Once the FBI fly-team located Defendant on June 27, 2019, FBI routed a request to SDF via FBI's Legal Attache in Baghdad, Iraq, which was subsequently delivered by the FBI fly-team, for SDF's approval and cooperation to interview Defendant at Ayn Issa Prison, in Ayn Issa, Syria.[3] SDF informed the FBI that they would honor the request at their convenience and would subsequently notify FBI when Defendant arrived at Ayn Issa Prison.[4]  Sometime in early August 2019, SDF notified FBI that Defendant arrived at Ayn Issa Prison, and the FBI fly-team  conducted interviews of Defendant on August 7 and 8, 2019.

The United States had no control over the interview's timing and were simply instructed to appear at Ayn Issa the morning of August 7, 2019.  To do so, SDF provided the FBI an armored escort to the interview, which included many SDF and FBI vehicles in the convoy.

---

[1] Fly-team agents are Special Agents that can rapidly deploy worldwide and are tasked with conducting investigative activities in support of counterterrorism cases in high threat, hostile, and austere environments.  In this specific case, the fly-team agents were based in Iraq and, among other tasks, were helping locate detained ISIS fighters who were United States citizens, in support of FBI investigations.

[2] On June 22, 2019, FBI sent a request to SDF about the Defendant's whereabouts, but the FBI never received a written response.  Seven days later, the FBI discovered Defendant was at the Shaddadi Prison.

[3] The FBI requested the Ayn Issa Prison because it was in a safer area and was a more established prison north of Defendant's location in Shaddadi.  At the time, the southern region of Syria was significantly more dangerous for United States personnel.

[4] The SDF did not honor all such requests, and sometimes ignored United States requests for interviews, showing Defendant was in SDF's sole custody.

### B. The Defendant's August 7 and 8, 2019, Interviews

The August 7 and 8 interviews took place within an air-conditioned room outside the Ayn Issa Prison, akin to a mobile home. SDF personnel escorted Defendant, who was blindfolded and handcuffed (pursuant to SDF protocols[5]) to and from the interview. During the interview, the blindfold and handcuffs were removed, and Defendant was interviewed by two FBI fly-team members in his native English language. The room also had an FBI linguist and an SDF guard, and Defendant was offered comfort breaks, soda, snacks, and bottled water.

After introductions and pleasantries, the two FBI fly-team members provided Defendant an Advice of Rights form, which they read aloud to Defendant. *See Exhibit 1*.[6] The FBI fly-team then asked Defendant to read the pertinent rights aloud back to them, to ensure Defendant read and understood English, which he did. Critically, Defendant was asked if he understood the form and his rights and asked if he would speak to the FBI without an attorney present. Moreover, the FBI repeatedly informed Defendant that he could refuse to speak and that the interview was voluntary, but Defendant was abundantly clear in his willingness to talk. In fact, as soon as Defendant signed the Advice of Rights form, he asked, "where do you want me to start" and began speaking. Defendant was later observed smiling, laughing, appearing engaged, answering all questions, and willingly volunteering information. Furthermore, once the interview finished on August 8, 2019, Defendant expressed his appreciation for the FBI agents, shook their hands, and thanked them for the polite conversation.

---

[5] SDF used a blindfold because the interview room was outside the Ayn Issa Prison.

[6] Because the August 7 and 8, 2019 interviews took place on consecutive days, FBI fly-team only utilized one Advice of Rights form for both days, reiterating to Defendant before restarting on August 8, 2019, that the Advice of Rights form from the previous day governed their continued interview, and Defendant verbally acknowledged and communicated to the fly-team that he wished to continue the interview.

Importantly, Defendant never mentioned torture or mistreatment nor showed any signs of trauma during his interview.  Instead, Defendant expressed that he was fine medically, although he did ask for an aspirin and to be seen by a doctor for a stomach issue, which the FBI communicated to SDF.  Furthermore, the FBI fly-team, members of which spent countless hours in SDF facilities, never saw or heard rumors of any abuse.  In fact, United States personnel informed SDF that any such conduct would have to be reported, and SDF appeared to make significant efforts to ensure that no such thing occurred.

### C.  Defendant Charged in Criminal Complaint on December 3, 2019

On December 3, 2019, the United States charged the Defendant with material support of a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B [ECF No. 3].

### D.  United States Notifies SDF It Was Seeking Transfer of Defendant to United States Custody

On December 21, 2019, the United States made its first written communication to the SDF since it interviewed Defendant on August 9, 2019. On that day, the FBI requested information from SDF about Defendant's whereabouts, again reiterating that the United States was not involved in Defendant's SDF detention.  Receiving no response, the FBI sent another similar request on January 24, 2020.  Then, on March 12, 2020, the FBI sent its final written request, asking that SDF transfer Defendant from Hasakah Prison to the Northern Landing Zone, Syria, to facilitate Defendant's transfer to United States custody.

Between March 2020 and September 28, 2020, the United States took proactive attempts to secure Defendant's safe return to the United States during the COVID-19 global pandemic.  This included logistical efforts requiring the coordination of SDF authorities and other foreign partners for permission to depart, land, refuel, and arranging for United States Government personnel to

undertake the trip. In fact, the United States had arranged and confirmed the original transport, including coordinating with all foreign partners and all relevant United States agencies, for the trip to occur between March 15 and 18, 2020. But the rapid spread of the COVID-19 pandemic throughout the United States and the world at exactly that time required the trip being postponed so additional safety precautions could be taken. As a result, despite vigorous effort, Defendant's transfer to United States custody did not occur until September 28, 2020.

