**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-CR-20123-BLOOM/OTAZO-REYES**

**UNITED STATES OF AMERICA**

**vs.**

**EMRAAN ALI,**
       **a/k/a "Abu Jihad TNT,"**

       **Defendant.**

                                     /

### MOTION FOR *JAMES* HEARING TO ADMIT ISIS DOCUMENTS AND NOTICE OF EXPERT WITNESSES UNDER FEDERAL RULES OF EVIDENCE

The United States moves to admit into evidence six ISIS documentary records (collectively, the "ISIS Documents") regarding Defendant Emraan Ali's participation in a conspiracy under Federal Rules of Evidence 901(a) and 801(d)(2)(E). Each of the ISIS Documents are authentic and were made in furtherance of the conspiracy the Defendant entered into to provide material support to ISIS, a designated Foreign Terrorist Organization ("FTO")[1], in the form of currency, monetary instruments, financial services, weapons, and personnel, in violation of 18

---

[1] The term "designated terrorist organization" means an organization designated by the Secretary of State as a foreign terrorist organization, as provided in 8 U.S.C. § 1189. *See* Eleventh Circuit Pattern Jury Instructions, Instruction O91.2.

On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

U.S.C. § 2339B ("the ISIS Conspiracy"). *See* Counts 1 and 2 of the *Superseding Indictment* [ECF No. 47]. The United States further requests that the Court hold a pretrial hearing under *United States v. James*, 590 F.2d 575 (5th Cir. 1979)[2], to determine the ISIS Documents' admissibility, which are listed below:

1. *ISIS Guesthouse Logbook* (NMEC-2016-117612): recovered on or about August 5, 2016, in the vicinity of Manbij, Syria;

2. *ISIS Arrival Logbook* (NMEC-2017-306798): recovered on or about April 20, 2017, in the vicinity of Raqqa, Syria;

3. *ISIS Military Assignment Spreadsheet* (NMEC-2018-415610): recovered on December 13, 2017, in the vicinity of Homs Province, Syria;

4. *ISIS Military Roster* (NMEC-2018-415663): recovered on or about December 13, 2017, in the vicinity of Homs Province, Syria;

5. *ISIS Census Coding Spreadsheet* (NMEC-2017-104816): recovered on or about January 8, 2017, in the vicinity of Mayadin and Raqqa, Syria; and,

6. *ISIS New Recruits Policies and Procedures Guidebook* (NMEC-2017-415185): recovered on or about January 2017 in the vicinity of Mosul, Iraq**.**

The United States also provides notice of its intent to call expert witnesses who will testify to the record-keeping practices of ISIS and how these practices set guidelines, rules and otherwise memorialized the provision of material support by individuals.

## I. BACKGROUND

In 2015, Defendant took his entire family from Trinidad & Tobago to join ISIS in Syria, passing through a series of third countries along the way. Defendant described his time in ISIS

---

[2] *See United States v. Espino-Perez*, 798 F.2d 439, 441 (11th Cir. 1986) (finding that a pretrial *James* hearing is the preferred practice for determining admissibility of coconspirator statements in the Eleventh Circuit).

from before he left Trinidad, to the time of his capture by Syrian Democratic Forces in Syria in great detail to the FBI following his receipt of warnings under *Miranda v. Arizona* (384 U.S. 435 (1966)).[3] Many of those details are contained herein.

Before leaving Trinidad to join ISIS, the Defendant set up a financial system whereby he could receive funds in Syria, collected $15,000 cash, falsely told his children they were going on vacation, and melted down gold to be converted to jewelry so he would have money and financial support once he was in Syria. *First Statement*. He also took pains to make Trinidadian authorities believe he was not leaving Trinidad so they would not interfere with his efforts to provide material support to ISIS. *Id*. Before departing Trinidad, the Defendant viewed *The Flames of War*, a violent ISIS propaganda movie, which depicts some of ISIS's atrocities. *Id*.; *September 28, 2020 Statement*.

The Defendant and his family then traveled to Brazil, there they thereafter flew to Turkey undetected by Trinidadian authorities. *Id*. In Turkey, Defendant bought a new SIM card for his phone.[4] *Id*. When they arrived in Turkey, the Defendant and his family stayed in Istanbul and then traveled to Gaziantep, Turkey, which witnesses will testify was a common point of confluence for ISIS volunteer fighters from the West due to its proximity to the Syrian border. *First Statement; MLAT Travel Records*. While in Gaziantep, the Defendant contacted coconspirators to arrange for travel across the Turkey-Syria border to join ISIS. *First Statement*. Shortly thereafter, the

---

[3] U.S. Law Enforcement performed three post-*Miranda* interviews of the Defendant, on August 7 and 8, 2019, when the Defendant was in Syria, and on September 28, 2020, during the flight back to the United States. Large portions of the facts contained in this section are derived from the Defendant's statements during those interviews.

[4] The changing of a SIM card allows a user to effectively change their telephone from its previous number and data and was commonly done by ISIS volunteers as a means of avoiding detection.

Defendant and his family were driven from Gaziantep to the Syrian border in a van. *Id*. Once at the border the Defendant and his family, including small children, got out of the van and ran across the border into Syria on foot. *Id*. Witnesses will testify that this travel pattern was a well-known roadmap used by many ISIS fighters to enter Syria and join ISIS.

Almost immediately, Defendant and his family encountered ISIS's bureaucracy and record-keeping system. Upon their arrival into ISIS controlled territory, as shown in the *ISIS Guesthouse Logbook*, ISIS registered the Defendant and his family, who thereafter joined a settlement in Manbij, Syria, where they lived while the Defendant awaited ISIS training. After the Defendant left Manbij, a coalition of troops led by the United States military (the "Coalition Forces") swept in and recovered the *ISIS Guesthouse Logbook* containing Defendant's family's initial registration with the terror group.

From July through November 2015, the Defendant went to Raqqa, Syria, for ISIS religious and military training with other English speakers. *First Statement*. That training included instruction on the operation of various automatic weapons such as the AK-47 assault rifle, PKC machine gun, and rocket-propelled grenade launcher. *Id*. Following this training, Defendant was given an ISIS census number in the "12000" series - the series reserved for military enlistees. *ISIS Census Coding Spreadsheet*; *Assignment Sheet from Homs*; *ISIS Military Assignment Sheet*. Defendant was also given boots, socks, and a gun barrel and made to register the M4 weapon he had personally acquired, according to the records ISIS prepared. *ISIS Military Spreadsheet*; *ISIS Military Roster*; *Assignment Spreadsheet Homs*; *First Statement*. In his conversation with the FBI, Defendant admitted to trafficking in weapons in Syria and expressed a preference for American weaponry. *First Statement*. The M4 is an American-made weapon.  The entry with the Defendant's

4

name stands out for other reasons as well.  While other ISIS fighters were issued weapons by ISIS (indicated in the "weapon" column as "State") the *ISIS Military Spreadsheet* recorded the fact that Defendant registered his own M4 with ISIS (indicated in the "weapon" column related to Defendant as "Self"). *First Statement*; *ISIS Military Assignment Spreadsheet*.

After he completed military training, the Defendant was assigned to the Anwar al-Awlaki katibah (battalion) in Raqqa and received an ISIS identification card under the kunya (alias) of "Abu-Jihad al-Trinidad al-Amriki" or "Abu Jihad TNT."[5] In Raqqa, ISIS again recorded Defendant's family's entry in the *ISIS Arrivals Logbook*.  During this time, between September and November 2015, the Defendant's son, Jihad Mohammed Ali, then only 15-years-old, began attending ISIS religious and military training in Raqqa, Syria, after which he also was assigned to the Anwar al-Awlaki katibah. *First Statement*.

In Raqqa, the Defendant conducted reconnaissance (in Arabic "rabhat") and guard duty on behalf of ISIS, both of which were important ways for ISIS to protect its battalions and supplies from possible outside attack. *First Statement*. After he went out on a "gazwa," or a raid of an area in which women and money are sometimes taken as spoils, Defendant said he became ill, a claim Defendant's ISIS superiors viewed with skepticism. *Id*. Eventually, the Defendant was discharged from the Anwar al-Awlaki battalion for medical reasons, and he moved his family to another location in Raqqa, Syria, which had become the *de facto* ISIS capital. *Id*.

