**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. <u>21-CR-20123-BLOOM/OTAZO-REYES</u>**

**UNITED STATES OF AMERICA**

**vs.**

**EMRAAN ALI,**
    **a/k/a "Abu Jihad TNT,"**

    **Defendant.**

_____/

<u>**SENTENCING MEMORANDUM**</u>

### I.    INTRODUCTION

In 2015, Emraan Ali uprooted his family, promising his young children they were going on vacation. Instead, they joined ISIS, the world's most violent terrorist organization. Importantly, the Defendant did so after significant planning and considering and after consuming violent ISIS propaganda videos, including *The Flames of War* (ISIS's most famous foreign fighter recruiting video) which advocated for violent jihad against Western governments. Thereafter, for approximately four years, Emraan Ali supported ISIS in various ways, by: (1) becoming an ISIS soldier himself and performing military duties including reconnaissance and terrorist raids; (2) volunteering his young sons as child soldiers; (3) marrying off his approximately fourteen-year-old daughter to an ISIS fighter; (4) trafficking in weapons in support of ISIS; and (5) helping finance ISIS operations. The Defendant did so until the very end, until ISIS's ultimate demise in Baghuz, Syria, where the Defendant ultimately surrendered to Coalition Forces. In fact, at the end, when ISIS was falling, the Defendant advocated others to continue to refuse to surrender, because

he still believed in the ISIS creed, and hoped that ISIS could relocate elsewhere and continue is global terrorism campaign.

Twenty years in prison is insufficient to fully account for the Defendant's support of terror and the immeasurable damage that he and his coconspirators have caused globally to countless individuals, but also to account for the damage the Defendant inflicted on his own family. But it is the advisory guideline sentence in this case, and based on all the sentencing factors, it is the appropriate and just sentence that this Court should impose, in addition to a life term of supervised release to ensure the safety of the public.

## II.    SENTENCING GUIDELINES

In accordance with the Plea Agreement entered in this case [ECF No. 79], the government agrees with the U.S. Probation Office that the following provisions of the Guidelines apply:

- The Base Offense Level is 26 pursuant to U.S.S.G. § 2M5.3(a) because the Defendant's offense of conviction involved a conspiracy to provide material support or resources to a designated foreign terrorist organization, namely, ISIS.
- A 12-level enhancement applies pursuant to U.S.S.G. § 3A1.4(a) because the Defendant's offense of conviction is a felony that involved, or was intended to promote a federal crime of terrorism.
- A 3-level enhancement applies pursuant to U.S.S.G. § 3B1.1(b) because the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive.
- A 2-level enhancement applies pursuant to U.S.S.G. § 2M5.3(b) because the Defendant's offense of conviction involved the provision of firearms and explosives.

Pursuant to U.S.S.G. § 3E1.1.(b), the government moves the Court to grant the Defendant an additional one-level reduction in the offense level for acceptance of responsibility. Factoring in these reductions, the government agrees with the U.S. Probation Office that the Guidelines are

properly calculated in the Presentence Investigation Report ("PSI") [ECF No. 91] at Level 40 and Criminal History Category VI, resulting in guideline imprisonment range of 360 months to life. [ECF No. 91 at ¶¶ 26-35, 70-71].   Because, however, Congress has prescribed a statutory maximum penalty of 20 years' imprisonment for conspiring to provide material support or resources to ISIS, the Defendant's guideline term of imprisonment is 240 months.  *Id.* at ¶ 71.

### III.   THE GUIDELINE TERM IS WARRANTED PURSUANT TO THE SECTION 3553(a) SENTENCING FACTORS

After calculating the appropriate advisory Guideline range, the Court must then turn to "the applicable factors in § 3553(a)" and consider whether to "vary from the advisory sentence." *United States v. Henry*, 1 F.4th 1315, 1323 (11th Cir. 2021).  Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.[1]  Additional factors set forth in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Based on a careful consideration of those factors, the imposition of the guideline sentence for the Defendant is appropriate and just.

---

[1] Courts have routinely noted that this statutory command requires the consideration of uncharged conduct about the Defendant's past actions.  *See, e.g., Pepper v. United States*, 562 U.S. 476, 488 (2011) (a sentencing court is permitted to "consider the widest possible breadth of information about a defendant"); *United States v. Brown*, 816 F. App'x 240, 247 (11th Cir. 2020) (noting that the district court "was required to consider what [the government] learned about [the defendant's] past conduct, even if uncharged, as part of the 'nature and circumstances' of the charged conduct and [the defendant's] 'history and characteristics'").

IV.   **EVIDENCE**

a.  **The Court has "Wide Latitude" In Deciding What to Consider at Sentencing**

The factual summary below is based on the totality of evidence obtained during this investigation, including, but not limited to: (1) foreign records obtained via Mutual Litigation Assistance Treaties with Trinidad & Tobago, Brazil, and Turkey; (2) Battlefield documents obtained by Coalition Forces during operations against ISIS between 2015 and 2018; (3) Electronic evidence, including text, picture, and voice messages; and (4) post-*Miranda* interviews with the Defendant and three of his children, Jihad Ali, S.N.A., and I.A.

The Court can and should consider the entirety of this evidence at the upcoming sentencing hearing.  "A district court has 'wide latitude in the kinds of information it may consider in the sentencing decision' and may consider hearsay evidence as long as 'the defendant [has] an opportunity to refute it and [the evidence bears a] *minimal indicia* of reliability.'"  *United States v. Hall*, 965 F.3d 1281, 1294 (11th Cir. 2020) (quoting *United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989) (emphasis in original); U.S.S.G. § 6A1.3 (court may consider relevant information at sentencing "without regard to its admissibility under the rules of evidence at trial").  Further, "[a] defendant challenging a sentencing court's reliance on hearsay evidence bears the burden of demonstrating that the evidence lacks the 'minimal indicia of reliability.'" *Id.* (quoting *United States v. Bourne*, 130 F.3d 1444, 1447 (11th Cir. 1997).

As the Government witnesses are prepared to testify, this evidence is undoubtedly reliable.  First, most of the evidence is not hearsay or has an applicable hearsay exception and would therefore be admissible at trial.  The only evidence that could be considered inadmissible hearsay are the statements of the Defendant's three children, each of whom were interviewed by law

4

enforcement numerous times and provided relevant information regarding their father and their time in Syria. All the Defendant's children's statements are reliable, as the children had no incentive to fabricate information about their father, but rather had an incentive to minimize his conduct. Further, as government witnesses are prepared to testify, the children appeared forthcoming and truthful, while also providing information about their own misconduct, indicating the information's trustworthiness. Finally, independent evidence corroborates the provided information, such as the Defendant's own statements, foreign travel records, and Battlefield documents, among other admissible evidence. The children's statements therefore bare far more than the required "minimum indicia of reliability" and are worthy of the Court's consideration in determining the Defendant's sentence.