### E.  Defendant's Transfer to United States Custody on September 28, 2020

On September 28, 2020, the FBI arrived at the Northern Landing Zone to take Defendant into United States custody using a DOD aircraft, which was first assembled in response to the Ebola outbreak, that was specially outfitted to ensure passenger safety in response to a contagious virus.[7] After arriving in that aircraft, the transfer of Defendant into FBI custody took about three hours in total. Upon arrival, FBI personnel exited the aircraft and met with SDF authorities, who escorted the FBI to Defendant's location (approximately half a mile away on the same military base). Soon after, two FBI agents conducted a medical exam of Defendant and provided Defendant with shower wipes, deodorant, and new clothing. Defendant was also offered food, which he declined. After the United States personnel ate lunch with their SDF counterparts, they began the journey to the United States with Defendant.

Thus, while a criminal complaint and warrant existed in the United States as of December 3, 2019, the United States was never responsible for Defendant's continued detention in Syria until his eventual release on September 28, 2020. The formal documents ("SDF Transfer Memorandum") transferring the Defendant to United States custody make this abundantly clear.

---

[7] For example, the DOD aircraft had a Negative Pressure Container which was a retro-fitted shipping container that was sealed for double-filtered air flow. Defendant stayed inside the Negative Pressure Container during the flight.

5

*See* Exhibit 2, *Memorandum of Understanding and Handing Over*.  The SDF Transfer Memorandum states that the "***SDF hands over*** one detainee . . . who joined to ISIS terrorist organization . . . based on our belief in joint action against terrorism . . . based on the free desire of the detainee to be repatriated to their country." *Id.*  The SDF Transfer Memorandum adds the "SDF is not responsible of detainee after the signing of this document by the US Government Representative" further evidencing that the SDF was responsible previously.  *Id.*  The SDF Transfer Memorandum is then signed by one representative from the SDF and the United States.

### F.  The Defendant's In-Flight Interview

About two and a half hours after the DOD aircraft took flight (and about four and half hours after the *Memorandum of Understanding and Handing Over* was signed), Defendant participated in a final audio and video recorded interview with law enforcement that lasted around one and a half hours.  Before the interview, Defendant was provided an Advice of Rights form nearly identical[8] to the previous interviews, which was read aloud to him.  *See Exhibit 3*. After the reading of each right, Defendant was asked "do you understand?" to which Defendant replied affirmatively.  Then the following exchange occurred:

> **Defendant**: Yeah, I mean, uh. There is no uh, there is no way that it is [UI][9].
> So, what, I mean [UI]. So what's, what's the best choice?
>
> **FBI Agent 1**: Well, it's your decision to make.
>
> **FBI Agent 2**: Yeah.
>
> **FBI Agent 1**: Um, so…

---

[8] The nominal difference was that the original form stated, "the fact that you made any statements at a previous time does not obligate you to speak with us now," while the new form stated, "even if you have already spoken to others, you do not have to speak to us now." *See Exhibit 1* and *3*.

[9] Given that this interview took place on a DOD military aircraft, outfitted with virus-protecting safety measures, and given that the participants were all wearing protective masks, many parts of the audio are unintelligible ("[UI]").

**Defendant**: What would be what you would [UI].

**FBI Agent 1**: We're going to talk to –

**Defendant**: This is the way I see it. I see it as, uh, obviously I mean of course I would love to have an attorney, but there is none. And uh, I mean you guys uh [UI] the situation. And this, uh, and it is probably the best thing uh to have an attorney.

**FBI Agent 2**: No, uh, I-I-I want you to make the decision, I mean, just yes or no if you want to talk to us.

**Defendant**: I - [UI from 5:11 – 5:28].

**FBI Agent 2**: Alright. So, quick here's a pen for ya. And let me get this.

Defendant then signed the Advice of Rights Form and promptly began answering the FBI's questions, concluding his remarks by stating "I'm trying to be, uh, as open as possible with you guys."

### G. Defendant's Prompt Presentment on September 30, 2020

Following the 24-hour journey from the Northern Landing Zone, Syria, Defendant was transported to the Miami Federal Detention Center at about 8:14 a.m. on September 29, 2020, and Defendant made his initial appearance before Magistrate Judge Edwin G. Torres, on September 30, 2020, less than 48 hours after being transferred to United States custody in Syria.

### H. The Superseding Indictment

On December 1, 2021, a federal grand jury returned a three-count superseding indictment charging Emraan Ali with: (1) conspiring to provide material support or resources to the Islamic State ("ISIS"), in violation of 18 U.S.C. § 2339B; (2) providing material support or resources to ISIS, in violation of 18 U.S.C. § 2339B; and (3) receiving military-type training from ISIS, in violation of 18 U.S.C. § 2339D.