---

[5] The Defendant's kunya, or Arabic alias, which he admitted in his statement to the FBI. *First Statement*.  The Defendant's kunya of Abu-Jihad al-Trinidad al-Amriki, means that the person is the "Father of Jihad"—the Defendant's eldest son—and is "Trinidadian and American"—the Defendant's two nationalities. "TNT" is an apparent abbreviation of Trinidad & Tobago. In his statement, Defendant admitted that these variations of his kunya, or alias, were used to identify him in ISIS. *First Statement.*

Despite leaving active military duty, Defendant continued to contribute material support to ISIS and its economy while in Raqqa between about 2015 through 2017. First, the Defendant worked in residential construction for ISIS. *Id*. The Defendant's construction work helped to create homes for ISIS members, including fighters and their families who occupied territories ISIS claimed from Syria. *Id*. Like others in ISIS who received housing to help the occupation, Defendant also received free housing from ISIS upon his arrival in Syria and his entry into ISIS military training. *Id*. In addition, the Defendant worked to create other buildings for ISIS operations. *Id*. To sustain its goals, ISIS had various other operations that required offices and locations, such as its various ministries, the government's witnesses will explain. Defendant's building and rehabilitation of housing and other buildings for ISIS furthered ISIS's goals of controlling particular swaths of land.

As Coalition Forces swept into Raqqa, ISIS fighters and their families fled, including the Defendant. *First Statement*. Upon their arrival in Raqqa, Coalition Forces began the process of recovering documentary evidence of ISIS's crimes. One of the documents recovered in Raqqa explained ISIS census numbers, while the other detailed the Defendant's arrival and joining of ISIS. *Census Coding Spreadsheet; ISIS Arrivals Logbook*.

Defendant also became a merchant, thereby supporting ISIS and its members. Defendant began buying and selling livestock, cars, weapons, weapons accessories, and telephones to and from other ISIS members. *First Statement*. As with other traditional military operations, such as the husbanding of vessels, the maintenance of armories, the operations and stocking of military bases, and the performance of logistics, this flow of commerce helped ISIS carry out its day-to-day affairs and advance its military and strategic interests in the region.

6

The Defendant also assisted ISIS's military goals by purchasing and selling weapons and weapons accessories to ISIS members to use in their fighting. *Id*. Defendant considered himself a quality weapons trafficker, preferring superior American-made accessories to those manufactured by China. *Id*. The Defendant also provided money remitting services to other Trinidadian ISIS fighters in Syria, serving as a "hawalder," or money transfer broker, and he donated his own money to ISIS members to support the ISIS cause. *Id*. The government's witnesses will testify that this flow of money to ISIS became increasingly important to ISIS's operations when ISIS began losing territory and was no longer able to pay stipends and salaries to incentivize ISIS fighters to stay on the job and not abandon the terrorist group.

Eventually, in late 2017, the Defendant left Raqqa with his family and moved to Mayadin, Syria, which had become the new headquarters for ISIS after the Coalition Forces retook Raqqa. *Id*. While in Mayadin, the Defendant was assigned to an ISIS housing battalion, or katibah, and received an ISIS identification card. *Id*. Consistent with ISIS's bureaucratic structure, the Defendant also received a monthly stipend or payment from ISIS in the amount of $35 US per adult and $28 US per child in his household. *First Statement*. In addition, the Defendant was again provided free housing by ISIS. *Id*.

In 2018, the Defendant moved his family to Hajin, Syria, where ISIS assigned him to construct a well to provide that ISIS community with potable water. *Id*. When ISIS came under attack in Hajin, the Defendant moved his family to Al-Shafah, Syria, where he ran a store that sold various goods. *Id*. While in Hajin, according to the Defendant, he donated some of the store's profits to other ISIS members, thereby furthering of ISIS's goals. *Id*. Just as his construction assistance, and payments supported the flow of commerce, the Defendant's building of a well and

operation of a general store also supported ISIS by maintaining its economy and supporting its military operations, among other things. It also allowed ISIS to populate areas that had lost infrastructure in the war.

Between late 2018 and early 2019, after ISIS was targeted in Al-Shafah, Syria, the Defendant moved his family to Baghuz, Syria, the last ISIS stronghold before its collapse in 2019. *Id*. In fact, in March 2019, just before his surrender on March 17, 2019, the Defendant urged other Trinidadian ISIS members to refuse to surrender to the Coalition Forces. *Id*.  By his own admission, the Defendant did this in the hope that Coalition Forces would allow ISIS members to simply relocate, thereby continuing the conspiracy to provide material support to ISIS. *Id*.  However, the Defendant admitted yet another reason for this late push to keep his fellow Trinidadians from surrender. He did not want to go to prison. *Id*.

## II.     THE ISIS DOCUMENTS

Following its years' long war in Iraq in Syria, ISIS, captured territory in Syria between 2015 and 2017.[6]  However, witnesses will testify that, Coalition Forces undertook operations to defeat ISIS, during which they routinely recovered or received documents and other materials that were subsequently exploited.  Many of the recovered documents were ultimately transferred to the United States Department of Defense's National Media Exploitation Center ("NMEC") in Maryland.[7] There, FBI agents pored over the materials and located the six documents contained in various media, all of which pertained to the Defendant in one way or another.

---

[6] See, https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.
[7] At the hearing, government's witnesses will further describe NMEC and it documents management.

Of the numerous records recovered during this effort, four relate directly to the Defendant. These four documents name the Defendant, his family members, and/or reference his unique ISIS-issued census number, or contain other details known about Defendant's family or provided by him in his post-*Miranda* statements. Evidence will also show that this census number was issued to Defendant upon his completion of ISIS military training and in accordance with ISIS-established protocols as described in the two remaining documents.

Witnesses will testify that the documents are consistent with ISIS's record-keeping businesses practices and were part of the ISIS's attempts to recruit, incentivize, and retain foreign fighters to fight on ISIS's behalf. The documents were also part of ISIS's attempt to use families of these fighters to populate areas ISIS claimed to prevent the return and reclamation of those areas by Syrian civilians and to support the flow of commerce necessary to ISIS's goal of establishing a caliphate. The authenticity and significance of the documents as statements in furtherance of the conspiracy will be corroborated by many of the Defendant's post-*Miranda* statements about events, and details of his times in ISIS that are memorialized in the ISIS Documents.

## III.    HOW THE DOCUMENTS RELATE TO THE CONSPIRACY CHARGED

In March 2015, Defendant Emraan Ali and his family left their home in Trinidad and joined the designated terrorist organization ISIS in Syria. After their arrival in Syria, Defendant received ISIS military training, performed ISIS military duties, and moved around Syria, registering his family with ISIS as they moved. From the moment Defendant first provided material support to ISIS, ISIS made official records of this fact in support of its efforts to staff its military and occupy lands it conquered with ISIS fighters and their families.

9

As the government's witnesses will testify, keeping records and establishing a bureaucracy was a critical part of ISIS's efforts to conquer foreign lands and establish a Caliphate. To the extent Defendant entered into a conspiracy to provide material support to ISIS, these records memorialized his service and the benefits he and his family received as part of that deal.

### 1.   The ISIS Guesthouse Logbook

The ISIS Guesthouse Logbook (NMEC-2016-117612) was recovered on or about August 5, 2016, in the vicinity of Manbij, Syria by Coalition Forces.[8] According to the Defendant, he moved Manbij in Syria in 2015, where he encountered ISIS's bureaucracy when he and his family went to an ISIS "registration office." *First Statement.* As the Defendant told FBI special agents, shortly thereafter, the family went to an ISIS "safe house." *Id*. This entry to a "safe house" was memorialized in the ISIS Guesthouse Logbook.

| Logbook (entry and exit) female guesthouse | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| # | Kunya | Country | Age | Social status | number of kids | Husband's name | Husband's location | Entry date | Exit date | Remarks |
| 18 | Salimah 'Abd-al-'Aziz ('UM Samirah) | Trinidad | 30 | Married | 6 | Ali 'Umran | Guest house | 5/29 | 6/2 | Transferred to Ar Raqqah |

Details contained in the ISIS Guesthouse Logbook are corroborated by Defendant's own post-*Miranda* statements and by the other documents. For example, according to the Defendant, he first settled in Manbij, Syria following his arrival from Turkey. Manbij is the location where

---

[3] On August 5, 2016, Coalition Forces received media recovered by Syrian Democratic Forces during offensive operations near Manbij, Syria, where the Defendant and his family had lived. *ISIS Guesthouse Logbook*. This recovered media included a handwritten logbook in Arabic, titled "Logbook (entry and exit) female guesthouse" (the "Guesthouse Logbook"). *Id*. The Guesthouse Logbook contained 1,418 lines of data entry and of particular importance here, line entry # 18 contained the entry in the box above. *Id*.

the ISIS Guesthouse logbook was recovered approximately a year after Defendant arrived there. *First Statement; The ISIS Guesthouse Logbook.* The Guesthouse Logbook accurately recorded the name of the Defendant's wife, that defendant, Emraan Ali ("Ali 'Umran") was her husband, that the couple then had six children, and other corroborating details. *First Statement; ISIS Guesthouse Logbook; ISIS Arrivals Logbook.* Specifically, the Defendant stated that he traveled with his wife and her relative, and his six children, he also said his wife's name was Salimah Abdul-Aziz, and that she was 30 years old in 2015, all of which are memorialized in the ISIS Guesthouse Logbook. *Id.*; *First Statement*. Defendant stated that when they left Manbij, he and his family went to Raqqa, which the document also indicates ("Transferred to Ar Raqqa"). *First Statement; ISIS Guesthouse Logbook.* Finally, and most obviously, the ISIS Guesthouse Logbook indicates that Defendant and his wife and family came from Trinidad. *ISIS Guesthouse Logbook*; *First Statement*.; *MLAT Travel Documents*.