The Government also intends to introduce expert testimony to "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). Such evidence complies with Rule 702 and meets the "three basic requirements: qualification, reliability, and helpfulness to the factfinder." *United States v. Valdes*, 688 F. App'x 739, 745 (11th Cir. 2017) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*)). As discussed in further detail below, Government expert Hassan Hassan[2], who recently testified as an expert in a different federal ISIS terrorism trial, is qualified, and will provide reliable evidence that will assist the Court in understanding the evidence.

---

[2] On June 25, 2021, the Government properly noticed its intention to utilize the expert testimony of Hassan Hassan [ECF No. 38] and also provided defense counsel his CV and a list of his publications.

### b. Factual Summary

In 2015, the Defendant took his family from Trinidad & Tobago to join ISIS in Syria, passing through a series of third countries along the way. Before leaving Trinidad, the Defendant set up a financial system whereby he could receive funds in Syria, collected significant cash, falsely told his children they were going on vacation, and melted down gold to be converted to jewelry so he would have money and financial support once he was in Syria. He also took pains to make Trinidadian authorities believe he was not leaving Trinidad so they would not interfere with his efforts to provide material support to ISIS.  Importantly, before departing Trinidad, the Defendant would watch *The Flames of War* with his young children, a violent ISIS propaganda movie, which glorifies jihad and graphically depicts ISIS's atrocities including close-range executions.

The Defendant and his family then traveled to Brazil, and thereafter flew to Turkey undetected by Trinidadian authorities.  When they arrived in Turkey, the Defendant and his family stayed in Istanbul and then traveled to Gaziantep, Turkey, which was a common point of confluence for ISIS volunteer fighters from the West due to its proximity to the Syrian border. While in Gaziantep, the Defendant contacted ISIS members to arrange for travel across the Turkey-Syria border to join ISIS.  Shortly thereafter, the Defendant and his family were driven from Gaziantep to the Syrian border in a van. Once at the border the Defendant and his family, including small children, got out of the van and ran across the border into Syria on foot, and experience his children described as freighting and scary.  Upon their arrival into ISIS controlled territory, ISIS registered the Defendant and his family (and indicated that they arrived with $40,000 cash), who

6

thereafter joined a settlement in Manbij, Syria, where they lived while the Defendant awaited ISIS training.

Almost immediately, approximately one month after the family arrived in Syria, the Defendant started proposing ISIS fighters as suitors for his then thirteen-year-old daughter, despite her protestations that she was too young. Ultimately, in November 2016, when his daughter was fourteen years old, the Defendant found a twenty-one-year-old ISIS member for his daughter to marry, and to whom the Defendant's daughter could not refuse. When asked how she felt about her father forcing her to marry, the Defendant's daughter commented that life could not get any worse and that she believed she was going to die soon anyway. Incredibly, even her two brothers, were upset about this marriage, as both, even though they were children themselves, recognized that their sister was far too young to marry. The Defendant disagreed, however, stating that it was "good for the Islamic State to spread." Thereafter, upon being married, the Defendant's daughter became pregnant and gave birth to a son approximately fifteen months later, all while she was still a child.

From July through November 2015, the Defendant went to Raqqa, Syria, for ISIS religious and military training with other English speakers. That training included instruction on the operation of various automatic weapons such as the AK-47 assault rifle, PKC machine gun, and rocket-propelled grenade launcher. Following this training, Defendant was given an ISIS census number in the "12000" series - the series reserved for military enlistees. Defendant was also given boots, socks, and a gun barrel and made to register the M4 weapon he had personally acquired, according to the records ISIS prepared. In his conversation with the FBI, Defendant admitted to trafficking in weapons in Syria and expressed a preference for American weaponry.

After he completed military training, the Defendant was assigned to the Anwar al-Awlaki katibah (battalion) in Raqqa and received an ISIS identification card under the kunya (alias) of "Abu-Jihad al-Trinidad al-Amriki" or "Abu Jihad TNT."[3].  During this time, between September and November 2015, the Defendant's son, Jihad Mohammed Ali, then only 15 years old, began attending ISIS religious and military training in Raqqa, Syria, after which he also was assigned to the Anwar al-Awlaki katibah. In fact, in 2015, the Defendant considered his son Jihad smart enough to attend an ISIS sniper course taught in Raqqa, Syria, despite Jihad only being fourteen years old.  To do so, given the fifteen-year-old age requirement, the Defendant told his son to lie about his age in order to attend the course.

In Raqqa, the Defendant conducted reconnaissance and guard duty (in Arabic "rabhat") on behalf of ISIS, both of which were important ways for ISIS to protect its battalions and supplies from possible outside attack.  After he went out on a "gazwa," or a raid of an area in which women and money are sometimes taken as spoils, Defendant said he became ill, a claim Defendant's ISIS superiors viewed with skepticism.  Eventually, the Defendant was discharged from the Anwar al-Awlaki battalion for medical reasons, and he moved his family to another location in Raqqa, Syria, which had become the *de facto* ISIS capital.

Despite leaving active military duty, Defendant continued to contribute material support to ISIS and its economy while in Raqqa between about 2015 through 2017.  Importantly, during the

---

[3] The Defendant's kunya, or Arabic alias, which he admitted in his statement to the FBI. *First Statement*.  The Defendant's kunya of Abu-Jihad al-Trinidad al-Amriki, means that the person is the "Father of Jihad"—the Defendant's eldest son—and is "Trinidadian and American"—the Defendant's two nationalities. "TNT" is an apparent abbreviation of Trinidad & Tobago. In his statement, Defendant admitted that these variations of his kunya, or alias, were used to identify him in ISIS.

Defendant's time in Raqqa, the city was ruled by terror.  It was not uncommon to have public executions, hangings, and torture to ensure civilians' compliance with ISIS directives.  Although the Defendant was exposed to this horrendous conduct on a daily basis, the Defendant continued to support ISIS.  First, the Defendant worked in residential construction for ISIS.  The Defendant's construction work helped to create homes for ISIS members, including fighters and their families who occupied territories ISIS claimed from Syria.  Like others in ISIS who received housing to help the occupation, Defendant also received free housing from ISIS upon his arrival in Syria and his entry into ISIS military training.  In addition, the Defendant worked to create other buildings for ISIS operations.  To sustain its goals, ISIS had various other operations that required offices and locations, such as its various ministries. Defendant's building and rehabilitation of housing and other buildings for ISIS furthered ISIS's goals of controlling particular swaths of land.