## II.   ARGUMENT

### A.  The United States Did Not Violate Defendant's Prompt Presentment Rights

For Defendant's prompt presentment argument to succeed, this Court must find that there was an improper "working arrangement" between SDF and the United States that delayed Defendant's prompt presentment *for the purpose* of extracting Defendant's confessions.  There is no factual basis for such a finding. Not only was there no "working arrangement" between the SDF and the United States, any cooperation between the two was solely logistical and not aimed at extracting Defendant's statements.  Indeed, the record belies Defendant's argument in four ways: (1) Defendant was lawfully "arrested" by SDF authorities and remained exclusively in SDF custody pursuant to violations of foreign law until September 28, 2020; (2) no United States charges existed against Defendant until December 3, 2019, which places the August 7 and 8, 2019, interviews outside the 18 U.S.C. § 3501(c) analysis; (3) the FBI had no control or decision-making authority with any aspect of Defendant's SDF custody and merely requested Defendant's presence for interviews; and (4) even if the Court finds that the United States influenced the SDF custody decision-making, the United States did not have the requisite level of control over SDF decision-making **_and_** the influence was not done with an improper purpose, *i.e.*, delaying presentment before a United States Magistrate Judge to extract a confession.

The Government is only aware of six courts that have analyzed the existence of a working arrangement in the context of a foreign detention.[10] *See United States v. Musaibli*, 575 F. Supp. 3d

---

[10] The Government believes that only six cases address this issue because the plain language of the statute is addressed towards domestic prosecutions and arrest/detention scenarios, evidencing that Congress did not anticipate foreign application of the statutory prompt presentment requirements. *See Abu Ali*, 528 F.3d at 226 ("Of course, any prompt presentment guarantee applies only to actions undertaken by domestic authorities."); *Cf. Bin Laden*, 132 F. Supp. 2d at 209 ("Although the court has found no cases which discuss the application of the working arrangement analysis to cooperation between the United States government and a foreign government, the purpose of the rule . . .seems equally applicable in the international context.").

870, 884 (E.D. Mich. 2021); *United States v. Khweis*, No. 1:16-CR-143, 2017 WL 2385355, at \*5-11 (E.D. Va. June 1, 2017), *aff'd*, 971 F.3d 453 (4th Cir. 2020)[11]; *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 67 (D.D.C. 2017); *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 519 (S.D.N.Y. 2013); *United States v. Abu Ali*, 528 F.3d 210, 226-27 (4th Cir. 2008); *United States v. Bin Laden*, 132 F. Supp. 2d 198, 206-11 (S.D.N.Y. 2001). None of those decisions found an improper working relationship between the United States and the foreign governments (Saudi Arabia, Kenya, Turkey, Libya, Iraq, and Syria).

### i.   "Working Arrangement" Legal Standard

Defendant "bears the burden of presenting evidence of an illicit working arrangement" that improperly circumvented the requirements of Rule 5(a) and 18 U.S.C. § 3501(c).  *Khweis*, 2017 WL 2385355, at \*6  (*citing In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008) ("To satisfy their burden, the [d]efendants must show that the Government made deliberate use of [foreign] custody to postpone their presentment requirements)); *Bin Laden*, 132 F. Supp. 2d. at 209 (*citing Alvarez-Sanchez*, 511 U.S. at 359); *see also Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956) ("The burden of showing unreasonableness of delay in arraignment rests upon the defendant . . . ."); *United States v. Boche-Perez*, 755 F.3d 327, 336 (5th Cir. 2014) ("The defendant has the burden of demonstrating a McNabb-Mallory violation.").

Mere suspicion of a collusive arrangement is insufficient. *Bin Laden*, 132 F. Supp. 2d at 209. The defendant has the burden to "show that the Government made deliberate use of [SDF] custody to postpone their presentment requirements." *Id*.  Courts use various phrases to describe the "working arrangement" analysis, but the overriding factor is the improper purpose of the

---

[11] The district court in *Khweis* rejected Khweis's presentment challenge, and, although Khweis appealed some district court rulings, he did not challenge the prompt presentment issue on appeal. *See United States v. Khweis*, 971 F.3d 453, n. 4 (4th Cir. 2020).

working arrangement. *Alvarez-Sanchez*, 511 U.S. at 359-60 ("improper collaboration"); *Abu Ali*, 528 F.3d at 226-27 ("illicit working arrangement" and "improper collaboration"); *Bin Laden*, 132 F. Supp. 2d at 209 ("improperly conspiring," "improperly collaborating" and "deliberate use of [foreign] custody to postpone their presentment requirements"). In other words, the working arrangement must be driven by a desire to undermine Defendant's right to prompt presentment.

In addition, identifying an improper "working arrangement" must be based on objective facts, "not mere suspicion or conjecture." *United States v. Coppola*, 281 F.2d 340, 344 (2d Cir. 1960) ("Mere words however, such as exchange of information, cooperation, collaboration, or even "working arrangement" do not carry within themselves any solution to the difficult problems of federal-state relations here involved."); *see also United States v. Leviton*, 193 F.2d 848, 854 (2d Cir. 1951) ("[E]ach case involving the McNabb rule must be decided without resort to a semanticism that obscures the facts out of which it arises.").