The entries in the ISIS Guesthouse Logbook are also corroborated by the ISIS Arrival Logbook, the defendant's statement to the FBI, and independent official records from the State of New York, including the birth certificates of his children Jihad, Islam and Sajedah.[9]  Specifically, like the ISIS Guesthouse Logbook, the ISIS Arrivals Logbook contains Defendant's wife's name, that he arrived in Raqqa as he said he did, that he arrived with his six children, that he, Emraan Ali, was Salimah Abdul-Aziz's husband, and that, at the time, he was 47 years old (a fact reflected

---

[9] For example, Defendant was convicted in 1992 in New York and provided his name and date of birth as being consistent with the entries in the *ISIS Arrivals Logbook; Records of United States v. Emraan Ali, Case No. K9106673.*  The government also has obtained the three birth certificates of Defendant's children from the New York State Department of Health (collectively with the records of conviction "New York State Documents"), which list Defendant's birthdate as July 4, 1967, consistent with the *ISIS Arrivals Logbook* and the *ISIS Guesthouse Logbook.*

in other records such as his New York State-issued documents and criminal conviction there). *Id*.;

*New York State Documents*.

## 2.  **The ISIS Arrivals Logbook**

Coalition Forces recovered the ISIS Arrivals Logbook (NMEC-2017-306798) near Raqqa

in 2017. Raqqa is where the Defendant went after he left Manbij.  *First Statement*. The handwritten

datebook, which was in both Russian and Arabic, contained arrival information about families,

including Defendant's.[10]  That entry is dated March 20, 2015, and contains the following

information: the Defendant's wife's name (Abdul Aziz Sulayman, alias Umm Samira); the number

of children with her (at that time six); her country or origin (Trinidad [and] Tobago); her arrival

companions (her father[11] and husband, "Ali Imran"); the age of her husband (47, which

corresponds to Defendant's age at the time); and that she carried $40,000 with her at the time.[12]

The information appears to have been entered on the date corresponding to March 20, 2015, and

contains the following entry:

---

[10] The original ISIS Arrivals Logbook still exists in physical form and is currently in the custody of United Kingdom authorities.  The United States therefore intends to have British Military Sergeant Thomas Millis, who personally handled the ISIS Arrivals Logbook, bring the ISIS Arrivals Logbook with him to testify in person about its origins, authenticity, and chain of custody.
[11] This single word "father" appears to be in error but is partially corrected later the entry to reflect the presence of her Uncle. *ISIS Arrival Logbook*. It is expected that the government's witnesses will testify that ISIS records sometimes contained data entry errors like the one here.
[12] In his post-*Miranda* statement, Defendant described carrying $15,000 cash with him when he arrived in Turkey, which he thought he did not spend there, though he did not state how much his Saudi-born wife brought to Syria. *First Statement*. He further stated that he had people in Trinidad send money to him in Syria in less than $2,000 increments to avoid detection, and that he set up plans to receive money in Syria before he even left Trinidad. *Id*. Beyond that, the Defendant boasted about how he could make a lot of money in Syria while other people did not live as well. *Id*.

> 7.  Abdul Aziz Sulayman. Umm Samira.
> Trinidad and Tobago. Children: 6
> She has arrived today with her father and husband.
> Husband: Ali Imran. 47 years old. [She/he has] $40,000 on her/him.
> Uncle: Mukhammad Musab. 33 years old.

Separately, despite some minor typographical differences possibly attributable to translations, transliterations, and human error, the ISIS Arrivals Logbook contains overlapping information as that contained the ISIS Guesthouse Logbook, including: that Defendant's wife's name was Sulayma[h] Abdul Aziz; Defendant's age; that the two were married; that they arrived with then six children; that they came from Trinidad & Tobago, and; that Defendant's wife was 33 years of age at the time of the data entry. *ISIS Arrivals Logbook*; *Guesthouse Logbook*.

### 3.  ISIS Military Assignment Spreadsheet

Coalition Forces recovered a hard drive containing two Microsoft Excel file listing ISIS fighters (NMEC-2018-415610) and the ISIS Military Roster (NMEC-2018-415663)[13] (discussed in further detail below) on or about December 13, 2017, in Homs Province, Syria.  On December 13, 2017, the Coalition Forces conducted a strike near Homs Province, Syria, on an ISIS convoy consisting of a large transport truck, a small pick-up truck, and twenty-two (22) ISIS fighters.  That strike resulted in seizures of various weapons and a plethora of electronic media, including but not limited to: twenty-six (26) cellphones; twenty-five (25) Hytera radios; twenty (20) laptop

---

[13] As will be detailed further by FBI Forensic Examiner Elizabeth Riddell, the metadata as to both the ISIS Military Assignment Spreadsheet and the ISIS Military Roster correlates with what we know about the Defendant's time in Syria.  More specifically, both spreadsheets' metadata reveal that they were last modified in March 2017, while Defendant was serving with ISIS in Syria.

computers; nineteen (19) external hard drives; seventeen (17) SD cards; twelve (12) internal hard drives; seven (7) tablets; and seven (7) thumb drives.

The ISIS Military Assignment Spreadsheet contains numerous tabs within the Excel file. One tab entitled "Residence" contains a list of ISIS fighters (most of the same fighters found on the "Arms" tab), but instead of detailing their weapons, the Residence tab identifies where each fighter resides, including whether their housing is ISIS owned and to which missions the fighter is assigned. Important here, line entry #40 contains the following entry:

| No. | Nickname | Personal ID Number | Home Address | State/Lease | Telephone Number | Detail |
|---|---|---|---|---|---|---|
| 40 | Abu-Jihad al-Trinidadi al-Amriki | 1200017746 | Next to al-Nuri Mosque | State | | Reconnaissance |

The ISIS Military Assignment Spreadsheet reflects Defendant's home address at the time was "Next to the al-Nuri Mosque." *Id*. This is consistent with Defendant's statement, in which he said that he moved his family into a home in near the main hospital in Raqqa, which the government's witnesses will testify is near the al-Nuri Mosque in Raqqa. *First Statement.* The ISIS Military Assignment Spreadsheet also contains an entry reflecting the fact that this residence was apparently owned by the "State". *Id*. This entry is also consistent with Defendant's statement that he received free housing from ISIS. *Id*. If that were not enough, the ISIS Military Assignment Spreadsheet also reflects Defendant's ISIS-issued census number (1200017746), which evidence will show was issued to Defendant upon completion of his military training and is in a number-series reserved for ISIS military personnel. *Id*.

14

The tab labeled "Arms" tracks weapons provided to a list of forty-four (44) ISIS fighters, with the following entry on line #43:

| Name | Name | Census Number | Section | Weapon | Owner | Weapon Number | Magazines | Bombs | Shoes | Jacket | Fur | Socks | Suit/ Uniform |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ابو جهاد الترينيداد ي الأمريكي | Abu-Jihad al-Trinidadi al-Amriki | 1200017746 | Reconnaissance | m4 | Personal | 67803 | | | 1 | 1 | 0 | 0 | 1 |

Details contained in the "Arms" section of the ISIS Military Assignments Spreadsheet were corroborated by the Defendant in his post-*Miranda* statement. Defendant explained that he said that he performed reconnaissance duties ("rabhat" duties in Arabic) with in his katibah. *First Statement*. In the ISIS Military Spreadsheet, Defendant's duties are translated to the English word "reconnaissance." *ISIS Military Spreadsheet*; *First Statement.* As Defendant described, ISIS used his Arabic alias – Abu-Jihad al-Trinidadi al-Amriki – in lieu of his non-Muslim name convention, Emraan Ali. *First Statement*. The ISIS Military Assignments Spreadsheet contains that alias. Defendant also expressed a preference for American made weaponry in his conversation with the FBI. *First Statement.* In the ISIS Assignment Military Spreadsheet, Defendant stands out as the only fighter in the cluster listed who provided his own M4 weapon.  This is consistent with the Defendant's admission that he trafficked in weapons while in Syria. *First Statement*. By contrast, other entries show the fighters' weapons ownership as "State" meaning ISIS-issued.

The ISIS Military Assignments Spreadsheet contains the exact same ISIS census number (1200017746) as the ISIS Military Roster further described below. In that regard, the two documents corroborate each other.