Defendant also became a merchant, thereby supporting ISIS and its members.  Defendant began buying and selling livestock, cars, weapons, weapons accessories, and telephones to and from other ISIS members. As with other traditional military operations, such as the husbanding of vessels, the maintenance of armories, the operations and stocking of military bases, and the performance of logistics, this flow of commerce helped ISIS carry out its day-to-day affairs and advance its military and strategic interests in the region.

The Defendant also assisted ISIS's military goals by purchasing and selling weapons and weapons accessories to ISIS members to use in their fighting, often giving ISIS fighters weapons for free.  Defendant considered himself a quality weapons trafficker, preferring superior American-made accessories to those manufactured by China.  The Defendant also provided money remitting services to other Trinidadian ISIS fighters in Syria, serving as a "hawalder," or money transfer

broker, and he donated his own money to ISIS members to support the ISIS cause.  This flow of money to ISIS became increasingly important to ISIS's operations when ISIS began losing territory and was no longer able to pay stipends and salaries to incentivize ISIS fighters to stay on the job and not abandon the terrorist group.  The Defendant utilized his wealth to provide his money to ISIS when ISIS fell on hard times.  Specifically, the Defendant's daughter stated that when ISIS had difficulty paying monthly salaries to ISIS members (vital to ISIS's aim of running a functioning state project), it was the Defendant who paid those salaries.  Further, the profits from the Defendant's weapons trafficking and various other businesses were "given to Dawla" (a term referring to the Islamic State).  In sum, the Defendant provided money, vehicles, weapons, equipment, and tools to ISIS to help ensure its success.

Eventually, in late 2017, the Defendant left Raqqa with his family and moved to Mayadin, Syria, which had become the new headquarters for ISIS after the Coalition Forces retook Raqqa. While in Mayadin, the Defendant was assigned to an ISIS housing battalion, or katibah, and received an ISIS identification card. Consistent with ISIS's bureaucratic structure, the Defendant also received a monthly stipend or payment from ISIS in the amount of $35 US per adult and $28 US per child in his household. In addition, the Defendant was again provided ISIS housing.

In 2018, the Defendant moved his family to Hajin, Syria, where ISIS assigned him to construct a well to provide that ISIS community with potable water.  When ISIS came under attack in Hajin, the Defendant moved his family to Al-Shafah, Syria, where he ran a store that sold various goods.  While in Hajin, according to the Defendant, he donated some of the store's profits to other ISIS members, thereby furthering ISIS's goals.  Just as his construction assistance, and payments supported the flow of commerce, the Defendant's building of a well and operation of a general

10

store also supported ISIS by maintaining its economy and supporting its military operations, among other things. It also allowed ISIS to populate areas that had lost infrastructure in the war.

Between late 2018 and early 2019, after ISIS was targeted in Al-Shafah, Syria, the Defendant moved his family to Baghuz, Syria, the last ISIS stronghold before its collapse in 2019. In fact, in March 2019, just before his surrender on March 17, 2019, the Defendant urged other Trinidadian ISIS members to refuse to surrender to the Coalition Forces.  By his own admission, the Defendant did this in the hope that Coalition Forces would allow ISIS members to simply relocate, thereby continuing the conspiracy to provide material support to ISIS.  The Defendant further told his daughter that he did not want to leave ISIS because he stilled believed in "Aqida" or creed, and that he still wanted to live in the Islamic State.   In other words, the Defendant was a fervent ISIS member who sought to remain with the callous terrorist organization, no matter the ultimate cost.  The Defendant did admit, however, yet another reason for this late push to keep his fellow Trinidadians from surrender. He did not want to go to prison.

## V.      Imposing the Advisory Guideline Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The seriousness of the Defendant's offense conduct cannot be overstated.  In sum, from as early as March 2015 until his surrender in March 2019, the Defendant proactively supported the world's most violent and abhorrent terrorist organization.  The harm caused by the Defendant therefore comes in two forms: (1) the support of wide-scale terrorist atrocities, resulting in the violent deaths of innocent civilians; and (2) the acute harm the Defendant caused to members of his own family, particularly his minor children.

11

Before addressing those two forms of harm, it is important to note at the outset that the entirety of this harm was easily avoidable. As a successful businessman in Trinidad, the Defendant and his family enjoyed an above-average Trinidadian lifestyle. Moreover, the Defendant's decision to join ISIS was well thought-out, planned, and organized. Trinidadian ISIS fighters, like the Defendant, were unique ISIS foreign fighters in that they skewed to be older, wealthier, and more likely to bring their entire family with them to the Islamic State. *See* Cottee, Simon, *Black Flags of the Caribbean: How Trinidad Became an ISIS Hotspot*, I.B. Tauris, First Edition (March 25, 2021) at pages 37-38. This is so because Trinidad's geographic location required significantly more resources and planning than typical foreign fighters. *Id.* The Defendant therefore had to organize surreptitious transit from Trinidad to Brazil, thereafter to Istanbul, Turkey, where the Defendant and his family then took an additional flight to Gazientep, Turkey, eventually driving to the Turkey-Syria border to be smuggled to the Islamic State. To do so, the Defendant exhibited substantial forethought evidenced by his spending tens of thousands of dollars for airline flights, melting gold, setting up a financial service to obtain money in Syria, and buying numerous gifts for his children. The willingness to exert such an effort, in turn, reflected the Defendant's commitment to ISIS. The Defendant's extreme devotion to the terrorist organization thereafter ruined the lives of many, which clarifies the severity of the Defendant's conduct.

### a. The Well-Documented Atrocities Committed by ISIS[4]

ISIS was and is a horrific organization which presided over, for a period, a state project that inflicted monstrously cruel acts, including genocide on thousands, in addition to widespread

---

[4] The facts contained come from the anticipated expert testimony of Hassan Hassan, as discussed further below.

public executions, torture, and beheadings.  ISIS's brand of terrorism believes in and relies on violence as a way of establishing Islamic rule.  To do so, ISIS emphasizes savagery in the way it conducts its Jihad against those it deemed nonbelievers, Muslims and non-Muslims alike.  ISIS furthermore actively advertises its savagery and extreme violence online to instill fear in its enemies. Even relative to other extremist and radical groups, ISIS is perceived to be too extreme, so much so that even al-Qaeda felt it needed to distance itself from ISIS in early 2014.