Further, "[t]he requirements of § 3501 are implicated only in the case of a prisoner who is arrested or detained for a federal crime and, thus, is in federal detention at the time the challenged detention is made." *United States v. Fullwood*, 86 F.3d. 27, 31 (2d. Cir. 1996) (*citing United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994)). Here, Defendant was not arrested or detained on a United States federal charge until September 28, 2020. In fact, to establish a SDF-FBI "working arrangement" to undermine Defendant's "prompt presentment" rights, the evidence must prove that "the [non-federal] officials are acting for, and under the direction of, federal agents under circumstances which fairly warrant the conclusion that the custody is federal in substance." *Carpenter v. United States*, 264 F.2d 565, 571 (4th Cir. 1959) *citing Anderson v. United States*, 318 U.S. 350 (1943). Without this improper "working arrangement" Defendant's prompt presentment argument fails. *See, e.g.*, *Khweis*, 2017 WL 2385355, at *5-11 (finding "no factual

10

basis to conclude that the United States engaged in an illicit working arrangement to deprive the Defendant of his right to prompt presentment"); *Abu Ali*, 528 F.3d. at 227 (affirming finding that no "working arrangement" existed between United States and Saudi governments where there was "no credible evidence that the Saudis held, or continued to hold, [Abu Ali] so that United States officials could evade their constitutional duties."); *Bin Laden*, 132 F. Supp. 2d at 209 ("In part because courts are reluctant to discourage cooperation between agencies, the mere fact of federal participation in an investigation does not suffice to establish an improper working arrangement."); *Alvarez-Sanchez*, 511 U.S. at 359-360 (explaining "improper collaboration" between federal and state officers undertaken to delay federal presentment requires suppression in federal court of any resultant confession.).

### ii.   The United States Did Not Have a "Working Arrangement" with SDF

There was no "working arrangement" between the United States and SDF designed to undermine Defendant's right to a prompt presentment and extract Defendant's confession.  As explained above, and as will be presented at the hearing, the United States was not involved in Defendant's detention in Syria.  In fact, the United States had only seven written communications (over a one-and-a-half-year period) with SDF about Defendant, most of which were ***requests*** by the United States to locate and interview Defendant.  In other words, the United States did not know where Defendant was, let alone had a "working arrangement" with the SDF to hold Defendant at its behest.  Instead, it was by happenstance that the United States discovered Defendant at the Shaddadi detention center, which led to Defendant's interviews on August 7 and 8, 2019.

Another central flaw in Defendant's prompt presentment argument is that for the August 7 and 8, 2019, interviews, there is no viable argument that Defendant was "arrested and held" on United States federal charges, until at the earliest, the signing on the complaint on December 3,

2019.   Before December 3, 2019, the FBI continued its investigation with the objective understanding that Defendant was being held exclusively under the lawful authority of SDF officials.   The United States therefore had no obligation on August 7 and 8, 2019, to present Defendant before a Magistrate Judge.   Because those August interviews predate any United States charges or arrest warrant, they are outside the § 3501 analysis.   *Fullwood*, 86 F.3d. at 31; *United States v. McDaniel*, 441 F.2d 1160, 1161 (4th Cir. 1971) (holding there was no Rule 5(a) violation "where the FBI questioning occurred during a period of reasonable investigation to determine whether federal charges should be brought."); *United States v. Vita*, 294 F.2d 524, 530 (2d Cir. 1961) (The Supreme Court has not "forbidden the police to investigate crime" under McNabb-Mallory) (internal citation omitted); s*ee also Leviton*, 193 F.2d. at 854 ("[E]ach case involving the McNabb rule must . . . be decided without resort to a semanticism that obscures the facts out of which it arises."); *Boche-Perez*, 755 F.3d at 338 ("Finally, in applying McNabb–Mallory, a district court should not resort to a 'semanticism that obscures the facts' of a case.") (*citing Leviton*, 193 F.2d at 854).

Because Defendant was not transferred to United States custody until September 28, 2020, that is the starting point for any prompt presentment argument.   The September 28, 2020, in-flight interview (the only interview subject to this analysis) occurred within hours after Defendant's transfer of custody from SDF to the United States, while Defendant was in transit to his prompt presentment before Judge Torres.   The September 28, 2020, interview is thus well within the six-hour requirement of 18 U.S.C. § 3501(c)[12], and, even if it exceeded the six-hour

---

[12] The Omnibus Crime Act of 1968 modified the *McNabb-Mallory* Rule, establishing a six-hour "safe harbor" for delays.  *See* 18 U.S.C. § 3501(c).  In *Corley v. United States*, 556 U.S. 303 (2009), the Supreme Court held that Section 3501(c) eliminated the *McNabb-Mallory* rule for statements given within six hours of arrest, but, when a statement is made after the six-hour period, the court must determine whether the delay was reasonable.

window, it was "reasonable considering the means of transportation and the distance to be travelled to the nearest available magistrate judge." 18 U.S.C. § 3501(c). *See, e.g.*, *United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir. 1985) (finding delay reasonable when "a large part of the delay was necessitated by the fact that the arrest was made so far from port on the high seas."); *United States v. Yunis*, 859 F.2d 953, 957, 969 (D.C. Cir. 1988) (finding time needed to transport defendant from Mediterranean Sea to Washington, D.C. was reasonable). Furthermore, "the fact that the [SDF] eventually elected to defer to the American prosecution does not establish the existence of an improper arrangement." *Bin Laden*, 132 F. Supp. at 211 (citing *Alvarez-Sanchez*, 511 U.S. at 359); *United States v. Rowe*, 92 F.3d 928, 932 (9th Cir. 1996).