15

4. **The ISIS Military Roster**

The ISIS Military Roster is a Microsoft Excel spreadsheet that tracks the availability of ISIS soldiers. The ISIS Military Roster's initial tab entitled "Bio" contains a list of three-hundred and twenty-two (322) ISIS fighters, while every following tab (generally titled "New & Deleted") reflects ISIS fighter additions and subtractions (as soldiers were either killed or wounded).  Like the ISIS Military Assignment Spreadsheet, the ISIS Military Roster was critical to ISIS's on-going military operations, as tracking available soldiers was necessary in the war against Coalition Forces. The Bio tab contains the following entry on line #43:

| Nickname | Personal ID | Status | Wives | Children | Support Mother | Support Father | Mother-in-law | Mission | Young Children | Sisters-in-law | Wife in infidel land | Children in infidel land | Adult children |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abu Jihad al-Trinidadi al-Amreki | 1200017 746 | Soldiers - Workers | 1 | 7 | 0 | 0 | 0 | Reconnaissance | 0 | 0 | 0 | 0 | 0 |

The ISIS Military Roster accurately reflects the Defendant's alias (Abu Jihad al-Trinidadi al-Amreki), that by 2017 he had seven children (after his wife gave birth to twins in Syria and one died), that his duty was to perform reconnaissance[14], that he had one wife, and that he had a census number of 120001746. *First Statement.*

5. **ISIS Census Coding Spreadsheet**

The ISIS Census Coding Spreadsheet (NMEC-2017-104816) was recovered on or about January 8, 2017, in the vicinity of Mayadin and Raqqa, Syria by Coalition Forces during an offensive operation. The items recovered at that time included one laptop, one hard drive, one

---

[14] Defendant did not just perform reconnaissance duties, though. According to the Defendant, once assigned to the katibah, he participated as a fighter in an ISIS raid, or, as he referred to it, a "ghazwa" (meaning a raid in which territory, and often women and money, are taken by force) with other members of the al-Awlaki battalion in Shaddadi, Syria. *First Statement*.

thumb drive, and hard copy documents. ISIS businesses practices and rules for governance were memorialized in part in the ISIS Census Coding Spreadsheet, which is a guide for data entry by ISIS records keepers. Because ISIS ran itself as bureaucracy, evidence will show the terror group assigned different series of census numbers based on various indicators. In the case of Defendant, the ISIS Census Coding Spreadsheet shows that numbers like the Defendant's, which begins with "12000", were reserved for ISIS's Military Administration, as shown below.

| 1150010000 | ولاية صلاح الدين | 15 | 15 | Wilayat Salah Al-Din | 1150010000 |
| 1160010000 | ولاية كركوك | 16 | 16 | Wilayat Kirkuk | 1160010000 |
| 1170010000 | ولاية نينوى | 17 | 17 | Wilayat Nineveh | 1170010000 |
| 1180010000 | ولاية الجزيرة | 18 | 18 | Wilayat Al-Jazeera | 1180010000 |
| 1190010000 | ولاية دجلة | 19 | 19 | Wilayat Dijlah (Tigris) | 1190010000 |
| 1200010000 | الإدارة العسكرية | 20 | 20 | The Military Administration | 1200010000 |

The government's witnesses will testify that the issuance of a unique census number to an ISIS fighter was the means by which ISIS paid and tracked its recruits. The ISIS Census Coding Spreadsheet corroborates the ISIS Military Roster and ISIS Military Assignment Sheet, both of which contain Defendant's ISIS census number.

### 6. ISIS New Recruits Handbook

The ISIS New Recruits Policies and Procedures Guidebook (NMEC-2017-415185) comes from "The Islamic State Central Administration for Human Resources" and was recovered in or about January 2017 in the area of Mosul, Iraq by Coalition Forces. The locus of this recovery in Iraq is consistent with what witnesses will explain, that ISIS formed in Iraq and began its efforts to form a bureaucracy and build out its international recruitment of personnel in the town of Mosul.

17

The ISIS New Recruits Book generally sets forth how ISIS on-boarded new foreign recruits. Given ISIS's need to bring together and direct fighters from different countries and to maintain these fighters as personnel, its rules were critical to the success of the bureaucracy and furthered the conspiracy in which the Defendant engaged. Furthermore, these rules are corroborated by statements Defendant made to the FBI about how he was put into ISIS military training, given a census number, and paid. *Id*. More specifically, it details how new members are to be received by particular sectors, how their data is to be entered upon arrival, how the new recruits will work during their initial 30-day grace period after which they pledge their allegiance to ISIS, and how they will receive ISIS census numbers and monthly stipends once these steps have been completed. The ISIS New Recruits Handbook sets the time for receipt of the census number and pay as being after military training was completed by personnel, and it details how new recruits are to be handled should they be killed or injured during their original 30-day grace period.

IV. **EXPERT WITNESSES WILL FURTHER CORROBORATE THE DOCUMENTS WERE KEY TO ISIS'S STRATEGY TO RECEIVE MATERIAL SUPPORT**

The government's expert witnesses are expected to testify that ISIS records were an essential part of how it operated and how its members, such as the Defendant, provided material support to further its mission. As well, the government's experts will say that acquiring land and establishing a government structure over the territory selected for the Islamic State, which was on the Syria-Iraq border, was vital to ISIS's stated goal of establishing a Caliphate with a Sharia Law system.[15] While controlling the Islamic State area of Iraq and Syria, ISIS continued to engage in

---

[15] See, Cole Bunzel, *The Kingdom and Caliphate: Duel of the Islamic States*, Carnegie Endowment for International Peace, February 18, 2016, also available at

the expected conduct of a violent terrorist organization. ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities based on their religion, nationality, or ethnicity; kidnapping of civilians; the enslavement of adults and children from the Yazedi minority; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence.[16] ISIS recruited thousands of foreign fighters from across the globe to assist with its efforts to continuously expand its territorial control in Iraq and Syria.[17] As a result, tens of thousands of radicalized persons and extremists traveled from all over the world to the Middle East to join ISIS, including the Defendant.[18]

Witnesses will also testify that, as soon as ISIS it took control of an area, ISIS operated that area using a bureaucracy similar to large, formal, state governments. *See United States v.*

---

https://carnegieendowment.org/2016/02/18/kingdom-and-caliphate-duel-of-islamic-states-pub-62810.

[16] See, https://www.ap.org/explore/a-savage-legacy/.

[17] See, *ISIS and the Threat from Foreign Fighters: on House Hearing, Before the Subcomm. On Terrorism, Nonproliferation, and Trade,* 113rd Congress, p. 11-13 (2014).

[18] ISIS has also claimed credit for many terrorist activities, including attacks against Americans in the United States and against Westerners abroad. ISIS supporters have claimed responsibility for the following attacks in the United States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; the June 2016 shooting in Orlando, Florida, at the Pulse nightclub; the October 2017 West Side Highway truck attack; and the December 2017 attempted bombing of the 42 Street-Port Authority Bus Terminal. ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; and the August 2017 van attack in Barcelona, Spain. Though such terror attacks also occurred before 2015 and received widespread publicity.

19

*Musaibli*, 42 F.4th 603, 606-07 (6th Cir. Aug. 2, 2022) (finding that due to ISIS's growth, "the terrorist group became increasingly bureaucratic" and "applied this bureaucratic mindset to how it structured and operated its military," including keeping "detailed entries in databases about its fighters" in order to "help to administer the salaries and keep track of its members"). "The group takes a bureaucratic, systematized approach to maintaining power that makes it look in some ways more like a settled government than a fly-by-night band of extremists. Whether under the flag of the Islamic State, or ISIS before that, the group organizes the territory it administers into well-defined geographic units, levies taxes in areas it controls, and manages large numbers of fighters across a sparsely populated territory roughly the size of the United Kingdom."[19] "The group [] meted out services . . . which in certain categories outperformed the one it had usurped. The Islamic State collected taxes and saw to it that the garbage was picked up. Couples who got married could expect to receive a marriage license printed on Islamic State stationery. Once children of those unions were born, their birth weight was duly recorded on an ISIS-issued birth certificate. The group even ran its own D.M.V."[20]  Many media outlets obtained copies of ISIS documents and reported on the terrorist group's detailed record keeping.[21]

---

[19] Jacob N. Shapiro and Danielle F. Jung, The Terrorist Bureaucracy: Inside the Files of the Islamic State, BOSTON GLOBE (Dec. 14, 2014) https://esoc.princeton.edu/publications/terrorist-bureaucracy-inside-files-islamic-state-iraq (last visited July 8, 2022).

[20] *See* Rukmini Callimachi and Falih Hassan, *Abu Bakr al-Baghdadi, ISIS Leader Known for His Brutality, Is Dead at 48*, THE NEW YORK TIMES (Oct. 27, 2019), https://www.nytimes.com/2019/10/27/world/middleeast/al-baghdadi-dead.html (last visited July 8, 2022).