The rigidity of ISIS's ideology also stands alone even in a jihadi landscape renowned for its rigidity. The group declared al-Qaeda leader al-Zawahiri to be an infidel because he sympathized with ousted Egyptian president Mohamed Morsi, who endorsed democracy. The Islamic State further promotes a political ideology and a worldview that actively classifies and excommunicates fellow Muslims and declares total war against non-believers.

More specifically, ISIS gained worldwide notoriety in 2013 and 2014 for its enslavement of hundreds of Yazidi women in Sinjar, the slaughter of at least 1,500 Shia soldiers in Tikrit and hundreds of Sunni tribesmen in Syria and Iraq, in addition to the beheading of Western hostages, Syrian and Iraqi civilians.

The Islamic State combines ideas such as loyalty to Islam and disavowal of un-Islamic ways and apostasy with a religious penal code to form a political ideology and a worldview actively classifying and excommunicating fellow Muslims.  In total, ISIS has killed and advertised in its various media outlets the killing of tens of thousands of civilians and other alleged non-believers. Through its global Islamic State project from 2014-2019, ISIS proactively declared war against all governments who did not pledge allegiance to ISIS and thereafter attempted to conduct global terrorism against all its enemies, including dozens of Western governments.  In sum, ISIS was and

13

is a terrorist organization like no other, unique in its rigidity, and more importantly, its extreme violence. The Defendant's robust support for such an organization enabled its sustained success for years and therefore caused incalculable harm to world.

### b. Expert Testimony of Hassan Hassan

There is ample evidence to show that the Defendant was well placed in the ISIS aristocracy and an important ISIS member and supporter. Much of that evidence, however, requires context and expert knowledge of ISIS's organization and structure. To provide such context, the Government intends to call ISIS expert Hassan Hassan to assist the Court in fully understanding the severity of the Defendant's conduct.

### i. Mr. Hassan's Qualifications

Hassan Hassan is the current Director of the Human Security Unit, Newslines Institute for Strategy and Policy and the current Editor-in-Chief of Newslines Magazine. Mr. Hassan is from Syria, where he received his B.A. in English Language & Literature from the University of Damascus. Mr. Hassan thereafter received his M.A. in International Relations from the University of Nottingham, School of Politics and International Relations. Mr. Hassan is also the Director of the Non-State Actors in Fragile Environments Program at the Center for Global Policy in Washington, D.C. where he focuses his work on developing U.S. foreign policy for foreign terrorist organizations including ISIS.

Importantly, Mr. Hassan is the co-author of *ISIS: Inside the Army of Terror* (with Michael Weiss), a critically acclaimed book on the New York Times bestsellers list and selected as one of the Wall Street Journal's top ten books on terrorism. Mr. Hassan's writings on terrorism and ISIS have also appeared regularly in *The Atlantic, Foreign Policy, The Guardian, Foreign Affairs, New*

14

*York Times, the Daily Beast, Financial Times*, as well as various academic and policy publications. Mr. Hassan also conducts training on extremism and the Middle East at various U.S. government agencies, including the Foreign Service Institute, and has previously testified before Congress.

### ii.    Mr. Hassan's Proffered Testimony

### 1.    The Defendant's Vital Role in Supporting ISIS

Mr. Hassan will testify that the Defendant was a vital ISIS member who provided critical resources that contributed to ISIS's sustained success.  As the Defendant's children stated, the Defendant was well known within ISIS and always had lots of money.  With that money, the Defendant provided ISIS various services.  For example, he bought and sold cars, weapons, equipment, and tools for ISIS, and upgraded those weapons by adding different parts, like putting scopes on rifles for ISIS's benefit.

Mr. Hassan will also testify that someone like the Defendant was not your typical ISIS foreign fighter.  Instead, as a wealthy businessman who contributed significantly to the ISIS cause, the Defendant enjoyed an elevated status within ISIS.  For example, the Defendant personally knew several Amirs ("ruler") within ISIS.  In fact, the Defendant often met with the Amir of Raqqa (ISIS's capital), who visited the Defendant's home several times.  Mr. Hassan will testify that this is incredibly uncommon for a typical foreign fighter, many of whom would never know the identity of the Amir, let alone have access to him, and is clear evidence of the Defendant's membership amongst the ISIS elites.  Further, the Defendant's daughter stated that the Defendant met with the Amir of Baghuz almost daily, who would come by the Defendant's tent and seek his counsel. Again, Mr. Hassan will testify about the extraordinary significance of such meetings, which

evidence that the Defendant was well-trusted within ISIS and had a substantial role within the organization.

Finally, Mr. Hassan will also testify that the Defendant's wealth and status within ISIS made it exponentially easier to flee.  The mere fact that the Defendant had numerous vehicles made this true, as driving straight to the Turkish border was not uncommon.  The Defendant's wealth also made it easier to pay smugglers to remove him and his family from the Islamic State, with the Defendant's daughter acknowledging that the Defendant had sufficient money to pay smugglers to remove the family but choose not to.  In fact, some estimates state that approximately 20-40% of ISIS foreign fighters return to their country of origin, after seeing the atrocities being committed. The Defendant rejected those opportunities.    Instead, the Defendant, despite the atrocities occurring around him and the terrorism he saw daily, ultimately decided that the ISIS mission was one to support, revealing his sincerest beliefs.

### 2.   ISIS Foreign Fighters: "ISIS's Greatest Commodity"

In addition to financing ISIS, the Defendant also provided himself, and his two oldest sons as foreign fighters for ISIS, which Mr. Hassan will explain was "ISIS's greatest commodity." Simply put, without foreign fighters, ISIS would not have been nearly as successful.  In fact, foreign fighters were perceived as more loyal, as the great lengths these individuals went through to travel to the Islamic State evidenced a "true belief" in ISIS's desire to establish an Islamic State under Sharia law and topple all non-believers.  This is particularly true for Trinidadian foreign fighters (like the Defendant) as travel from Trinidad to Syria required significant wealth and planning, and thus was not a decision made haphazardly or without true belief in the ISIS mission. Hence various jihadi organizations fought over foreigners, because they were well aware of their

16

usefulness and dedication, particularly for a violent organization like ISIS, who often used foreigners to fight on the front lines and perform suicide missions. Foreign fighters therefore often comprised ISIS's elite military forces, due to their extreme loyalty.

Foreign fighters were thus at the core of the organization and were critical to the original establishment of the Islamic State. In fact, foreign fighters dominated ISIS in its early stages, comprising approximately 40% of the organization. That number only increased as time went on, as foreign fighters proved their loyalty and remained within the organization until its very end, making up as much as 50% of ISIS in early 2019.