Finally, United States and foreign government coordination is an inherent necessity to combat international terrorism and should be encouraged. *Abu Ali*, 528 F.3d at 229 n. 5. The FBI faces difficult diplomatic and investigative challenges when a United States citizen is apprehended in a war zone after joining a terrorist organization, and courts have historically recognized the "difficult problems" facing inter-governmental law enforcement efforts. *Coppola*, 281 F.2d 340, 344 (2d Cir. 1960) ("Mere words however, such as exchange of information, cooperation, collaboration, or even 'working arrangement' do not carry within themselves any solution to the difficult problems of federal-state relations involved here."). Thus, Defendant's attempts to rely on a few logistical communications between the United States and SDF is insufficient to establish a "working arrangement." At best, the United States/SDF communications reveal the "difficult problems of [inter-government] relations." *Coppola*, 281 F.2d at 344. Defendant thus cannot satisfy his burden because "to bring a case within this rule there must be facts, as there were in *Anderson*, not mere suspicion or conjecture." *Id.*; *Leviton*, 193 F.2d at 854. Because there was no

"working arrangement," and because Defendant remained in lawful SDF custody until September 28, 2020, the United States promptly presented Defendant to a United States Magistrate Judge.

### iii.   Defendant's Repeated Voluntary *Miranda* Waivers Waived His Prompt Presentment Rights

Even if there were (there is not) sufficient evidence of a United States/SDF "working arrangement," Defendant's repeated *Miranda* waivers waived his prompt presentment rights. *See Musaibli*, 575 F. Supp. 3d at 884 (finding defendant's valid *Miranda* waiver foreclosed any prompt presentment argument); *O'Neal v. United States*, 411 F.2d 131, 136-137 (5th Cir.1969); *Pettyjohn v. United States*, 419 F.2d 651, 656 (D.C. Cir. 1969) ("[B]y validly waiving his *Miranda* rights to silence and an attorney, and by agreeing to speak with police, [the appellant] has thereby also waived any *Mallory* right to be brought before a magistrate 'as quickly as possible.'"). As discussed below, Defendant was apprised orally and in writing of his *Miranda* warnings before each of his interviews, Defendant acknowledged understanding his rights before each of his interviews, and he voluntarily waived his rights before each of his interviews.

A *Miranda* waiver functions as a waiver of speedy presentment because "one of the purposes of appearing before a magistrate is to have the defendant's rights explained to him-rights now explained in a Miranda warning." *United States v. Salamanca*, 990 F.2d 629, 634 (D.C. Cir. 1993) (holding that, when an accused validly waives his *Miranda* rights, he also waives his right to presentment without unnecessary delay). The binding precedent of this circuit, in accordance with many other circuits, holds that, by voluntarily agreeing to speak to law enforcement after being advising of the rights to remain silent and to an attorney, a defendant necessarily waives the right to be brought before a magistrate as quickly as possible. *See, e.g., O'Neal*, 411 F.2d at 136-37 (finding after *Miranda* waiver a delay in seeing a magistrate caused the defendant no harm); *United States v. Hector*, 2013 WL 2898078, at *13 (N.D. Ga. Jan. 29, 2013) ("The Court sees no

14

choice other than to find that Defendant's multiple *Miranda* waivers vitiated any prompt presentment problem"); *Musaibli*, 575 F. Supp. 3d at 884 ("[A] valid *Miranda* waiver also waives the prompt judicial warning of one's constitutional rights."); *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982) ("[W]aiver of one's Miranda rights also constitutes a waiver under McNabb-Mallory"); *United States v. Indian Boy X*, 565 F.2d 585, 591 (9th Cir. 1977) ("[T]he strong policy this court has in following the rule that the waiver of [*Miranda* rights]. . . also constitutes a waiver of' right to speedy presentment); *United States v. Howell*, 470 F.2d 1064, 1067, n. 1 (9th Cir. 1972) (explaining that a *Miranda* warning "operated to waive the requirements of Rule 5(a) and Mallory"); *United States v. Duvall*, 537 F.2d 15, 24 n.9 (2d Cir. 1976) (noting weight of authority); *but see United States v. Keeble*, 459 F.2d 757, 759 (8th Cir. 1972), *reversed on other grounds*, 412 U.S. 205 (1973).  Thus, should the Court find sufficient evidence of an improper "working arrangement," Defendant's prompt presentment claim still fails, as he repeatedly waived his prompt presentment rights.

## B.  Defendant Voluntarily, Intelligently, and Knowingly Waived *Miranda*

A *Miranda* waiver is valid when it was "made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1241 (11th Cir. 2015) (internal quotations and citations omitted).  Further, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Everett* 779 F.3d at 1241.  "For a court to conclude that a defendant waived his *Miranda* rights, the totality of the circumstances surrounding the interrogation must reveal both an uncoerced choice and the requisite level of comprehension." *Id*.  The key inquiry is thus the "totality of circumstances" related to the *Miranda* waiver.  *Frazier v. Cupp*, 394 U.S. 731,

15

739 (1969); *Arizona v. Fulminate*, 499 U.S. 279, 285-86 (1991). The government bears the burden of showing voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