[21] *See* Rukmini Callimachi, *The ISIS Files: When Terrorists Run City Hall*, THE NEW YORK TIMES (Apr. 4, 2018), https://www.nytimes.com/interactive/2018/04/04/world/middleeast/isis-documents-mosul-iraq.html (last visited July 8, 2022) ("The world knows the Islamic State for its brutality, but the

## V.      THE ISIS DOCUMENTS RELATE TO THE CHARGED CONSPIRACY

The government's experts will testify that, due to ISIS's bureaucratic need to keep records, and the Defendant's (and his family's) lengthy tenure with the terrorist organization, several ISIS official records that related to the Defendant were recovered by Coalition Forces after they removed ISIS from power in Syria.  Together the ISIS Documents establish:

1.  That there was a conspiracy between the Defendant and others inside ISIS to provide material support to ISIS, as charged in Count One of the Superseding Indictment;

2.  That the Defendant specifically provided material support to ISIS, including serving as an ISIS soldier, as charged in Count Two of the Superseding Indictment; and,

3.  That the Defendant received ISIS military training, as charged in Count Three of the Superseding Indictment.

## ARGUMENT

The ISIS Documents are authentic under Rule 901(a) and admissible as either non-hearsay statements in furtherance of the conspiracy pursuant to Rule 801(d)(2)(E) or as admissible hearsay statements under Rule 807.  The Government will authenticate the ISIS Documents through evidence and testimony as follows: (1) by evidence that the documents were obtained in Syria after

---

militants did not rule by the sword alone. They wielded power through two complementary tools: brutality and bureaucracy."); Ghaith Abdul-Ahad, *The Bureaucracy of Evil: How Islamic State Ran a City*, THE GUARDIAN (Jan. 29, 2018), https://www.theguardian.com/cities/2018/jan/29/bureaucracy-evil-isis-run-city-mosul      (last visited July 8, 2022) ("Totalitarian regimes can't survive on millennial ideology and mass terror alone. They need a functioning bureaucracy and competent administrators."); *Documents Reveal ISIS Bureaucracy*, CBC NEWS: THE NATIONAL (Nov. 14, 2014), https://www.youtube.com/watch?v=OvhftJHHteI (last visited July 8, 2022) ("ISIS clearly has an obsession with paperwork.").

Defendant was in a location where the documents were recovered; (2) by showing that the documents corroborate each other in their particulars; (3) by evidence that the documents are corroborated by the Defendant's statements about his time in ISIS and in Syria; (4) by showing the documents contain information that is corroborated by other independent evidence, including but not limited to official state records; (5) where a document was recovered in Iraq, it was part of the rules of ISIS to govern its many fighters, including Defendant, and further it terroristic aims; and, (6) by providing expert testimony that the ISIS Documents are authentic based on their unique features as well as ISIS's bureaucratic needs as well as consistent with ISIS's goals.

### A. The Documents are Not Hearsay

The Government asserts that the ISIS Documents are not hearsay, as they were made in furtherance of the conspiracy alleged in Count One, and helped ISIS keep accurate records and work as a functioning bureaucracy.  Should the Court, however, find the ISIS Documents to be hearsay, the Court can still admit the ISIS Documents pursuant to Rule 807's residual hearsay exception, as the ISIS Documents are sufficiently trustworthy and probative.

The United States Court of Appeals for the Sixth Circuit recently decided a nearly identical evidentiary issue in *United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022), which is a similar prosecution of another United States citizen who joined ISIS in Syria. The reasoning of that case is instructive and persuasive.

In *Musaibli*, the Government requested a pre-trial evidentiary hearing to determine the admissibility of ISIS battlefield documents, similar to, and in one instance, identical to, the ISIS Documents here. After a two-day evidentiary hearing, the district court found most of the government's proposed ISIS documents were authentic based on expert testimony (including ISIS

22

document expert Aymenn Al-Tamimi, whom the Government intends to call in this case) and testimony regarding how the documents were procured   [ECF No. 203 at 1] ("Based on the evidence presented at the hearing, it appears that many of the documents are authentic, if not accurate.").  The district court, however, concluded that the Government did not adequately prove that the proposed documents were statements in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E).  The Sixth Circuit reversed that determination, holding that the district court clearly erred in finding that the government failed to carry its burden pursuant to Rule 801(d)(2)(E).  *Id.* at 615.  As discussed more fully below, those rulings on authentication and admissibility under the hearsay exceptions are correct and should lead to the same result here.

### B. Federal Rule of Evidence 901(a) Requires the Government Only to Make a Prima Facie Demonstration that the Evidence is What it Purports to Be.

Federal Rule of Evidence 901(a) requires a proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  This entails a "two-step process for determining authenticity," in which the Court must ensure the proponent establishes "a prima facie case that the proffered evidence is what it purports to be." *PDVSA US Litig. Tr. v. Lukoil Pan Americas, LLC*, 991 F.3d 1187, 1190–91 (11th Cir. 2021) (quoting *United States v. Maritime Life Caribbean Ltd.*, 913 F.3d 1027, 1033 (11th Cir. 2019)).  Once a prima facie case is made – the evidence is admissible – as the second step of the process is left to the jury to determine the ultimate question of authenticity.  *Id.*; *Maritime Life*, 913 F.3d at 1033 ("Only at the second step would "the trier of fact … appraise whether the proffered evidence is in fact what it purports to be.").  Importantly, the burden of making a prima facie case is "not an onerous one," requiring a showing of less than a preponderance of the evidence.  *United States v. Lanzon*, 639 F.3d 1293, 1301 (11th Cir. 2011); *United States v. Muller*, 819 F. App'x 701, 709

23

(11th Cir. 2020).  Rather, once a proponent makes out a prima facie case, the evidence is admitted, and the inquiry proceeds to the second step.  *Maritime Life*, 913 F.3d at 1033 ("By requiring Maritime to prove authenticity by 'the greater weight of the evidence,' the district court compressed the two steps of the inquiry under Rule 901 into one and conflated the issue of authenticity with [the merits].").  Stated another way, Rule 901(a) requires only "some competent evidence in the record to support authentication."  *United States v. Koziy*, 728 F.2d 1314, 1321 (11th Cir. 1984).

Rule 901(b) set forth examples of how proponents can satisfy authenticity's low standard. Two of these examples are relevant here.

First, under subsection (b)(1), authentication can be established through "testimony of a witness with knowledge."  Fed. R. Evid. 901(b)(1).  During the proposed evidentiary hearing, as is detailed blow, the United States intends to call several witnesses with knowledge of the hallmarks of ISIS documents.  Both witnesses Elizabeth Riddell and Derek Jefferson, whose roles are further described below, will testify about their personal knowledge of the specific documents, including how they were obtained by and received from Coalition Forces in Syria.

Second, under subsection (b)(4), authentication can be established by the documents' distinctive characteristics such as "appearance, contents, substance, or internal patterns . . . taken in conjunction with circumstances."  Fed. R. Evid. 901 (b)(4).  The "circumstances" referred to in subsection (b)(4) include circumstances surrounding discovery of the documents.  *See United States v. Smith¸* 918 F.2d 1501, 1510 (11th Cir. 1990) (holding that the government may authenticate a document by the circumstances surrounding its discovery); *see also United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011) (relying in part on evidence of where a document

24

originated in deeming the document properly authenticated); *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (approving introduction of written materials as sufficiently authenticated because they were found in an isolated campsite occupied only by the defendant); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (finding the fact that drug ledgers were discovered in known drug trafficker's home to be evidence of authenticity); *United States v. Helmel*, 769 F.2d 1306 (8th Cir. 1985) (finding gambling ledger sufficiently authenticated even though author of the ledger was unknown because the contents of the ledger were such that only those persons acquainted with the particular transactions and persons involved could have written them, the ledger was found in one of the defendant's homes, and the names in the ledger corresponded to members of the gambling enterprise).

### C. Authenticity

At the pre-trial hearing, the Government will make a prima facie case of ISIS Documents' authenticity in two ways: (1) by providing evidence regarding the ISIS Documents' capture circumstances (i.e., how, when, and where the documents were recovered in Syria); and (2) by presenting expert testimony showing that the ISIS Documents contain distinctive characteristics demonstrating authenticity. *See United States v. Smith*¸ 918 F.2d 1501, 1510 (11th Cir. 1990) (holding that the government may authenticate a document solely through circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery).