Finally, foreigners, like the Defendant and his family, were also vital to ISIS as they could provide various other services like media and language expertise or financing. Wealthy English-speaking foreigners, like the Defendant, were therefore critical to ISIS's success, and facilitated immeasurable death and violence through their continued support.

### c. The Defendant's Harm to his Minor Children

When the Defendant decided to travel half-way across the globe to join ISIS, he uprooted his entire family and took his six minor children with him (Jihad Ali: 14 years old in March 2015, S.N.A.: 12 years old, step-daughter S.A.: 11 years old; I.A.: 10 years old, E.A.: 5 years old, Z.A.: 3 years old).[5] To do so, the Defendant lied to his children and told them they were going on vacation, and bought expensive gifts for them for the trip. Ultimately, the Defendant's conduct most directly harmed these children. The harm manifested itself in different ways, either by being

---

[5] All of the ages listed here are as of March 2015.

turned into ISIS child soldiers, being forced to marry an ISIS fighter, or by being killed in the Syrian warzone. The Government addresses each of these harms below.

### i.     The Defendant Turns his Two Oldest Sons into Child Soldiers

Shortly after the family's arrival in Syria, the Defendant attempted to send his son Jihad Ali to ISIS sniper training, instructing him to lie about his age, in order to meet the training's fifteen-year-old age requirement. Thereafter, when he became fifteen, Jihad Ali participated in full ISIS military training, that included training on the operation of various weapons including the AK-47 assault rifle, PKC machine gun, and rocket-propelled grenade launcher and eventually became a child soldier for ISIS, who was assigned to the English-speaking Anwar al-Awlaki katibah. For his conduct as an ISIS fighter, which included fighting on behalf of ISIS after he turned eighteen, Jihad Ali was convicted of conspiring to provide material support to ISIS and was sentenced to a statutory maximum of five years imprisonment.[6] *United States v. Jihad Ali*, Case No. 21-20109-KING/BECERRA. The following contains additional facts from Jihad Ali's factual proffer:

> In or around the summer of 2018, in Shamiyah, Syria, the Defendant conducted a mission on behalf of ISIS to retrieve a suitcase containing laptops and supplies left inside a house. Thereafter, while departing from Shamiyah, Syria with the suitcase, the Defendant fired his AK-47 assault rifle at ground forces attacking ISIS from a street outside of the house.
>
> In or around 2018, in Gharanij, Syria, the Defendant fired his weapon on behalf of ISIS against U.S.-led coalition forces and against a local tribe that opposed ISIS and at a different time, the Defendant fired his weapon in the air at a U.S. coalition force A-10

---

[6] In Jihad Ali's case, the Government agreed to charge Jihad Ali with a five-year statutory maximum sentence, to account for his father's much more significant culpability in bringing Jihad Ali to Syria at such a young age.

aircraft.  At some point during 2018, while still living in Gharanij, Syria, the Defendant became an Idari (manager) of supplies for an ISIS battalion after he was appointed by the battalion's Emir (leader).

Thereafter, between November 30, 2018, and on or about March 17, 2019, while in Baghuz, Syria, the last ISIS stronghold before ISIS's defeat in Syria, the Defendant fought on behalf of ISIS, firing his weapon against U.S.-led coalition forces.

*See United States v. Jihad Ali*, Case No. 21-20109-KING/BECERRA [ECF No. 33].

The Defendant's second eldest son, I.A., followed a similar path.  Two years after their arrival in Syria, I.A. attended military training in 2017, when he was approximately twelve years old, only to be kicked out of training for unknown reasons, potentially because he was too young. That said, I.A. eventually completed military training and was assigned to various katibahs as another ISIS child soldier.

In order to fully understand how the Defendant's conduct caused his two sons significant trauma in Syria, the Court will hear the children describe it themselves.  While the two boys were actively fighting the "kafir," or non-believers, as they themselves described them, both boys were simultaneously communicating with their mother, L.M., who remained in Trinidad.   The WhatsApp Communications were captured and saved on L.M.'s cell phones.[7]  The Government intends to play nineteen (19) WhatsApp voice messages between the boys and their mother at the upcoming sentencing hearing.  These WhatsApp voice messages show what life was truly like for them in Syria, and even detail I.A.'s first ISIS battle, during which he was crying, as he was just thirteen-years-old.

---

[7] On June 17, 2019, and January 21, 2020, U.S. law enforcement interviewed L.M. in Trinidad, and on both occasions, L.M. gave law enforcement consent to search her phones.

**July 13, 2018: Jihad Statements**

| # | File Name | Date and Time | Transcript |
|---|---|---|---|
| 1. | PTT-20180713-WA0026.opus | 7/13/2018 3:28 pm | Jihad: "No, no, no, that train [UI] a little bit because dawla wasn't really fighting and thing so they sent all their soldiers just to train so right now nothing is going on no more no more training and thing." |
| 2. | PTT-20180713-WA0029.opus | 7/13/2018 3:32 pm | Jihad: "Right now its real problems, its uh, right now Dawla don't have no money, right now we ain't even getting food, even if you have money right now you can't buy nothing, cause they have nothing in all the stores, right now we really going through a dred, nothing you know, but I think its going to get worse because we can't organize to come into the last place we have ready and its kind of bomb out the other, the other places real dred bomb out and make far and real doing it different." |
| 3. | PTT-20180713-WA0036.opus | 7/13/2018 3:39 pm | Jihad: "Just the other day we went we we tried to do an attack into into over the river [UI] Shaam side nuh, but we went I went out with Islam, this is Islam first imtihan ("test") I went with him.  Watch now, it was real crazy, we had to, way, real mad, if you see what go on.  It was real dred, Islam started to cry all kinda thing, when the plane come, you know? And afterward we have to swim across the river, Alhamdulillah, we get through, we get through you know, it was good first experience, you know? |
| 4. | PTT-20180713-WA0037.opus | 7/13/2018 3:39 pm | Jihad: "[UI] it was a little while ago, I think the 17th of Ramadan or 18th or something like that, it was, it was in Ramadan, it was the 20th, I forget what date it was, but it was in Ramadan." |
| 5. | PTT-20180713-WA0038.opus | 7/13/2018 3:40 pm | Jihad: "Yeah yeah, he normal, that was real long mommy, he normal, after 30 minutes when he get out of there he feeling real good." |
| 6. | PTT-20180713-WA0039.opus | 7/13/2018 3:40 pm | Jihad: "yeah real people get hurt, injured, shaheed inshallah, real people get killed, real people, even when we was going we was going across the boat get bombed, all kinds of thing, real mad, and then we trying to come back, all the boats getting bombed, we had to swim across with a tube, tire, all kinds of thing.  Fast we had to run out of there." |
| 7. | PTT-20180713-WA0040.opus | 7/13/2018 3:42 pm | Jihad: "No, no, no, we normal, we good" |