The totality of the circumstances generally addresses the characteristics of the accused (*e.g.*, age, maturity, education, intelligence, experience, comfort level, and willingness or unwillingness to engage with questioner) as well as the conditions faced by the defendant when he engaged with law enforcement (*e.g.*, agent's conduct; number of agents present; visible weapons; duration, location, and comfort level of the environment; availability of breaks, food, and water; length of the questions; who initiates the dialogue; and the use or absence of physical punishment, such as the deprivation of food or sleep). *See generally, United States v. Farley*, 607 F.3d 1294, 1331 (11th Cir. 2010) (finding knowing and voluntary waiver where agent never yelled or drew a weapon and where the defendant was a mature adult of average intelligence); *Hall v. Thomas*, 611 F.3d 1259, 1288 (11th Cir. 2010) (finding juvenile's *Miranda* waiver valid when the rights were read many times and there was no indication of confusion or misunderstanding); *United States v. Barbour*, 70 F.3d 580 (11th Cir. 1995) (finding valid *Miranda* waiver despite defendant's severe depression); *United States v. de Alejo*, No. 21-20069-CR-Altonaga/Torres, 2021 WL 4751271, at *4 (S.D. Fla. Oct. 2, 2021), *report and recommendation adopted*, No. 21-20069-CR, 2021 WL 4749797 (S.D. Fla. Oct. 12, 2021) (finding valid *Miranda* waiver pursuant to an Advice of Rights form, when FBI agents did not use intimidation, tactics, threats, or physical or psychological pressure).

Here, Defendant was read and subsequently signed the Advice of Rights forms (*See Exhibit 1* and *3*) before questioning. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility").

16

Defendant, however, argues the "totality of circumstances" surrounding his *Miranda* waivers render them involuntary for five reasons: (1) the conditions and length of his confinement, including the presence and threat of physical violence; (2) his personal characteristics; (3) the conditions of interrogation; (4) the Advice of Rights Form was false, misleading, and inadequate; and (5) he purportedly invoked his *Miranda* rights during the September 28, 2020 interview [ECF Nos. 54, 55]. These arguments are all without merit.

### i. The Conditions and Length of Defendant's Confinement

Defendant argues the conditions of his Syrian confinement render his *Miranda* waiver involuntary.[13] First, while Defendant complained about conditions at prior locations, he stated the conditions at Ayn Issa Prison (where the August 7 and8, 2019, interviews took place) were better. Second, at no point did Defendant mention any mistreatment or physical violence. Third, during all three interviews, Defendant appeared in good health with no signs of duress or physical injuries, which was corroborated by Defendant's September 28, 2020, medical examination, where he was found to be in good health, fully alert and oriented, and showed no signs of physical abuse.

Further, any mistreatment is neither attributable to the FBI nor would it render Defendant's *Miranda* waiver involuntary. "Coercive police activity is a necessary predicate to the finding that a confession is not voluntary" and thus due process is not violated unless the coercion is "casually related to the confession." *Connelly*, 479 U.S. at 163-64, 167. Thus, Defendant's allegations of SDF mistreatment are irrelevant to the analysis of the voluntariness of his *Miranda* waiver and statements. *See, e.g.*, *Musaibli*, 575 F. Supp. 3d at 882 ("Coercive conduct by foreign authorities cannot be imputed to domestic government agents who did not participate in any of the alleged

---

[13] Defendant cites to being "held in five different detention centers" during his 18 months of confinement. Incredibly, despite acknowledging that he was consistently relocated with no evidence of United States. involvement, Defendant somehow argues there was a "working arrangement" between the United States and SDF.

prior abuse"); *Khweis*, 971 F.3d at 464 ("[T]he context of Khweis's capture in the Middle East, a circumstance of Khweis's own making when he chose to travel to Syria and Iraq to join ISIL, does not undermine the effectiveness of the *Miranda* warnings he received or his waiver of those rights."); *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (holding that "while it is reasonable that Egyptian incarceration and torture, if true, would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion"); *United States v. Yousef*, 925 F. Supp. 1063, 1077 (S.D.N.Y. 1996) (finding that even if foreign authorities tortured defendant, his psychological state when the statement was given did not render his confession involuntary because there were no allegations of threats, coercion, or other tricks by the FBI agents in obtaining his statement); *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 519 (S.D.N.Y. 2013) (holding that even a finding of "past illness or mistreatment" does not negate the voluntariness of a *Miranda* waiver).

*Khweis* and *Musaibli* are particularly informative here, as both involve alleged mistreatment in Iraq and Syria, following the defendants' joining of ISIS. *See Musaibli*, 575 F. Supp. 3d at 882; *Khweis*, 2017 WL 2385355, at *11-13. In *Khweis*, the court evaluated the defendant's voluntariness against claims that "he was held far from home for more than two months, in a place where he did not speak the language, and desperately wanted to return home" together with coercive confinement conditions in Iraq, where "he was not able to regularly access the bathroom, lacked air conditioning in his cell, and the prison was infested with bugs." *Khweis* at *11. In finding no coercive acts on behalf of the United States, the court explained that Khweis "imposed upon himself the very coercive circumstances which he now blames on the Government"

18

and that "the Government cannot be blamed for the Defendant's initial detention in a foreign land, far removed from family and friends." *Id.*

In *Musaibli*, the court found a *Miranda* waiver was voluntary over the defendant's arguments about alleged coercive conduct by Syrian authorities. *Musaibli* at 882. In holding that "coercive conduct by foreign authorities cannot be imputed to domestic government agents who did not participate in any of the alleged prior abuse," the court rejected Musaibli' s voluntariness arguments and held that his in-flight interview (like Defendant's September 28, 2020 interview) was admissible at trial.