While subject to change, the Government intends to call the following witnesses:

1. ISIS Expert Hassan Hassan: Mr. Hassan is one of the world's preeminent experts on ISIS and co-author of the New York Times bestseller *ISIS: Inside the Army of*

*Terror*, which was selected as one of the Wall Street Journal's top 10 books on terrorism. Mr. Hassan will testify that he has reviewed thousands of ISIS documents throughout his career and that based on the distinct characteristics of the ISIS Documents, he finds them to be authenticate. At the evidentiary hearing, Mr. Hassan will expound on the reasons for his finding, which includes the unique language, characters, and terminology used by ISIS found within the ISIS Documents, the ISIS Documents' utility to the ISIS Conspiracy, and the internal consistencies within the ISIS Documents.

2. ISIS Document Expert Aymenn Jawad Al-Tamimi: Mr. Al-Tamimi is widely considered to be the world's preeminent ISIS document expert. Mr. Al-Tamimi is an Oxford graduate currently obtaining a Ph.D. at Swansea University on examining historical narratives in Islamic State propaganda. During his work, he has vetted and analyzed thousands of ISIS documents, writing peer-reviewed papers on his research. His work has been cited by the *New York Times*, *Washington Post*, and *USA Today*, among many others. Mr. Al-Tamimi will discuss his review of the ISIS Documents here and explain their unique characteristics that cause him to believe they are authentic. Mr. Al-Tamimi will also discuss the ISIS Conspiracy's bureaucracy more generally and explain the importance of documentation to the ISIS cause.[22]

---

[22] In addition to testifying about the ISIS Documents' authenticity, Mr. Hassan and Mr. Tamimi will also provide testimony regarding the ISIS Conspiracy more generally, as discussed in Section IV.C.i.

3. Former Department of Defense Contractor Derek Jefferson: As the Coalition Forces advanced on ISIS to recapture territory in Iraq and Syria, they frequently collected or received documents, computers, cell phones, electronic storage media, and other materials left behind by, or collected from, retreating ISIS fighters and administrative personnel. That material was transported to a Regional Exploitation Center ("REC") where various analysts mined the data for information. From December 2017 through April 2018, Jefferson was deployed to Iraq as a United States Department of Defense contractor at the REC, where he worked as a lab manager conducting technical examinations of electronic devices collected in the battle against ISIS in Syria.  Importantly, Jefferson was the first member of the United States military to receive the hard drive containing the ISIS Military Assignment Spreadsheet (NMEC-2018-415610) and the ISIS Military Roster (NMEC-2018-415663) at the REC.  Jefferson will testify about how he logged the hard drive at the REC and his recollection about the hard drive's capture circumstances.

4. FBI Forensic Examiner Elizabeth Riddell:  Riddell is an FBI Information Technology Specialist Digital Forensic Examiner assigned to the Miami Field Office.  When FBI Miami received an image of the ISIS hard drive containing the ISIS Military Assignment Spreadsheet (NMEC-2018-415610) and the ISIS Military Roster (NMEC-2018-415663), Riddell conducted numerous forensic examinations of that image to definitively conclude that it was the same hard drive captured on the battlefield in Syria and subsequently taken to Jefferson at the REC.

Riddell will detail how those examinations work and how the hard drive's serial number and hash values[23] match.   Riddell will also interpret and explain the metadata contained within the two spreadsheets based on her knowledge and training.

5.  British Military Sergeant Thomas Millis: Sgt. Millis worked at the REC from November 2019 until June 2020.  At the REC, Sgt. Millis was a Captured Enemy Material Coordinator, Team Leader.  As a Team Leader, Sgt. Millis oversaw the ingestion of captured enemy material into the REC, monitored the materials' status while at the REC, and oversaw the materials' storage and ultimate disposal. Importantly, Sgt. Millis was responsible for transporting the ISIS Arrivals Logbook from the REC back to the United Kingdom, where it remains today.  Sgt. Millis will therefore discuss how the REC processed material like the ISIS Arrivals Logbook, and will discuss the ISIS Arrivals Logbook's chain of custody, identifying it as captured ISIS material from Syria.

6.  Former ISIS member Omer Kuzu:  Omer Kuzu is an American former ISIS member who pled guilty to providing ISIS material support, in violation of Title 18, United States Code, Section 2339B.  *See United States v. Kuzu,* No. 3:19-cr-327 (N.D. Texas).  Mr. Kuzu worked for ISIS's Administration department and was thus keenly aware of the information ISIS tracked regarding its membership.  In that regard, Mr. Kuzu will discuss the ISIS Documents, identifying them as authentic

---

[23] A hash value is a string of characters that uniquely represents that data contained on electronic media.

ISIS materials based on Mr. Kuzu's familiarity with ISIS record keeping practices and the ISIS Documents' unique identifiers including the unique information the ISIS Documents recorded.

Here, the ISIS Documents contain numerous indicators of their authenticity. First, four of the six ISIS Documents contain the accurate unique identifiers of the Defendant, including his name, ISIS census number, kunya, number of wives and children, and other identifying information and, importantly, the information is consistent across the ISIS Documents. The ISIS Documents themselves show that ISIS routinely tracked important data regarding its population and in particular, its soldiers.  Moreover, the ISIS Documents are dated during the relevant time the Defendant was an ISIS member and were recovered in ISIS territory where the Defendant lived.  Finally, the specific nature of the contents of the ISIS Documents are corroborated by the Defendant's own statements.  Taken together, with the expected testimony, the appearance, contents, internal patterns, and the circumstances of the ISIS Documents' discovery establish that the ISIS Documents are what the Government purports them to be – authentic ISIS records.

Finally, the contents of the documents are corroborated by the Defendant's post-*Miranda* statements.

### D. The ISIS Documents are Admissible Under Federal Rule of Evidence 801(d)(2)(E), Because the Defendant Joined a Conspiracy to Materially Support and they are Co-Conspirator Statements Made in Furtherance of that Conspiracy

A statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E). To introduce the ISIS Documents as evidence, the government must show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the

defendant against whom the statement is offered; and (3) the declarant made the statement during the course of and in furtherance of the conspiracy. *United States v. Rivas Nunez*, 2022 WL 1763767, *5 (11th Cir. June 1, 2022) (citing *United States v. Christopher*, 923 F.2d 1545, 1549–50 (11th Cir. 1991)); *United States v. Musaibli*, 42 F.4th 603, 614-19 (6th Cir. Aug. 2, 2022). Further, the ISIS Documents themselves may be considered in determining their admissibility. *Id.* (holding that the district court may rely on the information provided by the co-conspirator statement) (citing *United States v. Byrom*, 910 F.2d 725, 735–36 (11th Cir. 1990)).

ISIS, unlike other terrorist organizations, such as al Qaeda, attempted to establish a fully-functioning, centrally controlled and organized hierarchical government with various subcomponents.  The ISIS Documents reflect an important goal of the conspiracy the Defendant joined – to create and run a nation living under Sharia law[24] – and are therefore admissible as non-hearsay co-conspirator statements.  More particularly, the documents reflect statements made by the Defendant's co-conspirators in ISIS and were made in furtherance of the Defendant's conspiracy to provide material support and resources to ISIS.

In considering how Defendant's ISIS co-conspirators were able to further their conspiratorial goals, it is important to recall that ISIS focused as much on its bureaucracy as it did on its fight against the Coalition Forces.  Defendant's own statements reflect a knowledge of and interest in the ISIS bureaucracy, its payments to personnel and their families (and, necessarily, its failure at times to pay), its housing and commercial needs, and its weaponry. Thus, as discussed more fully below, the ISIS Documents furthered the Defendant's aims of providing material

---

[24] *See What is "Islamic State?"*, Dec. 2, 2015, https://www.bbc.com/news/world-middle-east-29052144 (last visited on July 21, 2022).

support to ISIS, a part of which required that ISIS keep accurate records and give the appearance to recruits and members of being a fully functioning government.  More specifically, as it pertains to the Defendant, the ISIS Documents are statements by the Defendant's co-conspirators, the same people who gave him orders, paid him, provided him, his wife, and his six children housing, provided him weapons and training, and with whom he worked directly. As such they were within the scope of charged conspiracy and were made in furtherance of it.  As the Sixth Circuit has noted, "statements generated by ISIS's bureaucratic apparatus to support the mission of providing the terrorist group with personnel and services…fit comfortably within the alleged conspiracy's scope."  *United States v. Musaibli,* 42 F.4th 603, 618 (6th Cir. 2022) (defining the scope of the conspiracy for purposes of Rule 801(d)(2)(E) with reference to the defendant's charged conspiracy to provide material support and resources to ISIS).