| # | File Name | Date and Time | Transcript |
|---|---|---|---|
| 8. | PTT-20180713-WA0041.opus | 7/13/2018 3:42 pm | Jihad: "Just the man, the brother who I was staying with in Mayadin, remember when we was renting, we was staying in the house together, he get a little injured in the foot, but it's a small thing." |
| 9. | PTT-20180713-WA0042.opus | 7/13/2018 3:42 pm | Jihad: "other brothers, everybody else, you wouldn't know them, who get killed, and all kinda thing, it's a real real plenty different khattibas, so plenty of people, you know?" |
| 10. | PTT-20180713-WA0043.opus | 7/13/2018 3:43 pm | Jihad: "yeah, brother Aleem, mommy you forget, all Trinidadians don't fight, so them don't get killed mommy, only people who going and fighting get killed, Aleem and all of them make car bombs and all kinds of things, only the only fighters is Zayid, me, Islam, right now it has no set of fighters, no Trinidadian fighters, except Zayid, we with Zayid even in when we was in the, when we get surrounded in that next village for like three months or something, back when we didn't talk to you, we was in a city surrounded called Gharanij, and afterwards when we come out, at the end it wasn't this on the other side, a big city, maybe like 3,000 people get surrounded with we and um, we was fighting, we was with Zayid, then we come out, and all of we join a katibah, you know?  It was a host of English men you know? |
| 11. | PTT-20180713-WA0044.opus | 7/13/2018 3:46 pm | Jihad: "Yeah mommy, everything normal, but this, we have to make dua and see whats the end goal, I hope its jannah, inshallah." |

**September 21, 2018: Jihad Statement**

| # | File Name | Date and Time | Transcript |
|---|---|---|---|
| 12. | PTT-20180921-WA0019.opus | 9/21/2018 19:07 | Jihad: "Already did the attack now, they attack we where we was living close to the frontlines now, and everything was going crazy and kuffar attacking and then we mix up, I wasn't even studying what date before I would have been normal when kuffar attack before but now we have Neema and we have to move she out and then now its more different nuh, so that why I hadn't study what date and time, even last night we was moving she out, whole night we was taking stuff and moving nuh, that why I went to sleep late and I end up getting up about real late today." |

**September 23, 2018: Jihad Conversation Regarding Martyrdom**

| # | File Name | Date and Time | Transcript |
|---|-----------|---------------|------------|
| 13. | PTT-20180923-WA0010.opus | 9/23/2018 2:18 pm | Unknown: "Honestly speaking, ever since you know, all is love and all of you keep pleasant, its nice to hear all of your voice and thing, in these times and, honestly speaking, you know, we just had to be patient and I know some things are stiff out there but got to be patient and know that for a fact that you are in a better place than we are and in the life that Allah choose, and you know, we hope that he choose to make martyrs for him amongst all of us but know that you know, as I say nothing was left behind here of any significance, so honestly you know a reminder of the importance of all you men to the Umma because the fact is that if there was nobody doing this thing and establishing Islam and defending Islam as it truly is against the kuffar then it would be something compulsory upon all of us but once it has a group doing it, so no doubt, know the importance of all of you out there and the fact that all of you bringing a benefit to us and removing a harm from befalling us, no matter how many people might think and say that all of you actually bringing harm upon the Umma and know that I know different and always will love all of you, I am missing all of you, being the life that Allah created that we could meet in this world again, hope that we can meet in green birds under the arch of Allah." |
| 14. | PTT-20180923-WA0011.opus | 9/23/2018 2:40 pm | Jihad: "Yeah boy yeah boy [UI] right now well, you know it does go, right now we are in a little box, you know? Inshallah, right now they coming, right now they coming to one zone where we was real we was functioning now boy, so right now we getting ready to jazz up and look to hit again, inshallah sheen shallah, make dua for we inshallah." |
| 15. | PTT-20180923-WA0012.opus | 9/23/2018 2:40 pm | Unknown: "[UI] again you know as they say the best we can do is give advice at this point in time, inshallah, martyrdom or victory boy, the two best outcomes ever possible so nothing is a loss for y'all, where I, where we here we still have a lot of losses we could incur but nothing is a loss for y'all. Allah is going to make it easy and grant y'all the victory because at the end of the day we know the reality of Islam as it really should be, without doubt, lies in the hands of the Caliph and those who are there striving in the frontlines. No matter how much support all over the world if it is that is not being done, it's until it is be in come pass, everything will really be doing what we should do. So, I'll send my number for you inshallah [UI] after the victory that Allah gives y'all and know when y'all go out you could |

always, you know, liaise and talk as we used to, I'm glad to hear from y'all, hamdulillah."

**December 20, 2018: Jihad and Ms. Mohammed Discuss Islam's Whereabouts and Katibah Membership**

| # | File Name | Date and Time | Transcript |
|---|-----------|---------------|------------|
| 16. | PTT-20181220-WA0000.opus | 12/20/2018   4:46 am | Jihad: "As-alaykum mommy, this Jihad, whats the scene?  Whats going on?" |
| 17. | PTT-20181220-WA0009.opus | 12/20/2018 11:13 | Jihad: "What is going on with you, with everybody, what is going on with Islam, to be honest Amir we think he say he want to kick Islam out of the katibah, they find some porn on the phone and all kind of thing, I don't know what is going on, I ain't see him, I'm looking for him to find him back, but I can't find him at all" |
| 18. | PTT-20181220-WA0011.opus | 12/20/2018 11:14 | Ms. Mohammed: "Yeah, you better find him and talk to him and get that straighten out because if he gets kicked out from there where he going?  What is going to happen to him?" |
| 19. | PTT-20181220-WA0012.opus | 12/20/2018 11:15 | Jihad: "No, no, no, dulah will send him to the next katibah but then he won't be with me, that is the problem, I'm trying to talk, I tell the Amir everything, you know I want to see whats the scene, I don't know, I'm going to talk to them inshallah, but I have to find him, I want the number." |

The traumatic experiences were not just limited to the battlefield, however.  Rather, due to the Defendant's conduct and his commitment to ISIS, the Defendant's children also suffered immeasurable harm in their day to day lives.  Jihad Ali, for example, provided a list of at least nine bodies he helped bury in Baghuz, Syria, including the body of his infant brother.  The children also suffered from other effects of living in an active battlefield, including limited food and running water, in addition to dead bodies and destruction all around them.  No child should have to experience such trauma, particularly when such trauma was avoidable and unnecessary.  The Defendant's conduct, driven by his loyalty to ISIS, therefore inflicted significant trauma on his family and he thus must be held appropriately accountable.