If anything, the FBI's treatment of Defendant was in "stark contrast" to his prior experience as an SDF detainee. *Musaibli*, 575 F. Supp. 3d at 882; *Khweis*, 2017 WL 2385355, at *11-13 (finding objective circumstances of United States interrogation, "a well-lit room, no visible injuries, drinks, snacks, laughter, and cigarettes [did] not support an involuntariness argument"); *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 67 (D.D.C. 2017). In fact, we know that it did, as Defendant thanked his interviewers at the end of all the interviews for their courtesy and polite treatment. The totality of the circumstances thus show that the FBI treated Defendant well and did not hinder the voluntariness of his *Miranda* waiver.

### ii.   Defendant's Personal Characteristics

While Defendant claims to be an unsophisticated individual from rural Trinidad [ECF No. 54 at 19-20], the reality is different. Instead, Defendant was a relatively successful businessperson, both in the United States and Trinidad, who possessed the financial means and sophistication to arrange the undetected travel of eight family members from Trinidad to Brazil, Turkey, and then Syria to join ISIS. *See Musaibli* 575 F. Supp. 3d at 880 (upholding voluntariness of *Miranda* waiver where defendant was an adult, was fluent in English, and possessed a "typical intelligence level"). Indeed, Defendant: (1) organized a financial system through which he could receive funds

19

in Syria; (2) collected at least $15,000 in cash and financed the family's international travel; (3) falsely told his children they were going on vacation and bought them expensive electronics for the trip; (4) melted down gold to be converted to jewelry to avoid taking more cash; (5) communicated with coconspirators while in Turkey to be smuggled across the border to Syria; (6) completed ISIS religious and military training; and (7) successfully set up several businesses in Syria while an ISIS member.

Defendant is also familiar with the American legal system, having been convicted of possession of a firearm in New York in 1992. Defendant was no doubt read his *Miranda* rights in connection with that offense, and thus understood the nature of his constitutional rights when they were read to him here. *See Musaibli*, 575 F. Supp. 3d at 882 (relying on defendant's United States citizenship and familiarity with the United States legal system to find his *Miranda* waiver was knowing and voluntary). Defendant had been in Syrian custody for about five months by the time he was formally interviewed by the FBI fly team. There was thus no doubt Defendant understood that magnitude of his conduct and the consequences he was facing. This is particularly true when Defendant himself admitted that, prior to surrendering to Coalition Forces, he was advocating to refuse to surrender because he did not want to go to jail. In other words, Defendant was keenly aware of the nature of his conduct, the potential charges against him, and thus knowingly, voluntarily, and intelligently waived his *Miranda* rights.

### iii. The Conditions of Interrogation

The conditions of all three interviews were amenable. For the August 7 and 8, 2019, interviews, FBI fly team members interviewed Defendant in an air-conditioned room in civilian clothes without visible weapons or handcuffs. The same holds true for the September 28, 2020, in-flight interview. There, agents were in civilian clothes, with no visible weapons, and Defendant did not have restraints.

Throughout all the interviews, Defendant appeared alert, oriented, and eager to speak.  At no point did the agents threaten Defendant or promise him anything to get him to waive his rights. Instead, they did everything they could to make him comfortable given the circumstances, by providing him food, water, and comfort breaks.  *See Musaibli* 575 F. Supp. 3d at 882 (upholding *Miranda* waiver when the defendant was provided food, water, and comfort breaks); *Khweis*, 2017 WL 2385355, at *12 (relying on "a well-lit room, no visible injuries, drinks, snacks, laugher, and cigarettes" to find a *Miranda* waiver voluntary).  According to Defendant himself, the FBI agents treated him professionally and courteously, as Defendant thanked the agents for the polite conversation, and ended the September 28, 2020, interview stating, "if I'm being honest with you, I'm trying to be, us, as open as possible with you guys."

### iv. The Advice of Rights Forms Were Truthful and Accurate and Have Been Approved by Numerous Other Courts

Defendant argues that the Advice of Rights Forms were somehow inaccurate or misleading. Nothing could be further from the truth.  In fact, many courts have approved nearly identical advice of rights forms in similar foreign circumstances.  *See, e.g., Musaibli*, No. 18-cr-20495, 575 F. Supp. 3d 870 (E.D. Mich. 2021) at [ECF No. 115 at page 46] (identical advice of rights form albeit modified to include language about previous intelligence interviews not applicable here); *Khweis*, No. 16-cr-00143, 2017 WL 2385355 (E.D. Va. 2017) at [ECF No. 110-1] (same); *Abu Khatallah*, No. 14-cr-00141, 275 F. Supp. 3d 32 (D.D.C. 2017) at [ECF No. 197 at pages 15-16] (similar advice of rights form in all material respects);*Laden*, 132 F. Supp. 2d 198, 203 (S.D.N.Y. 2001) (similar advice of rights form in all material respects).