### 1.  Defendant Joined a Conspiracy to Provide Material Support to ISIS

As the Sixth Circuit found in *Musaibli*, there was a conspiracy to provide material support to ISIS.  *Musaibli,* 42 F.4th at 614-19. In the instant case as well, the Defendant entered into a conspiracy to provide material support and resources to ISIS. The bureaucratic records maintained by ISIS, ISIS Documents One through Six, were statements that furthered that conspiracy.  "The existence of an agreement between two or more persons" to provide material support to ISIS constitutes a criminal conspiracy.  *See United States v. Augustin*, 661 F.3d 1105, 1121 (11th Cir. 2011) (per curiam) ("A jury could find that by volunteering his service to Al Qaeda – whether for financial or other reasons – Augustin conspired to provide material support to a foreign terrorist organization in violation of § 2339B"); *United States v. Alebbini*, 979 F.3d 537, 544 (6th Cir. 2020) (citations omitted); *United States v. Gigante*, 166 F.3d 75, 82 (2nd Cir. 1999) (noting that as

criminal ventures expand, so too must the sweep of Rule 801(d)(2)(E)).  "When determining whether a conspiracy existed under Rule 801(d)(2)(E), 'the key is coordinated action.'" *Musaibli*, 42 F.4th at 615 (internal citations omitted).

Further, as *Musaibli* correctly held, it does not matter that ISIS was a large organization. "Statements made in furtherance of a large conspiracy [like one to provide material support to ISIS] are no more outside the bounds of Rule 801(d)(2)(E) than ones made in service of a small conspiracy." *Musaibli* 42 F.4th at 618   Rather, there must be a "unity of interests" of the co-conspirators, but "there is no magic number of co-conspirators past which unity unravels." *Id.*; *United States v. Hewes*, 729 F.2d 1302 (11th Cir. 1984) (holding that statements made in separate small conspiracies, which collectively form a larger RICO enterprise, are statements made in furtherance of the RICO enterprise); *United States v. Gigante*, 166 F.3d 75, 82 (2nd Cir. 1999) (finding that Rule 801(d)(2)(E) must expand to admit statements of a large mafia conspiracy); *United States v. Russo*, 302 F.3d 37, 46 (2nd Cir. 2002) (emphasizing that in large conspiracies, Rule 801(d)(2)(E) admissibility "depends on the nature of the statement offered – in particular, what objective it sought to advance – and whether the defendant was jointly engaged with the declarant in the conspiracy seeking that objective.").  A large conspiracy with many members is still a conspiracy, after all, and Sections 2339A and 2339B make clear that the provision of any material support or resources to ISIS is forbidden, and there is nothing in either statute that could circumscribe the size of the conspiracy, save that it be to a particular, designated foreign terrorist organization.

The United States formally designated ISIS as a foreign terrorist organization in May 2014. In July 2014, when Abu Bakr al-Baghdadi publicly declared the Islamic State a Caliphate, he

invited Muslims from around the world to join. *See Timeline: the Rise, Spread, and Fall of the Islamic State*, The Wilson Center, Oct. 28, 2019, https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state (last visited on July 20, 2022).   Thereafter, tens of thousands of people, including the Defendant, became radicalized, answered Baghdadi's call and pledged allegiance to the terrorist organization.   When they agreed to provide themselves as personnel, their services, money, expertise, or other things of value in support of ISIS in keeping with that pledge, these individuals, like the Defendant here, joined a criminal conspiracy to provide material support to ISIS.   Defendant was a member of the conspiracy to provide material support to ISIS—and is charged in relation to this conduct in Count One. "To establish that the defendant was a part of a conspiracy, 'the government must prove that a conspiracy existed, that the defendant had knowledge of the essential aims of the conspiracy, and that with such knowledge, the defendant joined the conspiracy.'"  *United States v. Dixon*, 901 F.3d 1322, 1343-44 (11th Cir. 2018).   As discussed above, overwhelming evidence, including that contained in the ISIS documents and the Defendant's statements, shows that the Defendant joined the conspiracy to provide material support and resources to ISIS, and that he had knowledge of ISIS's designation and its terroristic aims when he did so.

Law enforcement conducted three post-*Miranda* interviews of the Defendant.   During those interviews, the Defendant made numerous admissions regarding his knowledge of ISIS and his provision of material support.   Regarding his knowledge of ISIS's terroristic aims, the Defendant admitted that he watched at least two significant ISIS propaganda videos prior to joining the organization and taking his family into a war zone so he could provide material support: (1) Abu Bakr al-Baghdadi's July 4, 2014, Speech in Mosul, Iraq ("Baghdadi's Speech"); and (2) *The*

33

*Flames of War*.   These videos undoubtedly establish the Defendant's knowledge of ISIS's designation as a foreign terrorist organization, and its terroristic aims.

In discussing Baghdadi's Speech, the Defendant recalled that, during this time (presumably 2014), the border between Syria and Iraq ceased to exist and remarked "things were going back to the way it used to be," presumably a reference to a prior configuration of one of several ancient caliphates. Importantly, the Defendant viewed these developments as fulfillment of Islamic prophecy. In other words, Baghdadi's Speech, which touted ISIS's claim that it was a functioning government, motivated the Defendant to leave Trinidad, removing his children from their home, and their biological mother's reach, to join ISIS, and provide ISIS a range of material support. *The Flames of War,* which the Defendant viewed prior to leaving Trinidad, is an extremely violent hour-long ISIS propaganda video aimed at recruiting English-speaking persons to join ISIS's ranks as personnel. Such videos, along with its aggressive social media efforts directed at Westerners, were used by ISIS to radicalize foreigners and persuade them to join and fight for ISIS in Syria and otherwise bloat its ranks.  The Defendant even stated he agreed with the portion of *The Flames of War* that attempted to discredit Western media reports about ISIS's atrocities, even though information about ISIS's atrocities was widely publicized by news networks across the globe by the time the Defendant traveled to Syria.  Remarkably, the Defendant suggested that ISIS was "on the right path at that time."

The Defendant's knowledge of ISIS's terroristic aims is also evidenced by the Defendant's own material support of the organization, which lasted for approximately four years. Defendant's time is Syria, and his provision of material support was concurrent with the time when ISIS was seizing territory and homes from innocent Syrian civilians, killing those who sought to defend

34

their homes, and holding Yazedis, including children, as slaves, while citing religious authority for such atrocities that Muslims worldwide condemned as false. Specifically, during this time of ISIS's terroristic reign, the Defendant stated he participated in ISIS military training, which included instruction on the use of AK-47s, PKC machine guns, and rocket propelled grenade launchers.  After military training the Defendant admitted that he was a member of the Anwar al-Awlaki katibah (ISIS military's term for battalion).  As a katibah member, the Defendant stated that he went out on a "ghazwa" in Shaddadi, Syria. To be clear, "ghazwa" is an Arabic term for a raid during which territory is claimed from others, but it also refers to raids intended to recover money and women.  Thereafter, the Defendant indicated he received a medical discharge from the military katibah, although his material support for ISIS did not stop there. To the contrary, after contracting what he characterized as a heart problem, the Defendant went on adapt his material support to suit ISIS's changing needs as it took territory from Syrians. The Defendant pivoted to selling weapons and weapons parts to ISIS and participating in its flow of commerce by running a store to supply ISIS members with needed items. The Defendant's support continued as he assisted with ISIS's creation of housing and other ISIS buildings, repaired ISIS vehicles, and established a well in a town ISIS had seized. As stipend money from ISIS became less reliable, something that could have motivated fighters to leave ISIS or rebel, the Defendant provided money remitting services and funds to ISIS fighters from Trinidad.  The defendant sold goods and food needed by those in ISIS as they settled in each territory ISIS took.  In the final throes of the battle, the Defendant sought to maintain the provision of material support to ISIS by calling upon his fellow fighters from Trinidad to hold their ground and not to surrender.

Perhaps most tragically, the Defendant's material support for ISIS included providing his two boys, Jihad and Islam, 12 and 15 years old when they arrived in Syria, as ISIS fighters after being taken to Syria by the Defendant.

Most important to this motion, however, the details contained in each of the ISIS Documents, themselves, support the conclusion that the Defendant joined the conspiracy to provide material support to ISIS and are otherwise authentic. The ISIS Documents consistently list the Defendant and his family by their names, by the Defendant's ISIS census number, his kunya, his country of origin, and detail particular missions the Defendant was to complete.  Details of the statements, such as the Defendant's weapons trafficking and his preference for American-made weaponry, further corroborate the authenticity of these records. In other words, until his surrender in March 2019, the Defendant was actively providing material support to ISIS as part of the criminal conspiracy charged.

To the extent that the Defendant did not know each and every other coconspirator providing material support to ISIS, this is of no moment.  It is settled law that members of a conspiracy do not need to know each other, or even know of all the other members of the conspiracy. *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008) ("It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators."); *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). The Defendant knowingly conspired to provide material support to ISIS, including those who fought on its behalf, and those who maintained ISIS records.

36

Accordingly, statements made in furtherance of that effort are properly admitted against the Defendant.