23

####   ii.   The Defendant Forces his Fourteen-Year-Old Daughter to Marry an ISIS Fighter

While the Defendant was offering up his older sons as ISIS fighters, the Defendant was simultaneously offering his fourteen-year-old daughter (within one month of their arrival to Syria) as a potential wife for ISIS suitors.  Ultimately, the Defendant forced his daughter, despite her protestations that she was too young, to marry a twenty-one-year-old ISIS fighter, with whom she had a child when she was approximately fifteen years old.  After giving birth to her son, the Defendant's daughter was sent home from the hospital after approximately one hour.  Further, the Defendant's daughter suffered violent abuse in this marriage, but lamented that her husband was at least better than other potential ISIS suitors.  As a result of her traumatic experiences, the Defendant's daughter understandably concluded that she hated her father for bringing her to Syria.

Expert Hassan Hassan will provide further context establishing the significance of this conduct.  Specifically, Mr. Hassan will testify that the Defendant's provision of his 14-year-old daughter as a potential wife to ISIS fighters served several purposes.  First, it ingratiated the Defendant within the organization, confirming his unwavering loyalty to ISIS, so much so that he was willing to offer his own daughter to the cause.  By offering his own daughter, the Defendant demonstrated his commitment to ISIS, as his daughter will thereafter be part of the organization and the wife of potential individuals who would go on to kill or provide other services to ISIS.  Second, it helped ISIS achieve one of its central aims – build a community and provide proof of its ability to govern.  By marrying off his daughter, who shortly thereafter had a child, ISIS continued to strengthen and build the community it envisioned.  Finally, the provision of foreign wives to ISIS was central to ISIS foreign fighter recruitment propaganda.  ISIS relied on offers of

numerous wives (many enslaved Yazidi women) to convince foreigners to travel and join their cause.   Without them, ISIS's recruitment efforts would have suffered substantially.   The Defendant's provisions of his daughter, while abhorrent by itself, therefore served several other of the Defendant's selfish aims in supporting ISIS and needs to be appropriately punished and deterred in the future.

### iii.    The Defendant's Two Children Die During the War Against ISIS

Finally, and most tragically, the Defendant's support of ISIS caused the death of two of his children, his step-daughter S.A. in Baghuz, Syria and his son Essa Ali, who was still an infant at the time, and was buried by his father and brother in Baghuz, Syria.  Again, such outcomes were easily predictable despite being tremendously avoidable.  The Defendant's conduct, however, due to his unyielding allegiance to ISIS caused his children to move from their homeland to war-torn Syria, to support ISIS's fight against Western governments, a war they were forced by the Defendant to join.  Such conduct and corresponding tragic outcomes, specifically the preventable death of two young children, require this Court to impose the advisory guideline sentence.

## VI.    The Need to Afford Adequate Deterrence and Avoid Unwarranted Sentencing Disparities

Given the extremely serious nature of this case, which has been followed in this district, nationwide, and around the world, particularly in Trinidad and Tobago, the general deterrence value in imposing a sufficient sentence is significant.  Despite Trinidad having the highest rate of ISIS foreign recruitment in the Western hemisphere[8], the Defendant is the sole Trinidadian

---

[8] *See* Cottee, Simon, *ISIS in the Caribbean*, The Atlantic, December 8, 2016, available at https://www.theatlantic.com/international/archive/2016/12/isis-trinidad/509930/. (finding that Trinidad, with a population of 1.3 million is at the "top of the list of Western countries with the

prosecuted in the United States for providing material support to ISIS.  It is therefore imperative for this Court to seek to deter any individuals, but particularly those so close to our border, from considering joining extremist organizations like ISIS.  In other words, no would-be ISIS supporter, who is considering contributing to the ISIS cause should ever believe that support for such a reprehensible organization would earn them anything less than a twenty-year term of imprisonment.  This is particularly true for an individual, like the Defendant, who executed his plan to join ISIS, fought on its behalf in Syria, provided his children in support of the ISIS cause, and only surrendered when left with no other choice.

A twenty-year term of imprisonment also avoids sentencing disparities as it is consistent with other sentences issued by this Court in similar cases.  Below is a summary of such sentences.

| Case Name | Charges | Summary of Conduct | Sentence |
|---|---|---|---|
| *United States v. Qazi*, Case No.: 12-60298-CR-Bloom | 18 U.S.C. 2332a(a) 18 U.S.C. 2339B 18 U.S.C. 371 | Two South Florida brothers (Raees Alam Qazi and Sheheryar Alam Qazi) who ***conspired and attempted*** to conduct a bomb attack to retaliate for the killing of an al-Qaeda cleric in a United States missile strike | 35 years and 20 years imprisonment, respectively |
| *United States v. Mohammed & Said*, Case No.: 13-20364-CR-Ungaro | 18 U.S.C. 2339B | Two al-Shabaab operatives for ***conspiring and attempting*** to raise funds and recruits for al-Shabaab in Somalia and al-Nusrah Front in Syria | 15 years for both Defendants |
| *United States v. Suarez*, Case No.: 15-10009-CR-Martinez | 18 U.S.C. 2332a(a) 18 U.S.C. 2339B | Key West resident who ***attempted*** to detonate a bomb on a crowded beach and to recruit other individuals to join ISIS. | Life Imprisonment |

highest rates of foreign-fighter radicalization" and is "by far the largest recruitment hub in the Western Hemisphere.")

| | | | |
|---|---|---|---|
| *United States v. Medina*, Case No.: 16-20349-CR-Scola | 18 U.S.C. 2332a(a) 18 U.S.C. 247 | Miami resident who **_attempted_** to bomb an Aventura synagogue and damage a religious structure with the intent to kill. | Originally life imprisonment but later amended to 25 years imprisonment, followed by 20 years of supervised release |
| *United States v. Solano*, Case No.: 17-20781-CR-Huck | 18 U.S.C. 2332a(a) | Honduran immigrant who **_attempted_** to provide material support to ISIS through a plot to detonate a bomb at the Dolphin Mall. | 17.5 years imprisonment followed by lifetime supervised release |
| *United States v. Baptiste*, Case No. 18-20613-CR-Martinez | 18 U.S.C. 2339B | South Florida resident who posted bomb-making equipment on an online platform and encouraged others to carry out an ISIS attack. | 15 years imprisonment (consecutive to 6.5 year prior conviction for felon in possession of firearm (Case No. 16-20907-CR-Cooke)) |
| *United States v. Arcila Ramirez*, Case No. 19-20036-CR-Martinez | 18 U.S.C. 2339B | South Florida resident who had straw purchasers obtain firearms and ammunition that the Defendant later shipped to Colombia and resold to the National Liberation Army ("ELN") | 20 years imprisonment |

The Defendant's conduct here is far worse than these similar cases in that the Defendant active joined ISIS in Syria and supported their terrorism for approximately four years.  Issuing the advisory guideline sentence here therefore ensures unwarranted sentencing disparities and accurately accounts for the totality of the Defendant's conduct.