Defendant argues that the Advice of Rights Form for the August 7 and 8, 2019, interviews was "patently false" because it advised him of his right to counsel "in theory but in reality, the right did not exist in Syria."  [ECF No. 54 at 24].  Defendant unfortunately confuses having the

21

*right* to an attorney prior to question with having an attorney immediately provided.  The Advice of Rights Form accurately and truthfully advises Defendant of his *right* to have counsel before questioning by United States law enforcement.  At no point does the Advice of Rights Form say that such an attorney would be provided immediately.  In fact, the Advice of Rights Form itself cures this confusion by explicitly stating, "[h]owever, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney."  It therefore distinguished for Defendant that while he had the *right* to an attorney, one may not be available until later.  Either way, Defendant, should he have chosen, would have been provided an attorney before any questioning.  Since Defendant waived that right, questioning proceeded.  Thus, the Advice of Rights Form Defendant signed in August 2019 was truthful and accurate.

The crux of Defendant's argument about the September 28, 2020 Advice of Rights Form is that law enforcement somehow misled him into believing he was still in Syrian custody.  Such an argument belies Defendant's obvious awareness that he was in United States custody.  First, Defendant was formally transferred from SDF to United States custody and was immediately provided a medical examination performed by United States Government personnel, who spoke to Defendant in English.  At this time, Defendant was told, that he was being transported back to the United States.  Defendant was then moved to a United States Military aircraft, again by United States Government personnel.  Then, at the beginning of their interview, FBI Agents informed Defendant that "we're both with the FBI," and showed Defendant FBI credentials.  The FBI Agents then read Defendant the Advice of Rights form, which begins by stating "We are law enforcement agents from the Federal Bureau of Investigation . . .even though we are not in the United States, United States laws provide you with certain rights in your dealings with us."

Defendant, however, somehow objects to the statement "we are not in the United States," and attempts to concoct a nefarious FBI conspiracy to mislead him. The reality is, while Defendant was within the jurisdictional reach of the United States, he was not technically *in* the United States. Instead, Defendant was in-flight, likely somewhere over Europe or the Atlantic Ocean. Defendant uses that fact to argue that the statement "our ability to provide you with counsel at this time may be limited by the decisions of the local authorities *or* the availability of an American-trained attorney" was inaccurate. But it is indisputable that the FBI's ability to provide Defendant with an American-trained attorney was compromised while in-flight. Nothing about this statement, thus, was inaccurate or used in a way to mislead Defendant. Rather, the statement properly notified Defendant that should he elect to speak with a lawyer, that decision may delay the interview. Defendant acknowledge this fact and decided to speak with the FBI agents immediately. Thus, the Advice of Rights Form used in September 2020 truthfully and accurately advised Defendant of his rights.

### v. A Defendant Must Affirmatively and Unequivocally Invoke His *Miranda* Rights

An invocation of the right to remain silent must be affirmative and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370 (2010). Further, unless the invocation of the right to remain silent is unambiguous, law enforcement can continue their questioning. *Owen v. Florida Dept. of Corrections*, 686 F.3d 1181, 1193 (11th Cir. 2012); *Medina v. Singletary*, 59 F.3d 1095 (11th Cir. 1995); *Davis v. United States*, 512 U.S. 452 (1994) (holding that a suspect must articulate the desire to cut off questioning with sufficient clarity so that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent).

Here, at best, Defendant's alleged request for counsel was ambiguous. Defendant's statements that "I would love to have an attorney but there is none here" and "[i]t is probably the

best thing uh to have an attorney," show that Defendant was contemplating his options.  The FBI

agents then reiterated that it was Defendant's choice, stating, "I want you to make the decision, I

mean, just yes or no if you want to talk to us."  Defendant, after saying something unintelligible,

signed the Advice of Rights form within one minute.[14]  There is thus no plausible argument that

Defendant unambiguously and unequivocally invoked his right to counsel.  Instead, Defendant

considered his options, and when confronted with those options, waived his rights orally and in

writing.

In sum, the totality of the circumstances analysis shows that Defendant made a knowing,

voluntary, and intelligent waiver of his *Miranda* rights.  Defendant was well treated by United

States law enforcement who ensured he was aware of his rights, both orally and in writing before

he then signed written waiver forms.  Defendant's statements are thus admissible at trial.

## III.    CONCLUSION

For the reasons set forth above, Defendant's statements are admissible at trial and the Court

should deny Defendant's Motions to Suppress.  [ECF Nos. 54, 55, 56].

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:   s/ *Jonathan D. Stratton*
JONATHAN D. STRATTON
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0093075
99 Northeast 4th Street
Miami, Florida 33132-2111

---

[14] Although there was a written waiver here, the Eleventh Circuit has held that even a suspect's refusal to sign a written waiver does not necessarily render the suspect's oral waiver ineffective. *See United States v. Bernal-Benitez*, 594 F.3d 1303 (11th Cir. 2010); *United States v. Boon San Chong*, 829 F.2d 1572 (11th Cir. 1987); *see also Mincey v. Head*, 206 F.3d 1106 (11th Cir. 2000) (refusing to sign a waiver and refusal to make a written confession does not mean an oral waiver was ineffective); *United States v. Dowd*, 451 F.3d 1244, 1250-51 (11th Cir. 2006).

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the

Clerk of Court using CM/ECF, and that the foregoing document is being served this day on all

counsel of record via Notices of Electronic Filing generated by CM/ECF.


<u>s/ *Jonathan D. Stratton*</u>
JONATHAN D. STRATTON
Assistant United States Attorney