### 2. The ISIS Documents are Statements in Furtherance of the Conspiracy to Provide Material Support to ISIS

Third, and finally, the government must show that the statements were made in the course and in furtherance of the conspiracy. *Christopher*, 923 F.2d at 1549–50. This Circuit "applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Flores*, 572 F.3d 1254, 1264 (11th Cir. 2009) (internal quotations and citations omitted). Further, the "in furtherance of the conspiracy requirement" is met if the statement in question advances the conspiracy in any way. *Id.* (finding statements about a co-conspirator's reliability and stature fostered cohesiveness within the conspiracy and thus furthered its interests).

*Musaibli* is particularly instructive here. On appeal, Musaibli argued that finding the proposed ISIS documents admissible would usurp Rule 801(d)(2)(E)'s intention, and "allow the government to enter any statement made by any participant in ISIS's sizeable membership, regardless both of how tangentially connected this was to his conduct." In rejecting that argument, the Sixth Circuit found that statements that support ISIS's bureaucracy's "apparatus" are within the scope of the alleged conspiracy, just like the ISIS Documents here. *Id.* at 618. The court further held that the ISIS records undoubtedly furthered the conspiracy to provide material support to ISIS, finding that "statements identifying Musaibli as an ISIS fighter attest both to the services that Musaibli agreed with others to render to the terrorist group and to how the group managed its personnel." *Id.* Identically here, the ISIS Documents fulfilled a necessary role in allowing ISIS to function as a government, and in particular, a fighting force. They reflect the weapons Defendant used, his issuance of a uniform, his location, his ISIS-provided housing, his dependents

for purposes of receiving a stipend, and his assignments and duties (Raqqa and reconnaissance), among other things. The documents establishing the census numbers in 12000 series show that Defendant was assigned to and served in ISIS's military, hence went into the business of providing himself as personnel for ISIS as is alleged in Count 1 of the Superseding Indictment and was tracked and paid by ISIS for this service. The registration of his family, beginning in the guesthouse, were also in furtherance of the conspiracy in that ISIS documented family members for purposes of stipend payment and kept track of the families that serve as occupiers of territory is took from Syrian civilians.

This conclusion is inevitable when one considers similar prosecutions. In much the same way that a drug ledger records the actions inherent in a drug conspiracy, the ISIS Documents were statements made by members of a conspiracy to record the actions of the conspiracy. *See, e.g., United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (finding drug ledgers admissible as statements made by co-conspirators in furtherance of the conspiracy); *United States v. Goshen*, 14 F.3d 602 (6th Cir. 1993) (affirming admissibility of a drug ledger, because the information allowed members to better organize conspiracy's business). Financial databases are admissible in fraud prosecutions for the same reasons. *United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006) (affirming use of financial documents, including a Quickbooks database, to support a fraud conviction); *United States v. Moran*, 493 F.3d 1002, 1011 (9th Cir. 2007) (affirming admission of financial documents, including a Quickbooks database used to keep track of transactions which were a part of fraudulent scheme). And if an organized-crime syndicate created an organizational chart listing all the dons, capos, and foot soldiers, with notes on particular killings or acts of violence, it would be readily accepted in a RICO case against members of the enterprise. *United*

38

*States v. Hewes*, 729 F.2d 1302 (11th Cir. 1984) (holding that statements made in separate small conspiracies, which collectively form a larger RICO enterprise, are statements made in furtherance of the RICO enterprise); *United States v. Gigante*, 166 F.3d 75, 82 (2nd Cir. 1999).  Indeed, it is well-established that "statements identifying other conspirators and their roles in the conspiracy further the conspiracy." *United States v. Bailey*, 973 F.3d 548, 561 (6th Cir. 2020) (citations and quotations omitted); *United States v. Caraza*, 843 F.2d 432, 436 (11th Cir. 1988) (affirming the admission of co-conspirator statements that identified another member of the conspiracy); *United States v. Rendon*, 359 F. App'x 80, *81 (11th Cir. 2009) (citing *Caraza* in affirming the admission of coconspirator statements that identified the Defendant's role in the conspiracy). The ISIS Documents here are akin to these well-established principles and apply equally to the ISIS Conspiracy.[25]

The relevant statutes support this conclusion as well.  Specifically, Congress has outlawed "providing material support or resources to a foreign terrorist organization."  18 U.S.C § 2339B. This ban on aiding foreign terrorist organizations extends to essentially any kind of support or resources (except medicine or religious materials) provided to ISIS. 18 U.S.C. § 2339A(b)(1). The clear Congressional intent was to prevent any American from working in coordination with members an FTO (in this case ISIS) to help ISIS function as an organization, in any way.  As the

---

[25] Indeed, as the Fourth Circuit has held, these same principles of admissibility under Rule 801(d)(2)(E) apply equally to foreign antagonists. *United States v. Squillacote*, 221 F.3d 542, 564 (4th Cir. 2000). Thus, in *Squillacote*, the court admitted records of the East German intelligence service that contained information regarding the identity of spies, their activities, code names and assignments. *Id*. The ISIS Documents are no different, for they identify and catalogue the who, what, and when of the ISIS brigade with which the Defendant fought, as well ISIS members' whereabouts throughout the existence of the conspiracy.

legislative history explains, "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA §§ 301(a)(1)–(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose).

The Government need only establish that the Defendant had knowledge "of the essential nature of the plan and their connections with it"—which he undoubtedly did when he traveled to join ISIS to fight on its behalf, enlisted in religious and military training camps, took up arms, provided his children as child soldiers, provided construction support, wells, food, vehicle repairs, weapons, and money services and funds, and remained in ISIS until its very last stronghold in Baghuz, Syria. *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *see also United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) (citing *Blumenthal* in finding that the Government must prove the defendant knew of the essential nature of the plan and agreed to it).

### 3.  Proposed Evidence on Conspiracy to Materially Support ISIS

To establish the three prerequisites discussed above, the United States intends to present the following evidence, subject to change, regarding the conspiracy to materially support ISIS:

1. ISIS Expert Hassan: Hassan will provide expert testimony regarding ISIS's founding and origination; its methodology and recruiting practices for foreign fighters; ISIS's bureaucracy, including the various roles of ISIS members and ISIS's desire to maintain accurate and up-to-date documents like the ISIS Documents here, to maintain a government structure; and the role of ISIS documentation in ISIS propaganda.

2. ISIS Document Expert Aymenn Al-Tamimi: Al-Tamimi will provide expert testimony regarding the ISIS Documents' value to the Defendant's conspiracy to material support ISIS and how the ISIS Documents furthered that cause.

3. Former ISIS member Omer Kuzu:  Mr. Kuzu will testify regarding his involvement in ISIS, including its recruitment of foreign fighters, ISIS's bureaucracy and ISIS's desire to maintain accurate and up-to-date documents like the ISIS Documents here, to maintain a government structure.

### E. The ISIS Documents are Admissible Hearsay Under Federal Rule of Evidence 807, Because They Have Sufficient Circumstantial Guarantees of Trustworthiness.

Finally, and alternatively, each of the ISIS Documents are also admissible under the residual hearsay exception contained in Federal Rule of Evidence 807.  Rule 807 permits evidence to be admitted if it has sufficient "circumstantial guarantees of trustworthiness," and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Here, the evidence of the trustworthiness of the ISIS documents is significant. The documents were discovered in ISIS-controlled territory where the Defendant admits he was, during the conflict between Coalition Forces and ISIS. Moreover, most of the documents contain similar information—such as kunyas, number of wives, number of children, census number, etc.—providing an internal consistency that further supports their trustworthiness. *See, e.g., United States v. Brown*, 685 F. App'x 891 (11th Cir. 2017) (finding verbal statements trustworthy at a supervised release hearing because they were consistent with eyewitness testimony); *Federal Trade Commission v. On Point Global LLC*, No. 19-25046-SCOLA, 2021 WL 4891334 (S.D. Fla. Sept. 23. 2021) (admitting documents under the residual

hearsay exception due to the their consistent descriptions among other factors); *United States v. Hamama*, 2010 WL 2649877 at *19 (E.D. Mich. June 30, 2010) (applying the residual hearsay exception after finding the documents trustworthy based on the testimony of former Iraqi Intelligence Service officials and experts); *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005) (affirming the district court's finding of the residual exception to Iraqi Intelligence Service files).

## **CONCLUSION**

For these reasons, the Government respectfully requests that the Court hold a pre-trial evidentiary hearing and ultimately find each of the ISIS Documents admissible at trial.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:   s/ *Jonathan D. Stratton*
JONATHAN D. STRATTON
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0093075
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9151
Email: jonathan.stratton@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court using CM/ECF, and that the foregoing document is being served this day on all counsel of record via Notices of Electronic Filing generated by CM/ECF.


s/ *Jonathan D. Stratton*
JONATHAN D. STRATTON
Assistant United States Attorney