## VII.    The Need to Protect the Public from Further Crimes of the Defendant

The evidence discussed above and to be presented at the sentencing hearing will unequivocally establish that the Defendant is deeply committed to the ISIS cause – to engage in global terrorism to convince Western governments to retreat from the Muslim world and ultimately establish an Islamic state.  That commitment does not wane easily.  In fact, being prosecuted and incarcerated by the United States has the potential to further exacerbate the Defendant's perceived grievances against Western governments.  This is particularly true when the Defendant will remain

27

in the United States upon his release and has shown the ability to acquire the financial means to cause significant damage.  In other words, the Defendant's danger to the community upon his release is significant and requires the advisory guideline term of imprisonment to protect the public from further crimes of the Defendant.

## VIII.   *United States v. Arcila Ramirez*, 16 F.4th 844 (11th Cir. 2021)

Although the parties and the U.S. Probation Office agree that U.S.S.G. § 3A1.4's terrorism enhancement applies, the Eleventh Circuit requires this Court to make factual findings that the Defendant's offense "was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive." *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021).  Such a finding will be amply supported by the evidence presented at the upcoming sentencing hearing and will be primarily based on: (1) ISIS expert Hassan Hassan's testimony regarding ISIS's founding, aims, purpose, and the Defendant's corresponding support; and (2) *The Flames of War*, the ISIS propaganda video the Defendant admitted to viewing prior to traveling to Syria.

### a.   Expert Hassan Hassan will Demonstrate that the Defendant's Conduct, and ISIS's Entire Aim, Was Planned to "Influence, Affect, and Retaliate Against Government Conduct"

Mr. Hassan will explain that ISIS's primary mission was to "influence, affect, and retaliate" against Western governments, primarily the United States.  ISIS ideology believes that the problems of Muslims are caused by the West, and that the United States is the leader in that effort. ISIS therefore believes that the United States, including its citizens, is the ultimate enemy, and they therefore see the United States as the source of all their problems.  When ISIS thus established the Islamic State, and thereafter declared war against dozens of Western governments, it was a

28

direct retaliation against government conduct.  Their efforts in ensuring the Islamic State thrived (through violent terrorism among other means) and was a functioning government, was inherently to influence and affect government conduct.  Thus, the Defendant enduring support for ISIS and its efforts, undoubtedly satisfy the *Arcila Ramirez* standard.

> **b.  *The Flames of War***

The Defendant's state of mind prior to traveling to Syria also shows that he intended to "influence, affect, and retaliate against government conduct."  In September 2014, ISIS's Al Hayat Media Center released *The Flames of War*, a nearly hour-long propaganda video aimed at English-speaking Western recruits, like the Defendant, to join and fight for ISIS.  *The Flames of War* appeared shortly after then-President Obama announced a new military campaign against ISIS, showing images of President Obama and ISIS combat operations, focusing on ISIS military victories, and emphasizing the importance of foreign fighters joining the ISIS cause.  As ISIS expert Hassan Hassan will testify, ISIS used *The Flames of War* and other similar high quality, professionally made videos as influential and critical tools to recruit foreigners, particularly English-speaking fighters, to join and materially support ISIS.

At the upcoming sentencing hearing, the United States will only play the first four minutes of the 55-minute video.  The United States intends to play this excerpt because the initial four minutes of *The Flames of War* serves an introduction of what follows and provides as a summary of the video's message without the video's more gruesome violence.  While the United States will admit the video in its entirety, should the Court seek to better understand ISIS's and the Defendant's aims, the first four minutes will serve as a sufficient basis to show that certainly ISIS

(and thus inherently the Defendant) planned "to influence, affect, or retaliate against government conduct", in particular U.S. government conduct.

The Defendant discussed watching *The Flames of War* prior to leaving Trinidad during one of his statements to United States law enforcement. Specifically, Defendant discussed some of *The Flames of War* talking points about Western media, stating, "there was a lot of propaganda from the West, about what they, what they portray about the Islamic State" and that he believed that ISIS was "on the right path at that time." The Defendant further said it was widely believed then that "the West they don't like Muslims, and they, they will always fight against you," which he accurately confirmed is portrayed in *The Flames of War*. In addition, the Defendant's daughter stated that the Defendant played *The Flames of War* for his children before bed prior to leaving Trinidad.

Finally, the United States does not seek to play any additional excerpts because *The Flames of War* is an extremely graphic video that includes close range executions and footage of dead bodies covered in blood. The United States therefore choose this excerpt, in conjunction with expert witness testimony, to satisfy the *Arcila Ramirez* standard.

30

## IX.    CONCLUSION

Ultimately, the Court must evaluate the totality of the Defendant's conduct to determine an appropriate sentence.  By that measure, the Defendant has unequivocally demonstrated that he was a devout ISIS supporter, who dedicated everything, including the wellbeing and safety of his own children, to support an abhorrent terrorist organization.  Such conduct had catastrophic and immeasurable consequences for the world and therefore merits a significant sentence.  For these, and all the reasons discussed herein, the Government respectfully requests the Court to impose a sentence of 20 years' imprisonment, followed by a life term of supervised release.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:    s/ *Jonathan D. Stratton*
       JONATHAN D. STRATTON
       ASSISTANT UNITED STATES ATTORNEY
       Florida Bar No. 0093075
       99 Northeast 4th Street
       Miami, Florida 33132-2111
       Tel: (305) 961-9151
       Email: jonathan.stratton@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the

Clerk of Court using CM/ECF, and that the foregoing document is being served this day on all

counsel of record via Notices of Electronic Filing generated by CM/ECF.


<u>s/ *Jonathan D. Stratton*</u>
JONATHAN D. STRATTON
Assistant United States Attorney